# EXHIBIT "A"

# EXHIBIT "A"

**EXECUTION VERSION**



==============================================================================
==============================================================================

## DEBTOR IN POSSESSION CREDIT AGREEMENT

among

**AUBURN ARMATURE, INC.,**
**EASA ACQUISITION I, LLC,**
and
**EASA ACQUISITION II, LLC**
*collectively, as Borrower*

and

**KEYBANK NATIONAL ASSOCIATION**
*as Collateral Agent and Lender*

_____

**dated as of**
**MAY 23, 2017**

_____

==============================================================================
==============================================================================

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................. 2
   1.1      Definitions. ......................................................................... 2
   1.2      Accounting Terms. ............................................................. 19
   1.3      Terms Generally. ............................................................... 19
   1.4      Confirmation of Recitals. .................................................. 19

ARTICLE II AMOUNT AND TERMS OF CREDIT .......................... 19
   2.1      Amount and Nature of Credit. ............................................ 19
   2.2      Revolving Credit. ............................................................... 20
   2.3      [Reserved] ......................................................................... 20
   2.4      [Reserved] ......................................................................... 20
   2.5      Interest. .............................................................................. 20
   2.6      Evidence of Indebtedness. ................................................. 21
   2.7      Notice of Credit Event; Funding of Loans. ....................... 21
   2.8      Payment on Loans and Other Obligations. ........................ 22
   2.9      Prepayment. ....................................................................... 22
   2.10     Commitment and Other Fees; Reduction of Commitment. .................... 23
   2.11     Computation of Interest and Fees. ..................................... 23
   2.12     Mandatory Prepayments and Repayment. ......................... 23
   2.13     Liability of Borrower. ........................................................ 24

ARTICLE III ADDITIONAL PROVISIONS RELATING TO  INCREASED CAPITAL;
TAXES ..................................................................................... 24
   3.1      Requirements of Law. ........................................................ 24
   3.2      Taxes. ................................................................................ 25

ARTICLE IV CONDITIONS PRECEDENT .................................... 27
   4.1      Conditions to Each Credit Event. ...................................... 27
   4.2      Conditions to the First Credit Event. ................................. 27

ARTICLE V COVENANTS ............................................................. 30
   5.1      Insurance. .......................................................................... 30
   5.2      Retention of Consultant; Commercial Financial Audits and Appraisals. .......... 31
   5.3      Financial Statements and Information. ............................... 31
   5.4      Financial Records. ............................................................. 33
   5.5      Franchises; Change in Business. ........................................ 34
   5.6      ERISA Pension and Benefit Plan Compliance. ................. 34
   5.7      [Reserved] ......................................................................... 34
   5.8      Borrowing. ........................................................................ 34
   5.9      Liens. ................................................................................. 34
   5.10     Regulations T, U and X. .................................................... 35
   5.11     Investments, Loans and Guaranties. .................................. 35
   5.12     Merger and Sale of Assets. ................................................ 35
   5.13     Acquisitions. ..................................................................... 35
   5.14     Notice. ............................................................................... 35

{6741987:7}

i

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 5.15 | Restricted Payments. | 36 |
| 5.16 | Environmental Compliance | 36 |
| 5.17 | Affiliate Transactions. | 36 |
| 5.18 | Use of Proceeds. | 36 |
| 5.19 | Corporate Names and Locations of Collateral. | 37 |
| 5.20 | Limitation on Creation of Subsidiary. | 37 |
| 5.21 | Property Acquired Subsequent to the Closing Date and Right to Take Additional Collateral. | 37 |
| 5.22 | [Reserved] | 37 |
| 5.23 | Amendment of Organizational Documents; Prepetition Obligations. | 37 |
| 5.24 | Collateral. | 38 |
| 5.25 | Further Assurances. | 39 |
| 5.26 | Communications with Professionals. | 39 |
| 5.27 | Executory Contracts. | 40 |
| 5.28 | Limitation on Creation of Bank Accounts. | 40 |
| 5.29 | Bankruptcy Case. | 40 |
| 5.30 | Cash Management Arrangements; Depositary Arrangements. | 40 |
| 5.31 | Severance Payments. | 41 |
| 5.32 | Maximum Disbursements. | 41 |
| 5.33 | Minimum Sales. | 41 |
| 5.34 | Chief Restructuring Officer. | 41 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES | 41 |
| 6.1 | Corporate Existence; Subsidiaries; Foreign Qualification. | 41 |
| 6.2 | Corporate Authority. | 42 |
| 6.3 | Compliance with Laws and Contracts. | 42 |
| 6.4 | Litigation and Administrative Proceedings. | 42 |
| 6.5 | Title to Assets. | 43 |
| 6.6 | Liens and Security Interests. | 43 |
| 6.7 | Tax Returns. | 43 |
| 6.8 | Environmental Laws. | 43 |
| 6.9 | Locations. | 43 |
| 6.10 | Continued Business. | 43 |
| 6.11 | Employee Benefits Plans. | 44 |
| 6.12 | Consents or Approvals. | 44 |
| 6.13 | [Reserved] | 44 |
| 6.14 | Budget. | 44 |
| 6.15 | Regulations. | 44 |
| 6.16 | Material Agreements. | 44 |
| 6.17 | Intellectual Property. | 45 |
| 6.18 | Insurance. | 45 |
| 6.19 | Deposit Accounts. | 45 |
| 6.20 | Accurate and Complete Statements. | 45 |
| 6.21 | Investment Company; Other Restrictions. | 45 |
| 6.22 | Defaults. | 45 |

# TABLE OF CONTENTS

**Page**

6.23     Existing Indebtedness. .................................................................................... 45

ARTICLE VII EVENTS OF DEFAULT ......................................................................... 45

7.1     Payments. ........................................................................................................ 45
7.2     Covenants. ....................................................................................................... 46
7.3     Representations and Warranties. ..................................................................... 46
7.4     Failure to Pay Post-Filing Date Indebtedness, Etc. ........................................ 46
7.5     Change in Control. .......................................................................................... 46
7.6     Money Judgment. ............................................................................................ 46
7.7     Material Adverse Change. ............................................................................... 46
7.8     Security. .......................................................................................................... 46
7.9     Validity of Loan Documents. .......................................................................... 46
7.10     Default Under Prepetition Credit Agreement. ................................................ 46
7.11     Continued Operation of Business. .................................................................. 47
7.12     Final Judgment. .............................................................................................. 47
7.13     [Reserved] ....................................................................................................... 47
7.14     Relief from Automatic Stay. ........................................................................... 47
7.15     Modification of Any Order. ............................................................................ 47
7.16     Final Order. ..................................................................................................... 47
7.17     Termination Event under Orders. .................................................................... 47
7.18     Application for Superpriority Claim. ............................................................... 47
7.19     Motions with Bankruptcy Court. .................................................................... 48
7.20     Suit against Lenders, etc. ................................................................................ 48
7.21     Reorganization Plan or Disclosure Statement. ............................................... 48
7.22     [Reserved] ....................................................................................................... 48
7.23     Plan of Sale. .................................................................................................... 48
7.24     Resignation or Termination of Chief Restructuring Officer. .......................... 48

ARTICLE VIII REMEDIES UPON DEFAULT ............................................................. 49

8.1     Remedies. ........................................................................................................ 49
8.2     [Reserved] ....................................................................................................... 49
8.3     Offsets. ............................................................................................................ 50
8.4     Application and Sharing of Set-Off Amounts. ................................................ 50
8.5     Other Remedies. .............................................................................................. 50
8.6     Application of Proceeds. ................................................................................. 50

ARTICLE IX PRIORITY AND SECURITY ................................................................... 51

9.1     Cash Management Arrangements; Depository Arrangements. ........................ 51
9.2     Collections and Receipt of Proceeds by Collateral Agent. ............................. 52
9.3     Superpriority Claims and Collateral Security. ................................................ 53
9.4     Collateral Security Perfection. ........................................................................ 54
9.5     No Discharge; Survival of Claims. ................................................................. 54
9.6     Application of Collections. ............................................................................. 54

ARTICLE X THE AGENT .............................................................................................. 55

10.1     Appointment and Authorization. .................................................................... 55

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 10.2 | Note Holders. | 55 |
| 10.3 | Consultation With Counsel. | 55 |
| 10.4 | Documents. | 55 |
| 10.5 | Agent and Affiliates. | 56 |
| 10.6 | Notice of Default. | 56 |
| 10.7 | Action by Collateral Agent. | 56 |
| 10.8 | Release of Collateral. | 56 |
| 10.9 | Delegation of Duties. | 57 |
| 10.10 | Indemnification of Agent. | 57 |
| 10.11 | Successor Collateral Agent. | 57 |
| 10.12 | No Reliance on Collateral Agent's Customer Identification Program. | 58 |

ARTICLE XI MISCELLANEOUS ................................................................. 58

| | | |
|---|---|---|
| 11.1 | Lenders' Independent Investigation. | 58 |
| 11.2 | No Waiver; Cumulative Remedies. | 58 |
| 11.3 | Amendments, Waivers and Consents. | 59 |
| 11.4 | Notices. | 59 |
| 11.5 | Costs, Expenses and Taxes. | 60 |
| 11.6 | Indemnification. | 60 |
| 11.7 | Obligations Several; No Fiduciary Obligations. | 60 |
| 11.8 | Execution in Counterparts; Electronic Signature. | 61 |
| 11.9 | Binding Effect; Borrower's Assignment. | 61 |
| 11.10 | Lender Assignments. | 61 |
| 11.11 | Sale of Participations. | 63 |
| 11.12 | Patriot Act Notice. | 64 |
| 11.13 | Joint and Several Obligations. | 64 |
| 11.14 | Severability of Provisions; Captions; Attachments. | 65 |
| 11.15 | Investment Purpose. | 65 |
| 11.16 | Entire Agreement. | 66 |
| 11.17 | Legal Representation of Parties. | 66 |
| 11.18 | Governing Law; Submission to Jurisdiction. | 66 |
| 11.19 | JURY TRIAL WAIVER. | 66 |

Exhibit A      Form of Revolving Credit Note
Exhibit F      Form of Borrowing Base Certificate
Exhibit G      Form of Notice of Loan
Exhibit H      Form of Compliance Certificate
Exhibit J      Reaffirmation of Guaranty of Payment

Schedule 1      Commitments of Lenders
Schedule 4      Pledged Securities
Schedule 6.1      Corporate Existence; Subsidiaries; Foreign Qualification
Schedule 6.4      Litigation and Administrative Proceedings

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

Schedule 6.9   Locations
Schedule 6.11 Employee Benefits Plans
Schedule 6.16 Material Agreements
Schedule 6.17 Intellectual Property
Schedule 6.18 Insurance
Schedule 6.19 Deposit Accounts


Annex 1       Form of Budget
Annex 3       Other Prepetition Liens
Annex 4       Existing Indebtedness

This DEBTOR IN POSSESSION CREDIT AGREEMENT (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made effective as of the 23rd day of May, 2017, by and between **Auburn Armature, Inc.,** a New York corporation, **EASA Acquisition I, LLC,** a Delaware limited liability company, and **EASA Acquisition II, LLC**, a Delaware limited liability company, each, a debtor in possession and located at 70 Wright Circle, Auburn, New York 13021 (individually or collectively, as the context may require, "Borrower") and **KeyBank National Association**, a national banking association, whose address is 127 Public Square, Cleveland, Ohio 44114, and each other Eligible Transferee, as hereinafter defined, that from time to time becomes a party hereto pursuant to Section 11.10 hereof (collectively, the "Lenders" and, individually, each a "Lender").

WITNESSETH:

WHEREAS, on May 19, 2017 (the "Filing Date"), Borrower (individually or collectively, as the context may require, the "Debtor") filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York; and

WHEREAS, the Debtor intends to continue to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, before the Filing Date, Borrower and the lender party to the Prepetition Credit Agreement (as defined below) (the "Prepetition Lender"), entered into an Amended and Restated Credit and Security Agreement, dated as of March 31, 2014, as amended by a Third Amendment to Amended and Restated Credit and Security Agreement dated as of December 29, 2014, a Second Amendment to Amended and Restated Credit and Security Agreement dated as of March 20, 2015, and a Third Amendment to Amended and Restated Credit and Security Agreement dated as of December 15, 2015, and that certain Forbearance and Amendment Agreement dated as effective as of December 22, 2016, as further amended by a First Amendment to Forbearance and Amendment Agreement dated March 17, 2017, a Second Amendment to Forbearance and Amendment Agreement dated April 28, 2017, a Third Amendment to Forbearance and Amendment Agreement dated May 4, 2017, a Fourth Amendment to Forbearance and Amendment Agreement dated May 10, 2017, a Fifth Amendment to Forbearance and Amendment Agreement dated May 12, 2017, and a Sixth Amendment to Forbearance and Amendment Agreement dated May 17, 2017 (as amended and in effect from time to time prior to the Filing Date, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Lender extended credit to Borrower on the terms set forth therein; and

WHEREAS, as of May 19, 2017, the Prepetition Lender under the Prepetition Credit Agreement and the other Notes and Loan Documents (defined therein) executed and delivered in connection therewith, is owed not less than: (i) $4,946,853.33 on the Second Amended and Restated Revolving Note dated as of April 14, 2014, and (ii) $180,907.36 on the Amended and Restated CapEx Note Loan dated as of April 14, 2014, constituting principal obligations incurred directly by Borrower as of May 19, 2017, plus any unpaid interest, fees, costs and expenses (the "Prepetition Obligations"); and

WHEREAS, the Prepetition Obligations are secured by liens (the "Prepetition Liens") on substantially all of the existing and after-acquired assets of Borrower, and such liens are

perfected and, except as otherwise permitted in the Prepetition Credit Agreement, have priority over other liens; and

WHEREAS, Borrower has requested that the Lender provide financing to Borrower pursuant to Section 364(c)(1), (2) and (3) and Section 364(d) of the Bankruptcy Code, and enter into this Agreement pursuant to which the Lenders would extend to Borrower a revolving credit facility not to exceed at any one time outstanding $1,800,000.00 (the aggregate total post-Filing Date revolving loans) prior to the entry of the Final Order and up to an additional $3,700,000.00 after the entry of the Final Order (in each case, as such amount may be reduced pursuant to this Agreement), to be available in the form of revolving loans advanced by the Lenders from time to time at the request of and for the account of Borrower; and

WHEREAS, the Lender is willing to extend such credit to Borrower on the terms and conditions set forth herein and in the other Loan Documents in accordance with Section 364(c)(1), (2) and (3) and Section 364(d) of the Bankruptcy Code, so long as:

(a)     such post-petition credit obligations are (i) secured by Liens on substantially all of the property and interests, real and personal, tangible and intangible, of Borrower, whether now owned or hereafter acquired, subject to priority only to certain Liens and claims in respect of the Carve Out (as defined below) as herein provided and (ii) given super priority status as provided in the Orders (as defined below); and

(b)     the Prepetition Lender receives certain adequate protection for Borrower's use, sale or lease of collateral, including Borrower's use of cash collateral, and the priming of the Prepetition Liens securing the Prepetition Obligations; and

WHEREAS, Borrower has agreed to provide such collateral, super priority claims and adequate protection subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, it is mutually agreed as follows:

ARTICLE I
DEFINITIONS

1.1     Definitions.    As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Bidder(s)" means that term as defined in Section 4.2(o) of this Agreement.

"Account" means all accounts, as defined in the U.C.C.

"Account Debtor" means any Person obligated to pay all or any part of any Account in any manner and includes (without limitation) any Guarantor thereof.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of in excess of fifty percent

(50%) of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

"Advantage" means any payment (whether made voluntarily or involuntarily, by offset of any deposit or other indebtedness or otherwise) received by any Lender, in respect of the Obligations, if such payment results in that Lender having less than its pro rata share (based upon its Applicable Commitment Percentage) of the Obligations then outstanding.

"Affiliate" means any Person, directly or indirectly, controlling, controlled by or under common control with a Borrower and "control" (including the correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the power, directly or indirectly, to direct or cause the direction of the management and policies of a Borrower, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means that term as defined in the first paragraph hereof.

"Applicable Commitment Percentage" means, for each Lender with respect to the Total Commitment, the percentage, if any, set forth opposite such Lender's name under the column headed "Revolving Credit Commitment Percentage", as listed in Schedule 1 hereto.

"Applicable Margin" means ten percent (10.00%) per annum.

"Asset Brokers" means that term as defined in Section 5.37 of this Agreement.

"Assignment Agreement" means an assignment and acceptance agreement in form and substance satisfactory to Collateral Agent.

"Authorized Officer" means a Financial Officer or other individual authorized by a Financial Officer in writing (with a copy to Lender) to handle certain administrative matters in connection with this Agreement.

"Avoidance Actions" means avoidance actions of Borrower under Chapter 5 of the Bankruptcy Code (and the proceeds thereof).

"Bank Product Agreements" means those certain cash management service and other agreements entered into from time to time between Borrower and a Lender (or an affiliate of a Lender) in connection with any of the Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by Borrower to any Lender (or an affiliate of a Lender) pursuant to or evidenced by the Bank Product Agreements.

"Bank Products" means any service or facility extended to Borrower by any Lender (or an affiliate of a Lender) including (a) credit cards and credit card processing services, (b) debit and purchase cards, (c) ACH (automated clearing house) transactions, and (d) cash management, including controlled disbursement, accounts or services.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of New York.

"Base Rate Loan" means a Loan described in Section 2.2(a) hereof, that shall be denominated in Dollars and on which Borrower shall pay interest at a rate based on the Derived Base Rate.

"Borrower" means that term as defined in the first paragraph hereof.

"Borrowing Base" shall mean, at any time, the sum of (a) up to 85% of the book value of Borrower's Eligible Accounts at such time, plus (b) the least of (i) up to 53.55% of Borrower's Eligible Inventory, (ii) the product of 85% multiplied by the Net Orderly Liquidation Value multiplied by each Borrower's Eligible Inventory, in each case, valued at the lower of cost or market value, determined on a first in first out basis at such time, and (iii) $2,500,000, minus (d) Reserves. The Lender may, in its sole discretion, reduce the advance rates set forth above, adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base.

"Borrowing Base Certificate" means a Borrowing Base Certificate in the form of the attached Exhibit F.

"Budget" means a thirteen week budget projecting on a week-by-week basis the Debtor's (i) sales, (ii) cash receipts, (iii) disbursements, including, without limitation, line items for payroll, trade debt, interest and fees under this Agreement, interest and fees on other indebtedness and professional fees), and (iv) amounts of Revolving Loans to be requested and outstanding, substantially in the form of the attached Annex 1 and in substance satisfactory to Lender, including as such budget is updated, amended or revised each week with the agreement of Lender, in its sole discretion.

"Business Day" means any day that is not a Saturday, a Sunday or another day of the year on which national banks are authorized or required to close in Cleveland, Ohio.

"Capital Distribution" means a payment made, liability incurred or other consideration given by Borrower to any Person that is not Borrower, for the purchase, acquisition, redemption, repurchase, payment or retirement of any capital stock or other equity interest of Borrower or as a dividend, return of capital or other distribution (other than any stock dividend, stock split or other equity distribution payable only in capital stock or other equity of Borrower) in respect of Borrower's capital stock or other equity interest.

"Carve Out" means, at any time, an amount equal to the sum of the then unpaid (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6), plus (b) allowed fees and expenses incurred by the professionals retained by Borrower, plus (c) allowed fees and expenses incurred by the professionals retained by any Statutory Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code (excluding, however, fees, costs and expenses of third party professionals employed by the members of any such Statutory Committee).  For purposes of clause (b) above, the Carve Out shall be limited to, prior to the Termination Date, an aggregate amount not in excess of the professional fees and expenses projected in the Budget to

be incurred each week prior to the Termination Date. For purposes of clause (c) above, the Carve Out shall be limited to accrued and unpaid professional fees and expenses in a maximum aggregate amount of $683,000.00.  For purposes hereof, "Termination Date' shall have the meaning ascribed to it in the Interim Order and the Final Order.

"Case" means, collectively, the Debtors' reorganization cases under Chapter 11 of the Bankruptcy Code (Chapter 11 Case Nos. _____, _____, and _____, respectively) pending in the United States Bankruptcy Court for the Northern District of New York.

"Cash Collateral Account" means a commercial Deposit Account designated "cash collateral account" and maintained by Borrower with Lender, without liability by Lender to pay interest thereon, from which account Lender shall have the exclusive right to withdraw funds until all of the Secured Obligations are paid in full.

"Cash Reserve" means that term as defined in Section 8.6(a) of this Agreement.

"Change in Control" means a "Change of Control" as defined in the Prepetition Credit Agreement or in any other Material Indebtedness Agreement.

"Chief Restructuring Officer" means that term as defined in Section 5.35 of this Agreement.

"Closing Date" means the date on which all of the conditions set forth in Section 4.2 are satisfied to the satisfaction of Lender, or waived in writing by, Lender.

"Code" means the Internal Revenue Code of 1986, as amended, together with the rules and regulations promulgated thereunder.

"Collateral" means all of the "Collateral", as defined in the Security Agreement.

"Collateral Agent" means KeyBank National Association acting as Collateral Agent for the Lenders pursuant to the Security Documents, and any successor designated as Collateral Agent pursuant to Section 10.12 hereof.

"Commitment" means, with respect to each Lender, (a) prior to the entry of the Final Order, the amount set forth opposite such Lender's name in Schedule 1 hereto directly below the column titled "Interim Order Commitment" (the "Interim Order Commitment") and (b) on or after the entry of the Final Order, the amount set forth opposite such Lender's name in Schedule 1 hereto directly below the column titled "Final Order Commitment" (the "Final Order Commitment"), in each case as may be reduced from time to time pursuant to the terms hereof.

"Commitment Period" means the period from the Closing Date to, but not including, the Maturity Date.

"Compliance Certificate" means a Compliance Certificate in the form of the attached Exhibit H.

"Consultant" means that term as defined in Section 5.2 of this Agreement.

"Controlled Group" means Borrower and each Person required to be aggregated with Borrower under Code Section 414(b), (c), (m) or (o).

"Credit Event" means the making by the Lenders of a Loan.

"Credit Party" means Borrower and any Guarantor.

"Creditors' Committee" means the official committee of unsecured creditors in the Case.

"Debtor" means that term as defined in the first Whereas paragraph of this Agreement.

"Default" means an event or condition that constitutes, or with the lapse of any applicable grace period or the giving of notice or both would constitute, an Event of Default, and that has not been waived by the Required Lenders (or, if applicable, all of the Lenders) in writing.

"Default Rate" means (a) with respect to any Loan, a rate per annum equal to five percent (5%) in excess of the Derived Base Rate otherwise applicable thereto.

"Deposit Account" means (a) a deposit account, as defined in the U.C.C., (b) any other deposit account, and (c) any demand, time, savings, checking, passbook or similar account maintained with a bank, savings and loan association, credit union or similar organization.

"Derived Base Rate" means a rate per annum equal to the Applicable Margin.

"Dollar" or the $ sign means lawful money of the United States of America.

"Eligible Accounts" shall mean, at any time, Accounts of Borrower that the Lender determines in its sole discretion are eligible as the basis for the extension of Revolving Loans. Without limiting the Lender's discretion provided herein, Eligible Accounts shall not include any Account:

     (a)     which is not subject to a first priority perfected security interest in favor of the Lender;

     (b)     which is subject to any Lien other than a Permitted Lien that does not have priority over the Lien in favor of the Lender;

     (c)     (i) which is unpaid more than 90 days after the date of the original invoice therefore, or (ii) which has been written off the books of Borrower or otherwise designated as uncollectible;

     (d)     which is owing by an Account Debtor if more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible;

     (e)     with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true;

(f)　　which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(g)　　for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by Borrower or if such Account was invoiced more than once;

(h)　　with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i)　　which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j)　　which is owed by any Account Debtor which has sold all or substantially all of its assets;

(k)　　which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada (other than Quebec) or (ii) is not organized under applicable law of the U.S., any state of the U.S., Canada, or any province of Canada (other than the province of Quebec);

(l)　　which is owed in any currency other than U.S. dollars;

(m)　　which is owed by the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S., or (ii) the federal government of the U.S., or any department, agency, public corporation, or instrumentality thereof;

(n)　　which, to Borrower's knowledge, is owed by any Affiliate, employee, officer, director, agent or stockholder of Borrower;

(o)　　which, for any Account Debtor, the aggregate amount of Accounts owed to such Account Debtor exceeds 25% of all Eligible Account to the extent of such excess;

(p)　　which is owed by an Account Debtor or any Affiliate of such Account Debtor to which Borrower is indebted, or is subject to any security, deposit, progress

payment, retainage or other similar advance made by or for the benefit of an Account Debtor;

(q)     which is subject to any counterclaim, deduction, defense, setoff or dispute;

(r)     which is evidenced by any promissory note, chattel paper, or instrument;

(s)     which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, unless Borrower has filed such report or qualified to do business in such jurisdiction;

(t)     with respect to which Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and Borrower created a new receivable for the unpaid portion of such Account;

(u)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System;

(v)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than Borrower has or has had an ownership interest in such goods, or which indicates any party other than Borrower as payee or remittance party;

(w)     which was created on cash on delivery terms; or

(x)     which the Lender determines may not be paid by reason of the Account Debtor's inability to pay or which the Lender otherwise determines in its sole discretion is unacceptable.

In determining the amount of an Eligible Account, the face amount of an Account may, in the Lender's sole discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by Borrower to reduce the amount of such Account.

"Eligible Inventory" shall mean, at any time, Inventory of Borrower that the Lender determines in its sole discretion is eligible as the basis for the extension of Revolving Loans. Without limiting the Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Lender;

(b)     which is subject to any Lien other than a Permitted Lien that does not have priority over the Lien in favor of the Lender;

(c)     which is, in the Lender's sole discussion, slow moving;

(d)     which is, in the Lender's sole discussion, obsolete, unmerchantable, defective, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(e)     with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true and which does not conform to all standards imposed by any Governmental Body;

(f)     in which any Person other than Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(g)     which is not finished goods or raw materials or which constitutes work-in-process, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(h)     which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers;

(i)     which is located in any location leased by Borrower unless the lessor has delivered to the Lender a Waiver;

(j)     which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document unless such warehouseman or bailee has delivered to the Lender a Waiver and such other documentation as the Lender may require;

(k)     which is being processed offsite at a third party location or outside processor, or is in transit to or from said third party location or outside processor;

(l)     which is a discontinued product or component thereof

(m)     which is the subject of a consignment by Borrower as consignor;

(n)     which is perishable;

(o)    which contains or bears any Intellectual Property rights licensed to Borrower unless the Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(p)    which is not reflected in a current perpetual inventory report of Borrower;

(q)    for which reclamation rights have been asserted by the seller; or

(r)    which the Lender otherwise determines in its sole discretion is unacceptable.

"Eligible Transferee" means a commercial bank, financial institution or other "accredited investor" (as defined in SEC Regulation D) that is not a Borrower, a Subsidiary or an Affiliate.

"Environmental Laws" means all provisions of law (including the common law), statutes, ordinances, codes, rules, guidelines, policies, procedures, orders in council, regulations, permits, licenses, judgments, writs, injunctions, decrees, orders, awards and standards promulgated by a Governmental Authority or by any court, agency, instrumentality, regulatory authority or commission of any of the foregoing concerning environmental health or safety and protection of, or regulation of the discharge of substances into, the environment.

"Equipment" means all equipment, as defined in the U.C.C.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated pursuant thereto.

"Event of Default" means an event or condition that shall constitute an event of default as defined in Article VII hereof.

"Excluded Taxes" means, in the case of each Lender, taxes imposed on or measured by its overall net income or branch profits, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such Lender, as the case may be, is organized or in which its principal office is located, or, in the case of any Lender, in which its applicable lending office is located.

"Existing Indebtedness" means that term as defined in Section 5.8 of this Agreement.

"Federal Funds Effective Rate" means, for any day, the rate per annum (rounded upward to the nearest one one-hundredth of one percent (1/100 of 1%)) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the Closing Date.

"Filing Date" means that term as defined in the first Whereas paragraph of this Agreement.

"First Days Orders" means customary first day orders for a debtor in Chapter 11 of the Bankruptcy Code and in form and substance satisfactory to Lender.

"Final Order" means a final order of the Bankruptcy Court in the Case authorizing and approving, among other things, this Agreement and the other Loan Documents under Section 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Lender and its counsel.  The Final Order shall, among other things, have:

        (a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not greater than the Total Commitment provided for herein and any extension of the scheduled Maturity Date as provided in the definition of the term "Maturity Date";

        (b)    granted the claim status and Liens described in Article IX and prohibited the granting of additional Liens on the assets of Borrower other than Permitted Liens; and

        (c)    provided that such Liens are automatically perfected by the entry of the Final Order and also granted to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of nonbankruptcy law.

"Final Order Commitment" means that term as defined in the definition of "Commitment."

"Financial Officer" means any of the following officers of Borrower:  chief executive officer, president, chief financial officer or treasurer.

"First Priority Liens" means that term as defined in Section 9.3 of this Agreement.

"GAAP" means generally accepted accounting principles in the United States as then in effect, which shall include the official interpretations thereof by the Financial Accounting Standards Board, applied on a basis consistent with the past accounting practices and procedures of Borrower.

"General Intangibles" means all (a) general intangibles, as defined in the U.C.C.; and (b) choses in action, causes of action, intellectual property, customer lists, corporate or other business records, inventions, designs, patents, patent applications, service marks, registrations, trade names, trademarks, copyrights, licenses, goodwill, computer software, rights to indemnification and tax refunds.

"Governmental Authority" means any nation or government, any state, province or territory or other political subdivision thereof, any governmental agency, department, authority,

instrumentality, regulatory body, court, central bank or other governmental entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization exercising such functions.

"Guarantor" means, Electrical Supply Acquisition, Inc., a Delaware corporation, and any other Person that shall have pledged its credit or property in any manner for the payment or other performance of the indebtedness, contract or other obligation of another and includes (without limitation) any guarantor (whether of payment or of collection), surety, co-maker, endorser or Person that shall have agreed conditionally or otherwise to make any purchase, loan or investment in order thereby to enable another to prevent or correct a default of any kind.

"Hedge Agreement" means any (a) hedge agreement, interest rate swap, cap, collar or floor agreement, or other interest rate management device entered into by Borrower with any Lender in connection with any Indebtedness of Borrower, or (b) currency swap agreement, forward currency purchase agreement or similar arrangement or agreement designed to protect against fluctuations in currency exchange rates entered into by Borrower with any Lender.

"Indebtedness" means, for Borrower, without duplication, (a) all obligations to repay borrowed money, direct or indirect, incurred, assumed, or guaranteed, (b) all obligations in respect of the deferred purchase price of property or services, (c) all obligations under conditional sales or other title retention agreements, (d) all obligations (contingent or otherwise) under any letter of credit or banker's acceptance, (e) all net obligations under any currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management device or any Hedge Agreement, (f) all synthetic leases, (g) all lease obligations that have been or should be capitalized on the books of Borrower in accordance with GAAP, (h) all obligations of Borrower with respect to asset securitization financing programs to the extent that there is recourse against Borrower or Borrower is liable (contingent or otherwise) under any such program, (i) all obligations to advance funds to, or to purchase assets, property or services from, any other Person in order to maintain the financial condition of such Person, (j) all indebtedness of the types referred to in subparts (a) through (i) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which Borrower is a general partner or joint venturer, unless such indebtedness is expressly made non-recourse to Borrower, (k) any other transaction (including forward sale or purchase agreements) having the commercial effect of a borrowing of money entered into by Borrower to finance its operations or capital requirements, and (l) any guaranty of any obligation described in subparts (a) through (k) hereof.

"Interim Order" means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement on an interim basis under Section 364(c) of the Bankruptcy Code and entered at a preliminary hearing under Bankruptcy Rule 4001, in form and substance reasonably satisfactory to the Lender and its counsel.  The Interim Order shall, among other things, have:

       (a)     authorized the transactions contemplated by this Agreement and the extension of credit under this Agreement in an amount not greater than the Total Commitment and any extension of the scheduled Maturity Date as provided in the definition of the term "Maturity Date";

(b)  authorized the payment by Borrower of Borrower's obligations under the Prepetition Credit Agreement;

(c)  granted the claim status and Liens described in Article IX, and prohibited the granting of additional Liens on the assets of Borrower other than Permitted Liens; and

(d)  provided, that such Liens are automatically perfected by the entry of the Interim Order and also granted to the Lender for the benefit of the Lenders, relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Lender, if the Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Lender to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of nonbankruptcy law.

"Interim Order Commitment" means that term as defined in the definition of "Commitment."

"Inventory" means all inventory, as defined in the U.C.C.

"Investment Banker" means League Park Advisors, LLC.

"Lender" means that term as defined in the first paragraph hereof.

 "Lien" means any mortgage, deed of trust, security interest, lien (statutory or other), charge, assignment, hypothecation, encumbrance on, pledge or deposit of, or conditional sale, leasing (other than Operating Leases, sale with a right of redemption or other title retention agreement and any capitalized lease with respect to any property (real or personal) or asset.

"Loan" means a Revolving Loan granted to Borrower by the Lenders in accordance with Section 2.2 hereof.

"Loan Documents" means, collectively, this Agreement, each Note, each Security Document, the Pledge Agreement, and each guaranty executed by a Guarantor, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"Mandatory Prepayment" means that term as defined in Section 2.12(a) hereof.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of Borrower (other than the commencement of the Case and the circumstances giving rise to its commencement), (b) the rights and remedies of any Lender under any Loan Document, (c) the ability of any Credit Party to perform its obligations under any Loan Document to which it is a party, (other than, in any case, on account of the filing or pendency of the Case) or (d) the legality, validity, binding effect or enforceability against any Credit Party of any Loan Document to which it is a party (other than, in any case, on account of the filing or pendency of the Case).

"Material Indebtedness Agreement" means any debt instrument, lease (capital, operating or otherwise), guaranty, contract, commitment, agreement or other arrangement evidencing or

entered into in connection with any Indebtedness of Borrower in excess of the amount of $25,000.

"Material Recovery Event" means (a) any casualty loss in respect of assets of Borrower covered by casualty insurances, and (b) any compulsory transfer or taking under threat of compulsory transfer of any asset of Borrower by any Governmental Authority.

"Maturity Date" means the earliest to occur of (a) June 30, 2017, (b) the effective date of a sale of all or substantially all of the Debtor's assets or business pursuant to Section 363 of the Bankruptcy Code which is authorized by the Bankruptcy Court (and in the event of a series of transactions resulting in the sale of all or substantially all of the Debtor's assets or business, the latest of such sale) and (c) the Termination Date.

"Maximum Rate" means that term as defined in Section 2.5(f) hereof.

"Moody's" means Moody's Investors Service, Inc., and any successor to such company.

"Multiemployer Plan" means a Pension Plan that is subject to the requirements of Subtitle E of Title IV of ERISA.

"Net Orderly Liquidation Value" shall mean, the orderly liquidation value (net of costs and expenses estimated to be incurred in connection with such liquidation) of the Borrower's Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory expressed as a percentage of the net book value thereof, such percentage to be as determined from time to time by reference to the most recent Inventory appraisal completed by a qualified third-party appraisal company (approved by the Lender in its sole discretion) delivered to the Lender.

"Note" means a Revolving Credit Note or any other promissory note delivered pursuant to this Agreement.

"Notice of Loan" means a Notice of Loan in the form of the attached Exhibit G.

"Obligations" means, collectively, (a) all Indebtedness and other obligations incurred by Borrower pursuant to this Agreement and the other Loan Documents, and includes the principal of and interest on all Loans; (b) each extension, renewal or refinancing of the foregoing, in whole or in part; (c) the commitment and other fees, and any prepayment fees payable hereunder; and (d) all Related Expenses.

"Operating Leases" means all real or personal property leases under which Borrower is bound or obligated as a lessee or sublessee and which, under GAAP, are not required to be capitalized on a balance sheet of Borrower, provided that Operating Leases shall not include any such lease under which Borrower is also bound as the lessor or sublessor.

"Orders" means, collectively, the Interim Order and the Final Order.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation, operating agreement or

equivalent formation documents, and Regulations (Bylaws), or equivalent governing documents, and any amendments to any of the foregoing.

"Other Prepetition Liens" means the prepetition liens and security interests (exclusive of those in respect of the Prepetition Credit Agreement) which are (a) valid, perfected and senior to the prepetition liens and security interests in respect of the Prepetition Credit Agreement and (b) not avoidable, including, without limitation, such liens and security interests listed on Annex 3 hereto.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, charges or similar taxes or levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant" means that term as defined in Section 11.11 hereof.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"Payment in Full" means the irrevocable payment in full in cash in United States Dollars of all of the Secured Obligations and all Prepetition Obligations.

"Payment Office" means initially KeyBank National Association, Mail Code: OH-01-49-0114, 4900 Tiedeman Road, Brooklyn, Ohio 44144-2302; and, thereafter, such other office of the Lender, if any, which it may designate by notice to the Lender.

"Permitted Liens" means that term as defined in Section 5.9 of this Agreement.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, Governmental Authority or any other entity.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of Borrower or any member of the Controlled Group or any such Plan to which Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreement" means any Pledge Agreement executed by Borrower and certain Guarantors, on or after the Closing Date, as any of the foregoing may from time to time be amended, restated or otherwise modified.

"Pledged Securities" means all of the shares of capital stock or other equity interest of a Subsidiary of a Credit Party, whether now owned or hereafter acquired or created, and all proceeds thereof.  Schedule 4 hereto lists, as of the Closing Date, all of the Pledged Securities.

"Prepetition Collateral" means "Collateral" as defined in the Prepetition Credit Agreement.

"Prepetition Collateral Agent" means the Prepetition Lender.

"Prepetition Credit Agreement" means that term as defined in the third Whereas paragraph of this Agreement.

"Prepetition Loan Documents" means the Prepetition Credit Agreement, the Notes, (as defined in the Prepetition Credit Agreement) and all security agreements, guaranties, promissory notes, pledge agreements, forbearance agreements, and related agreements and documents executed, delivered, issued or filed at any time in connection therewith.

"Prepetition Lender" means that term as defined in the third Whereas paragraph of this Agreement.

"Prepetition Liens" means that term as defined in the fifth Whereas paragraph of this Agreement.

"Prepetition Obligations" means that term as defined in the fourth Whereas paragraph of this Agreement.

"Reaffirmation of Guaranty of Payment" means a Reaffirmation of Guaranty of Payment, by each Guarantor of the Guaranteed Obligations (as defined in the Prepetition Credit Agreement), in the form of the attached Exhibit J, reaffirming their respective obligations to the Prepetition Lender.

"Register" means that term as described in Section 11.10(i) hereof.

"Regularly Scheduled Payment Date" means the first day of each calendar month.

"Related Expenses" means any and all costs, liabilities and expenses (including, without limitation, losses, damages, penalties, claims, actions, attorneys' fees, legal expenses, judgments, suits and disbursements) (a) incurred by any Lender or Collateral Agent, or imposed upon or asserted against the Collateral Agent or any Lender in connection with the Case, the negotiation or preparation of this Agreement or any attempt by the Collateral Agent and any Lender to (i) obtain, preserve, perfect or enforce any Loan Document or any security interest evidenced by any Loan Document; (ii) obtain payment, performance or observance of any and all of the Obligations; or (iii) maintain, insure, audit, collect, preserve, repossess or dispose of any of the collateral securing the Obligations or any part thereof, including, without limitation, costs and expenses for appraisals, assessments and audits of Borrower or any such collateral; or (b) incidental or related to (a) above, including, without limitation, interest thereupon from the date incurred, imposed or asserted until paid at the Default Rate.

"Related Writing" means each Loan Document, each Borrowing Base Certificate and any other assignment, mortgage, security agreement, guaranty agreement, subordination agreement, financial statement, audit report or other writing furnished by any Credit Party, or any of its officers, to the Lenders pursuant to or otherwise in connection with this Agreement.

"Required Lenders" shall mean the holders of at least sixty-six and two-thirds percent (66-2/3%) of the Total Commitment or, if after the termination of the Total Commitment, the Revolving Credit Exposure.

"Requirement of Law" means, as to any Person, any law, treaty, rule or regulation or determination or policy statement or interpretation of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property.

"Reserves" means any reserves against Borrowing Base established by the Collateral Agent from time to time in such amounts as the Collateral Agent shall determine.

"Restricted Payment" means, with respect to Borrower, (a) any Capital Distribution, (b) any amount paid by Borrower in repayment, redemption, retirement or repurchase, directly or indirectly, of any Subordinated Indebtedness, (c) any amount paid by Borrower in respect of any management, consulting or other similar arrangement with any shareholder of Borrower or Affiliate, if any, or (d) any amount paid by Borrower with respect to any pre-Filing Date Indebtedness or obligations, other than pursuant to (i) the First Day Orders, (ii) this Agreement, or (iii) other orders of the Bankruptcy Court acceptable to the Required Lenders.

"Revolving Credit Exposure" means, at any time, the aggregate principal amount of all Revolving Loans outstanding.

"Revolving Credit Note" means a Revolving Credit Note, in the form of the attached Exhibit A, executed and delivered pursuant to Section 2.6(a) hereof.

"Revolving Loan" means a Loan made to Borrower by the Lenders in accordance with Section 2.2(a) hereof.

"Sales Plan" means that term as defined in Section 4.2(t) of this Agreement.

"SEC" means the United States Securities and Exchange Commission, or any governmental body or agency succeeding to any of its principal functions.

"Secured Obligations" means collectively, (a) the Obligations, (b) the Prepetition Obligations, (c) all obligations and liabilities of Borrower owing to Lenders under Hedge Agreements, and (d) the Bank Product Obligations owing to Lender under Bank Product Agreements.

"Security Agreement" means each Senior Security Agreement, executed and delivered by Borrower in favor of Collateral Agent, dated as of the Closing Date, and any other Security Agreement executed on or after the Closing Date, as the same may from time to time be amended, restated or otherwise modified.

"Security Documents" means each Security Agreement, each Waiver, each U.C.C. Financing Statement or similar filing as to a jurisdiction located outside of the United States of America, filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any Lien is granted by Borrower or any

other Person to Collateral Agent, as security for the Secured Obligations, or any part thereof, and each other agreement executed in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"Special Trust Account" means that term as defined in Section 2.12(c) of this Agreement.

"Statutory Committee" means any committee appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

"Subordinated" means, as applied to Indebtedness, Indebtedness that shall have been subordinated (by written terms or written agreement being, in either case, in form and substance satisfactory to the Required Lenders) in favor of the prior payment in full of the Obligations.

"Subsidiary" means (a) a corporation more than fifty percent (50%) of the Voting Power of which is owned, directly or indirectly, by Borrower, (b) a partnership, limited liability company or unlimited liability company of which Borrower, directly or indirectly, is a general partner or managing member, as the case may be, or otherwise has an ownership interest greater than fifty percent (50%) of all of the ownership interests in such partnership, limited liability company or unlimited liability company, or (c) any other Person (other than a corporation, partnership, limited liability company or unlimited liability company) in which Borrower, directly or indirectly, has at least a majority interest in the Voting Power or the power to elect or direct the election of a majority of directors or other governing body of such Person.

"Superpriority Claim" means a claim against Borrower in the Case which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b), 506(c) and 507 of the Bankruptcy Code.

"Taxes" means any and all present or future taxes of any kind, including but not limited to, levies, imposts, duties, surtaxes, charges, fees, deductions or withholdings now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto) other than Excluded Taxes.

"Termination Date" means that term as defined in the Interim Order and the Final Order.

"Testing Period" means each period of four (4) consecutive fiscal weeks of Borrower, in each case, taken as one accounting period, commencing with the week during which the Closing Date occurred.

"Total Commitment" means (a) prior to the entry of the Final Order, the sum of each Lender's Interim Order Commitment and (b) on or after the entry of a Final Order, the sum of each Lender's Final Order Commitment, in each case as it may be reduced from time to time pursuant to the terms hereof.

"U.C.C." means the Uniform Commercial Code, as in effect from time to time in New York.

"U.C.C. Financing Statement" means a financing statement filed or to be filed in accordance with the Uniform Commercial Code, as in effect from time to time, in the relevant state or states.

"Voting Power" means, with respect to any Person, the exclusive ability to control, through the ownership of shares of capital stock, partnership interests, membership interests or otherwise, the election of members of the board of directors or other similar governing body of such Person. The holding of a designated percentage of Voting Power of a Person means the ownership of shares of capital stock, partnership interests, membership interests or other interests of such Person sufficient to control exclusively the election of that percentage of the members of the board of directors or similar governing body of such Person.

"Waivers" means, collectively, any and all landlord's waivers, warehouseman's waivers, creditor's waivers, mortgagee waivers and processing facility and similar bailee's waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to the Lender.

1.2     Accounting Terms.  Any accounting term not specifically defined in this Article I shall have the meaning ascribed thereto by GAAP.

1.3     Terms Generally.  The foregoing definitions shall be applicable to the singular and plural forms of the foregoing defined terms.  Unless otherwise defined in this Article I, terms that are defined in the U.C.C. are used herein as so defined.

1.4     Confirmation of Recitals.  Borrower, and the Lender hereby confirm the statements set forth in the recitals of this Agreement.

ARTICLE II
AMOUNT AND TERMS OF CREDIT

2.1     Amount and Nature of Credit.

(a)     Subject to the terms and conditions of this Agreement, the Lenders, during the Commitment Period and to the extent hereinafter provided, shall make Loans to Borrower at the request of Borrower, in such aggregate amount as Borrower shall request pursuant to the Total Commitment; provided that in no event shall the aggregate principal amount of all Loans and Letters of Credit outstanding under this Agreement be in excess of the lesser of (i) the Total Commitment, *minus* all Reserves, and (ii) the Borrowing Base. Notwithstanding the foregoing, to the extent that there exists any amounts in the Cash Reserve, Borrower shall utilize such amounts in full before requesting a Loan hereunder.

(b)     Each Lender, for itself and not one for any other, agrees to make Loans, during the Commitment Period, on such basis that, immediately after the completion of any borrowing by Borrower, the aggregate outstanding principal amount of Loans made by such Lender shall not be in excess of the Commitment for such Lender.

Each borrowing from the Lenders shall be made pro rata according to the respective Applicable Commitment Percentages of the Lenders.

2.2     Revolving Credit.  Subject to the terms and conditions of this Agreement, during the Commitment Period, the Lenders shall make a Revolving Loan or Revolving Loans to Borrower in such amount or amounts as Borrower, through an Authorized Officer, may from time to time request, but not exceeding in aggregate principal amount at any time outstanding hereunder the lesser of (i) the Total Commitment *minus* all Reserves and (ii) the Borrowing Base.  Borrower shall have the option, subject to the terms and conditions set forth herein, to borrow Revolving Loans, maturing on the last day of the Commitment Period, by means of Base Rate Loans.  Notwithstanding the foregoing, to the extent that there exist any amounts in the Cash Reserve, Borrower shall utilize such amounts in full before requesting a Loan hereunder. Subject to the provisions of this Agreement, Borrower shall be entitled under this Section 2.2(a) to borrow funds, repay the same in whole or in part and re-borrow hereunder at any time and from time to time during the Commitment Period.

2.3     [Reserved]

2.4     [Reserved]

2.5     Interest.

(a)     Revolving Loans.  Borrower shall pay interest on the unpaid principal amount of a Revolving Loan that is a Base Rate Loan outstanding from time to time from the date thereof until paid at the Derived Base Rate from time to time in effect. Interest on such Base Rate Loan shall be payable, commencing on June 1, 2017, and continuing on each Regularly Scheduled Payment Date thereafter and at the maturity thereof.

(b)     CapEx Loan.  Borrower shall pay principal and interest on the unpaid principal amount of the loans under that certain Amended and Restated CapEx Note dated April 14, 2014, executed and delivered by Borrower in favor of Lender (as the same has been amended, amended and restated, or modified from time to time) at the interest rate from time to time in effect.  Principal and Interest on such CapEx Loan shall be payable, commencing on June 1, 2017, and continuing on each Regularly Scheduled Payment Date thereafter and at the maturity thereof.

(c)     [Reserved]

(d)     [Reserved]

(e)     Default Rate.  Anything herein to the contrary notwithstanding, if an Event of Default shall occur (i) the principal of each Loan and the unpaid interest thereon shall bear interest, until paid, at the Default Rate and (ii) in the case of any other amount not paid when due from Borrower hereunder or under any other Loan Document, such amount shall bear interest at the Default Rate.

(f)     Limitation on Interest.  In no event shall the rate of interest hereunder exceed the maximum rate allowable by law.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrower.  In determining whether the interest contracted for, charged, or received by a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations.

2.6     Evidence of Indebtedness.  Upon the request of a Lender, to evidence the obligation of Borrower to repay the Revolving Loans made by such Lender and to pay interest thereon, Borrower shall execute a Revolving Credit Note payable to the order of such Lender in the principal amount of its Applicable Commitment Percentage of the Total Commitment, or, if less, the aggregate unpaid principal amount of Revolving Loans made by such Lender; provided that the failure of a Lender to request a Revolving Credit Note shall in no way detract from Borrower's obligations to such Lender hereunder.

2.7     Notice of Credit Event; Funding of Loans.

(a)     Notice of Credit Event.  Borrower, through an Authorized Officer, shall provide to Lender Notice of Loan prior to 1:00 P.M. (Eastern time) on the proposed date of borrowing of any Base Rate Loan.  Borrower shall comply with the notice provisions set forth in Section 2.2(b) hereof with respect to Letters of Credit.

(b)     Funding of Loans.  Collateral Agent shall notify the other Lenders, if any, of the date and amount promptly upon the receipt of a Notice of Loan and, in any event, by 12:00 P.M. (Eastern time) on the date such Notice of Loan is received.  On the date that the Credit Event set forth in such Notice of Loan is to occur, each Lender shall provide to Collateral Agent, not later than 1:00 P.M. (Eastern time), the amount in Dollars, in federal or other immediately available funds, required of it.  If Collateral Agent shall elect to advance the proceeds of such Loan prior to receiving funds from such Lender, Collateral Agent shall have the right, upon prior notice to Borrower, to debit any account of Borrower or otherwise receive such amount from Borrower on demand, in the event that such Lender shall fail to reimburse Collateral Agent in accordance with this subsection. Collateral Agent shall also have the right to receive interest from such Lender at the Federal Funds Effective Rate in the event that such Lender shall fail to provide its portion of the Loan on the date requested and Collateral Agent shall elect to provide such funds.

2.8     <u>Payment on Loans and Other Obligations</u>.

(a)     <u>Payments Generally</u>.  Each payment made hereunder by a Credit Party shall be made without any offset, abatement, recoupment, counterclaim, withholding or reduction whatsoever.

(b)     <u>Payments from Borrower</u>.  All payments (including prepayments) to Collateral Agent of the principal of or interest on each Loan or other payment, including but not limited to principal, interest, fees or any other amount owed by Borrower under this Agreement, shall be made in Dollars.  All payments described in this subsection (b) shall be remitted to Collateral Agent, at the Payment Office not later than 11:00 A.M. (Eastern time) on the due date thereof in immediately available funds.  Any such payments received by Collateral Agent after 11:00 A.M. (Eastern time) shall be deemed to have been made and received on the next Business Day.

(c)     <u>Payments to Lenders</u>.  Upon Collateral Agent's receipt of payments hereunder, Collateral Agent shall immediately distribute to the Lenders their respective ratable shares, if any, of the amount of principal, interest, and commitment and other fees received by Collateral Agent for the account of such Lender.  Payments received by Collateral Agent shall be delivered to the Lenders in Dollars in immediately available funds.  Each Lender shall record any principal, interest or other payment, the principal amounts of Base Rate Loans, all prepayments and the applicable dates with respect to the Loans made, and payments received by such Lender, by such method as such Lender may generally employ; provided, however, that failure to make any such entry shall in no way detract from the obligations of Borrower under this Agreement or any Note.  The aggregate unpaid amount of Loans and similar information with respect to the Loans set forth on the records of Agent shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to each Lender.

(d)     <u>Timing of Payments</u>.  Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Loan, shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next Business Day and such extension of time shall in each case be included in the computation of the interest payable on such Loan.

2.9     <u>Prepayment</u>.

(a)     <u>Right to Prepay</u>.  Borrower shall have the right at any time or from time to time to prepay, on a pro rata basis for all of the Lenders, all or any part of the principal amount of the Loans with the proceeds of such prepayment to be distributed on a pro rata basis to the Lenders.  Such payment shall include interest accrued on the amount so prepaid to the date of such prepayment and any amount payable under Article III hereof with respect to the amount being prepaid.  Prepayments of Base Rate Loans shall be without any premium or penalty.

(b)    Notice of Prepayment.    Borrower shall give Collateral Agent notice of prepayment of a Base Rate Loan by no later than 11:00 A.M. (Eastern time) on the Business Day on which such prepayment is to be made.

2.10    Commitment and Other Fees; Reduction of Commitment.

(a)    Commitment Fees.    Borrower shall pay to Collateral Agent, for the ratable account of the Lenders, as a consideration for the Commitment, a commitment fee equal to $50,000.00 on the date of entry of the Interim Order.

(b)    [Reserved]

(c)    [Reserved]

(d)    Optional Reduction of Revolving Credit Commitment.    Borrower may, at any time and from time to time, permanently reduce in whole or ratably in part the Total Commitment to an amount not less than the then existing Revolving Credit Exposure, by giving Collateral Agent not fewer than five (5) Business Days' (or thirty (30) days if the Total Commitment is to be reduced or terminated in its entirety) written notice of such reduction.  Collateral Agent shall promptly notify each Lender of the date of each such reduction and such Lender's proportionate share thereof. If Borrower reduces in whole the Total Commitment, on the effective date of such reduction (Borrower having prepaid in full the unpaid principal balance, if any, of the Loans, together with all interest (if any), and commitment and other fees accrued and unpaid with respect thereto, all of the Revolving Credit Notes shall be delivered to Collateral Agent marked "Canceled" and Collateral Agent shall redeliver such Revolving Credit Notes to Borrower. Any partial reduction in the Total Commitment shall be effective during the remainder of the Commitment Period.

2.11    Computation of Interest and Fees.    Interest on Loans, Related Expenses, and commitment and other fees and charges hereunder shall be computed on the basis of a year having three hundred sixty (360) days and calculated for the actual number of days elapsed.

2.12    Mandatory Prepayments and Repayment.

(a)    Mandatory Prepayments.    Borrower shall make mandatory prepayments (each a "Mandatory Prepayment") in accordance with the following provisions:

(i)    Sale of Assets.    On the first Business Day after receipt by Borrower of proceeds from any sale or other disposition of any assets by Borrower to any Person other than in the ordinary course of business, Borrower shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale or other disposition.

(ii)    Material Recovery Event.    On the first Business Day after receipt by Borrower of any proceeds from a Material Recovery Event, Borrower shall make a Mandatory Prepayment in an amount equal to one hundred

percent (100%) of such proceeds (net of reasonable costs and taxes incurred in connection with such Material Recovery Event).

(iii)    <u>Tax Refund</u>.  On the first Business Day after receipt by Borrower of any tax refund, Borrower shall make a Mandatory Prepayment in an amount equal to one hundred percent (100%) of such tax refund.

(iv)    <u>Overadvance</u>.  If on any date, the sum of the aggregate outstanding principal amount of Loans exceeds an amount equal to the lesser of (A) the Total Commitment *minus* all Reserves and (B) the Borrowing Base, *less*, in each case, all Reserves, Borrower shall repay on such date Loans in an aggregate amount equal to such excess.

(b)    <u>Repayment</u>.  The Revolving Loans shall become due and payable in full, and Borrower shall repay the Revolving Loans in full, on the Maturity Date, together with any and all accrued and unpaid interest thereon, and any fees and other Obligations due and payable hereunder.

(c)    <u>Application of Mandatory Prepayments</u>.  Mandatory Prepayments under this Section 2.12 shall be paid by Borrower to Collateral Agent to be applied to the following, (i) first, to the then outstanding balance of the Revolving Loans, with a corresponding permanent reduction of the Total Commitment in the amount of such payment and (ii) second, held as cash collateral in accordance with Section 8.6.

2.13    <u>Liability of Borrower</u>.  Borrower acknowledges and agrees that the Lenders are entering into this Agreement at the request of Borrower and with the understanding that Borrower is and shall remain fully liable for payment in full of the Obligations.  Borrower agrees that it is receiving or will receive a direct pecuniary benefit for each Loan made hereunder.

ARTICLE III
ADDITIONAL PROVISIONS RELATING TO
INCREASED CAPITAL; TAXES.

3.1    <u>Requirements of Law</u>.

(a)    If, after the Closing Date, (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof by a Governmental Authority, or (ii) the compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority:

(i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Taxes and Excluded Taxes which are governed by Section 3.2 hereof);

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or

other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender; or

(iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall pay to such Lender, promptly after receipt of a written request therefor (which shall include the method for calculating such amount), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this subsection (a), such Lender shall promptly notify Borrower (with a copy to Collateral Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that, after the Closing Date, the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof by a Governmental Authority or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder, to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration the policies of such Lender or corporation with respect to capital adequacy), then from time to time, upon submission by such Lender to Borrower (with a copy to Collateral Agent) of a written request therefor (which shall include the method for calculating such amount), Borrower shall promptly pay or cause to be paid to such Lender such additional amount or amounts as will compensate such Lender for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section 3.1 submitted by any Lender to Borrower (with a copy to Collateral Agent) shall be conclusive absent manifest error. In determining any such additional amounts, such Lender may use any method of averaging and attribution that it (in its commercially reasonable discretion) shall deem applicable. The obligations of Borrower pursuant to this Section 3.1 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

3.2    Taxes.

(a)    All payments made by any Credit Party under any Loan Document shall be made free and clear of, and without deduction or withholding for or on account of any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to any Lender hereunder, the amounts so payable to such Lender shall be increased to the extent necessary to yield to such

Lender (after deducting, withholding and payment of all Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the Loan Documents.

(b)     Whenever any Taxes or Other Taxes are required to be withheld and paid by a Credit Party, such Credit Party shall timely withhold and pay such taxes to the relevant Governmental Authorities.  As promptly as possible thereafter, Borrower shall send to Collateral Agent for its own account or for the account of the relevant Lender, as the case may be, a certified copy of an original official receipt received by such Credit Party showing payment thereof or other evidence of payment reasonably acceptable to Collateral Agent or such Lender.  If such Credit Party shall fail to pay any Taxes or Other Taxes when due to the appropriate Governmental Authority or fails to remit to Collateral Agent the required receipts or other required documentary evidence, such Credit Party and Borrower shall indemnify Collateral Agent and the appropriate Lenders on demand for any incremental taxes, interest or penalties that may become payable by Collateral Agent or such Lender as a result of any such failure.

(c)     If any Lender shall be so indemnified by a Credit Party, such Lender shall use reasonable efforts to obtain the benefits of any refund, deduction or credit for any taxes or other amounts with respect to the amount paid by such Credit Party and shall reimburse such Credit Party to the extent, but only to the extent, that such Lender shall receive a refund with respect to the amount paid by such Credit Party or an effective net reduction in taxes or other governmental charges (including any taxes imposed on or measured by the total net income of such Lender) of the United States or any state or subdivision or any other Governmental Authority thereof by virtue of any such deduction or credit, after first giving effect to all other deductions and credits otherwise available to such Lender.  If, at the time any audit of such Lender's income tax return is completed, such Lender determines, based on such audit, that it shall not have been entitled to the full amount of any refund reimbursed to such Credit Party as aforesaid or that its net income taxes shall not have been reduced by a credit or deduction for the full amount reimbursed to such Credit Party as aforesaid, such Credit Party, upon request of such Lender, shall promptly pay to such Lender the amount so refunded to which such Lender shall not have been so entitled, or the amount by which the net income taxes of such Lender shall not have been so reduced, as the case may be.

(d)     Each Lender that is not (i) a citizen or resident of the United States of America, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or (iii) an estate or trust that is subject to federal income taxation regardless of the source of its income (any such Person, a "Non-U.S. Lender") shall deliver to Borrower and Collateral Agent two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement with respect to such

interest and a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by Credit Parties under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement or such other Loan Document. In addition, each Non-U.S. Lender shall deliver such forms or appropriate replacements promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify Borrower at any time it determines that such Lender is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this subsection (d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this subsection (d) that such Non-U.S. Lender is not legally able to deliver.

(e)     The agreements in this Section 3.2 shall survive the termination of the Loan Documents and the payment of the Loans and all other amounts payable hereunder.

ARTICLE IV
CONDITIONS PRECEDENT

4.1     <u>Conditions to Each Credit Event</u>.  The obligation of the Lenders to participate in any Credit Event shall be conditioned, in the case of each Credit Event, upon the following:

(a)     all conditions precedent as listed in Section 4.2 hereof required to be satisfied prior to the first Credit Event shall have been satisfied prior to or as of the first Credit Event;

(b)     Borrower shall have submitted a Notice of Loan and otherwise complied with Section 2.7 hereof;

(c)     no Default or Event of Default shall then exist or immediately after such Credit Event would exist; and

(d)     each of the representations and warranties contained in Article VI hereof shall be true in all material respects as if made on and as of the date of such Credit Event, except to the extent that any thereof expressly relate to an earlier date.

Each request by Borrower for a Credit Event shall be deemed to be a representation and warranty by Borrower as of the date of such request as to the satisfaction of the conditions precedent specified in subsections (c) and (d) above.

4.2     <u>Conditions to the First Credit Event</u>.  Borrower shall cause the following conditions to be satisfied on or prior to the Closing Date. The obligation of the Lenders to participate in the first Credit Event is subject to Borrower satisfying each of the following conditions prior to or concurrently with such Credit Event:

(a)     <u>Commencement of the Case</u>.  The Case of Borrower shall have commenced on or before May 19, 2017**.**

(b)     <u>Entry of Interim Order</u>.  The Case shall have commenced and the Bankruptcy Court shall have entered the Interim Order, such Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.

(c)     <u>Notes as Requested; Agreement</u>.  Borrower shall have executed and delivered to each Revolving Lender requesting a Revolving Credit Note such Lender's Revolving Credit Note.  Borrower shall have executed and delivered to Collateral Agent this Agreement in sufficient counterparts for each Lender and Collateral Agent.

(d)     <u>Loan Documents</u>.  The Lender shall have received duly executed Loan Documents, including, without limitation, a guaranty executed by the Guarantor and a Senior Pledge and Security Agreement executed by the Credit Parties, all in form and substance satisfactory to the Lender;

(e)     <u>Security Interest</u>.  The Credit Parties shall have executed and delivered to Collateral Agent such documents or instruments as may be required by Collateral Agent to create or perfect the Liens of Collateral Agent in the assets of Borrower, all to be in form and substance satisfactory to Collateral Agent.

(f)     <u>Officer's Certificate, Resolutions, Organizational Documents</u>.  Borrower shall have delivered to Collateral Agent an officer's certificate certifying the names of the officers/members of Borrower authorized to sign the Loan Documents, together with the true signatures of such officers/members and certified copies of (i) the resolutions of the board of directors (or similar governing body) of Borrower evidencing approval of the execution and delivery of the Loan Documents and the execution of other Related Writings to which Borrower is a party, and (ii) the Organizational Documents of Borrower.

(g)     <u>Good Standing and Full Force and Effect Certificates</u>.  Borrower shall have delivered to Collateral Agent a good standing certificate or full force and effect certificate, as the case may be, issued on or about the Closing Date by the Secretary of State in the state where Borrower is incorporated/organized or qualified to do business.

(h)     <u>Closing Fee and Other Fees</u>.  Borrower shall have (i) paid to Collateral Agent, for the benefit of the Lenders, the Commitment Fees set forth in Section 2.10(a) of this Agreement, and (ii) paid all legal fees and expenses of Collateral Agent in connection with the preparation and negotiation of the Loan Documents.

(i)     <u>Initial Budget</u>.  Borrower shall have prepared and delivered to Collateral Agent the initial Budget and Collateral Agent shall have approved the initial Budget, in its discretion.

(j)    <u>Borrowing Base Certificate</u>.  Borrower shall have delivered to Collateral Agent an initial Borrowing Base Certificate.

(k)    <u>Closing Certificate</u>.  Borrower shall have delivered to Collateral Agent an officer's certificate certifying that, as of the Closing Date, (i) all conditions precedent set forth in this Article IV have been satisfied, (ii) no Default or Event of Default exists nor immediately after the first Credit Event will exist, and (iii) each of the representations and warranties contained in Article VI hereof are true and correct as of the Closing Date.

(l)    <u>Collateral Matters</u>.

    (i)    Collateral Agent shall have received evidence that the completion of all recordings and filings necessary or, in the reasonable opinion of Collateral Agent, desirable to perfect and protect the security interests purported to be created by this Agreement and the other Security Documents have been taken; and

    (ii)    Collateral Agent shall have received evidence that all other actions necessary or, in the reasonable opinion of Collateral Agent, desirable to perfect and protect the first priority Lien in the Collateral, subject only to Permitted Liens, have been taken, or arrangements therefor have been made on a basis satisfactory to Collateral Agent and shall be in place.

(m)    <u>First Day Orders</u>.  The Bankruptcy Court shall have entered the First Day Orders, in form and substance acceptable to Collateral Agent, including, without limitation, an order approving Borrower's use of the cash management system specified therein.

(n)    <u>Prepetition Interest, Fees and Expenses</u>.  The Prepetition Lender shall have received payment of all fees and expenses incurred and accrued and unpaid interest due and payable under the Prepetition Credit Agreement to the extent authorized by the Bankruptcy Court or in any order entered by the Bankruptcy Court.

(o)    <u>Sales Plan and Timetable</u>.  Collateral Agent shall have received a specific plan and timetable for effecting the sale of the businesses and assets of Borrower, in form and substance satisfactory to Collateral Agent, which shall include, without limitation, the following milestones:

    (i)    Borrower shall file with the Bankruptcy Court, on or before May 19, 2017 at 5:00 p.m. (Eastern time), a motion in form and substance reasonably satisfactory to Collateral Agent requesting entry by the Bankruptcy Court of an order approving auction, bid and sale procedures for a proposed sale of all or substantially all or a substantial portion of Borrower's assets pursuant to Section 363 of the Bankruptcy Code; provided, that substantially all of Borrower's assets shall be subject to the auction, bid and sale procedures;

(ii)     Subject to the extension period set forth in (iv) below, Borrower shall conduct, on or before June 14, 2017 at or before 5:00 p.m. (Eastern time), an auction for the sale of its assets to a bidder(s) acceptable to the Collateral Agent and the Required Lenders (the "Accepted Bidder(s)");

(iii)    Subject to the extension period set forth in (iv) below, Borrower shall obtain from the Bankruptcy Court, on or before June 15 2017 at 5:00 p.m. (Eastern time), a hearing to approve the proposed sale of all or substantially all of Borrower's assets to the Accepted Bidder(s) pursuant to Section 363 of the Bankruptcy Code;

(iv)    Borrower shall obtain, on or before June 16, 2017 at 5:00 p.m. (Eastern), which deadline may be extended one (1) time by the Seller, upon written notice to the Purchaser, for a period of ten (10) days provided that a hearing to consider entry of the Sale Order is scheduled before the Bankruptcy Court before the expiration of such ten (10) day period, an order from the Bankruptcy Court approving the proposed sale of substantially all of Borrower's assets to the Accepted Bidder(s) pursuant to Section 363 of the Bankruptcy Code; and

(v)     The closing of the sale to the Accepted Bidder(s) shall occur on or before June 30, 2017.

(p)    <u>Miscellaneous</u>.  Borrower shall have provided to Collateral Agent and the Lenders such other items and shall have satisfied such other conditions as may be reasonably required by Collateral Agent or the Lenders.

ARTICLE V
COVENANTS

5.1    <u>Insurance</u>.  Borrower shall at all times maintain insurance upon all of its personal and real property in such form, written by such companies, in such amounts, for such periods, and against such risks as may be acceptable to Collateral Agent, in its commercially reasonable discretion, with provisions satisfactory to Collateral Agent for payment of all losses thereunder to Collateral Agent and Borrower as their interests may appear (loss payable endorsement in favor of Collateral Agent), and, if required by Collateral Agent, Borrower shall deposit the policies with Collateral Agent.  Any such policies of insurance shall provide for no fewer than thirty (30) days prior written notice of cancellation to Collateral Agent.  Any sums received by Collateral Agent in payment of insurance losses, returns, or unearned premiums under the policies shall be applied as set forth in Section 2.12(c) hereof.  Collateral Agent is hereby authorized to act as attorney-in-fact for Borrower in obtaining, adjusting, settling and canceling such insurance and indorsing any drafts.  In the event of failure to provide such insurance as herein provided, Collateral Agent may, at its option, provide such insurance and Borrower shall pay to Collateral Agent, upon demand, the cost thereof.  Should Borrower fail to pay such sum to Collateral Agent upon demand, interest shall accrue thereon, from the date of demand until paid in full, at the Default Rate.  Within ten days of Collateral Agent's written request, Borrower shall furnish to Collateral Agent such information about the insurance of Borrower as Collateral Agent

may from time to time reasonably request, which information shall be prepared in form and detail reasonably satisfactory to Collateral Agent and certified by a Financial Officer.

5.2    <u>Retention of Consultant; Commercial Financial Audits and Appraisals</u>.

(a)    Borrower agrees that any consultant retained by Collateral Agent's counsel, McDonald Hopkins LLC or any other Person (the "Consultant"), selected by McDonald Hopkins LLC, as a consultant, may, among other things, make visits to, and discuss financial and operational matters with, Borrower. Such Consultant shall not be limited in the frequency of visits to the facilities of Borrower, subject to reasonable notice and accommodation of the operating needs of Borrower. Borrower shall cooperator with such Consultant and provide such Consultant with all information reasonably requested by such Consultant in connection with its engagement by McDonald Hopkins LLC.

(b)    Upon the request of Collateral Agent, Borrower will obtain and deliver to Collateral Agent, or, if Collateral Agent so elects, will cooperate with Collateral Agent in Collateral Agent's obtaining, a report of an independent collateral auditor satisfactory to Collateral Agent (which collateral auditor may be affiliated with Collateral Agent) with respect to the Collateral. All such reports shall be conducted and made at the expense of Borrower.

(c)    Upon the request of Collateral Agent, Borrower will obtain and deliver to Collateral Agent, or, if Collateral Agent so elects, will cooperate with Collateral Agent in Collateral Agent's obtaining, a report of an appraiser or appraisers satisfactory to Collateral Agent (which appraiser or appraisers may be affiliated with Collateral Agent) with respect to the other assets of any Credit Party. All such appraisals shall be conducted and made at the expense of Borrower.

5.3    <u>Financial Statements and Information</u>.

(a)    <u>Monthly Financials</u>. Borrower shall deliver to Collateral Agent, within twenty (20) days after the end of each calendar month a balance sheet of Borrower as to the end of each such month and a statement of income of Borrower (including a statement of revenues and expenses for each of Borrower's business segments and corporate charges) and cash flows for such month and for the period from the beginning of the fiscal year to the end of such month, prepared in accordance with GAAP, in form and detail satisfactory to Collateral Agent, certified by a Financial Officer or the Chief Restructuring Officer, subject to audit, footnotes, and normal year-end adjustments, and accompanied by a Financial Officer's or the Chief Restructuring Officer's certificate to the effect that there exits no Default or Event of Default, or if any Default or Event of Default exists, specifying the nature thereof, the period of existence thereof, and what action Borrower proposes to take with respect thereto.

(b)    <u>Borrowing Base</u>. Borrower shall deliver to Collateral Agent each day on or before Noon (Eastern Time) (and at such other times and for such other periods as

Collateral Agent may request) a Borrowing Base Certificate prepared by a Financial Officer or the Chief Restructuring Officer and an Accounts aging report and a summary Inventory report, each in form and substance satisfactory to Collateral Agent and signed by a Financial Officer or the Chief Restructuring Officer.

(c)     <u>Compliance Certificate</u>.  Borrower shall deliver to Collateral Agent, concurrently with the delivery of the financial statements set forth in subsection (a) above, a Compliance Certificate.

(d)     <u>Reports; Filings in the Case</u>.   Borrower shall deliver to Collateral Agent concurrently with:

    (i)     the filing thereof, copies of all pleadings, motions, applications, information and other papers and documents of any kind filed by or on behalf of the Debtor in the Case;

    (ii)     the giving thereof, copies of all written reports given by or on behalf of the Debtor to any Statutory Committee; and

    (iii)     the giving thereof, copies of all written reports, including without limitation, the monthly report of operations, to the United States Trustee.

(e)     <u>Updated Budget</u>.  Before 5:00 p.m. (Eastern time) on Wednesday of each week, Borrower shall deliver to Collateral Agent (i) an updated Budget reflecting sales, receipts, disbursements and the amounts of Loans of Borrower for the immediately preceding calendar week and the following consecutive thirteen calendar weeks, substantially in the form of Annex 1 hereto, which updated Budget shall be in form and substance satisfactory to Collateral Agent and (ii) before 5:00 p.m. (Eastern time) on Wednesday of each week, a report, certified by the Financial Officer or Chief Restructuring Officer, of the actual performance during the prior calendar week, (i) itemizing and cumulatively totaling all post-Filing Date receipts and disbursements of Borrower for the previous calendar week (i.e. Sunday through Saturday) and actual Loans obtained under this Agreement, (ii) setting forth a comparison of the actual performance (including with respect to sales and collections) for such prior week against the forecast set forth in the Budget for such week, (iii) setting forth a comparison of the actual performance (including with respect to sales and collections) for the period beginning on the Filing Date through the previous calendar week against the cumulative forecast set forth in the Budget for such period, and (iv) itemizing expenses incurred but not paid (and the terms thereof) during the previous calendar week, which report shall be in form and substance satisfactory to Collateral Agent.

(f)     <u>Notice of Litigation</u>.  Promptly, and in any event within two (2) Business Days after Borrower obtains knowledge thereof, Borrower shall provide notice to Collateral Agent of the commencement of or any significant development in the

Case or any other litigation or governmental proceeding pending against Borrower which involves an amount in excess of $25,000, or would be reasonably likely to have a Material Adverse Effect.

(g) <u>Claims Against Collateral</u>. Immediately upon becoming aware thereof, Borrower shall notify Collateral Agent of any notices in writing of any setoffs, claims, withholdings or other defenses to which any of the Collateral, or any of Collateral Agent's or Lenders' rights with respect to the Collateral, are subject.

(h) <u>Financial Information of Borrower</u>. Borrower shall deliver to Collateral Agent, within three (3) days of the written request of Collateral Agent or any Lender, such other information about the financial condition, properties and operations of Borrower as Collateral Agent or such Lender may from time to time reasonably request, which information shall be submitted in form and detail reasonably satisfactory to Collateral Agent or such Lender and certified by a Financial Officer of Borrower.

(i) <u>Marketing and Sale Process Report</u>. Before 12:00 p.m. (Eastern time) each Tuesday, Borrower shall deliver to Collateral Agent, a written status report prepared by Borrower and any Investment Banker regarding the sales process of the Debtor's assets, which report shall include, without limitation, the name of each Person that has contacted Debtor or any Investment Banker (or that Debtor or the Investment Banker has contacted) regarding the sale. Without limiting the foregoing, Borrower shall provide Collateral Agent with an update each day of any significant development in the sale process, including, without limitation, the name of any Person that enters into a confidentiality agreement, requests due diligence materials or makes any proposal with respect to Debtor's assets.

5.4    <u>Financial Records</u>. Borrower shall (a) at all times maintain true and complete records and books of account, including, without limiting the generality of the foregoing, prepare authentic invoices for all of the Accounts and appropriate provisions for possible losses and liabilities, all in accordance with GAAP; (b) render to Collateral Agent, forthwith upon each request of Collateral Agent or any Lender, such financial statements of Borrower's financial condition and operations, including but not limited to Borrower's tax returns, and such reports of the Accounts, as Collateral Agent or any Lender may from time to time request; (c) give Collateral Agent prompt written notice whenever any Account Debtor shall become in default in any manner or assert any defense or offset and whenever any other event, omission, condition or thing having a material adverse effect on any Account shall occur or arise; (d) forward to Collateral Agent, upon request of Collateral Agent or any Lender, whenever made, (i) invoices, sales journals or other documents satisfactory to Collateral Agent or such Lender, as the case may be, that summarize the Accounts, certified by an Authorized Officer of Borrower, (ii) within the time specified by Collateral Agent, an aging report of the Accounts then outstanding setting forth, in such form and detail and with such representations and warranties as Collateral Agent or such Lender may from time to time reasonably require, the unpaid balances of all invoices billed respectively during that period and during each of the three next preceding periods, and certified by an Authorized Officer of Borrower, and (iii) with respect to the Inventory and any other Collateral, such reports and other documents that are satisfactory to Collateral Agent and the

Lenders; and (e) at all reasonable times (during normal business hours and upon notice to Borrower) permit Collateral Agent or any Lender, or any representative of Collateral Agent or such Lender, to examine Borrower's books and records and to make excerpts therefrom and transcripts thereof.

5.5    <u>Franchises; Change in Business</u>.

(a)    Borrower shall preserve and maintain at all times its existence, and its rights and franchises, if any, necessary for its business, except as otherwise permitted pursuant to Section 5.12 hereof.

(b)    Borrower shall not engage in any business if, as a result thereof, the general nature of the business of Borrower taken as a whole would be substantially changed from the general nature of the business Borrower is engaged in on the Closing Date.

5.6    <u>ERISA Pension and Benefit Plan Compliance</u>.  Borrower shall not become part of a Controlled Group or create, maintain or become obligated to contribute to any Plan or Multiemployer Plan.

5.7    [Reserved]

5.8    <u>Borrowing</u>.    Borrower shall not create, incur or have outstanding any Indebtedness of any kind; provided that this Section 5.8 shall not apply to the following:

(a)    the Loans and any other Indebtedness under this Agreement; and

(b)    Indebtedness existing as of the Filing Date ("Existing Indebtedness"), without giving effect to any subsequent extension, renewal or refinancing thereof.

5.9    <u>Liens</u>.  Borrower shall not create, assume or suffer to exist (upon the happening of a contingency or otherwise) any Lien upon any of its property or assets, whether now owned or hereafter acquired; provided that this Section 5.9 shall not apply to the following (each, a "Permitted Lien"):

(a)    Liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with GAAP;

(b)    other statutory Liens or Liens of carriers, customs brokers and warehousemen or shippers incidental to the conduct of its business or the ownership of its property and assets that (i) were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of its property or assets or materially impair the use thereof in the operation of its business;

(c)    Liens on property or assets of a Subsidiary, if any, to secure obligations of such Subsidiary to a Credit Party in existence on the Filing Date;

(d)      any Lien granted to Collateral Agent or any Lender pursuant to this Agreement, the other Loan Documents or the Orders; or

(e)      the Prepetition Liens and the Other Prepetition Lien.

Borrower shall not enter into any contract or agreement (other than a contract or agreement entered into in connection with the purchase or lease of fixed assets that prohibits Liens on such fixed assets) that would prohibit Collateral Agent or the Lenders from acquiring a security interest, mortgage or other Lien on, or a collateral assignment of, any of the property or assets of Borrower.

Nothing contained in this Section 5.9 subordinates the Liens in favor of Collateral Agent or the Lenders under the Loan Documents to any Permitted Lien that is not valid, perfected and entitled to priority over Collateral Agent's or the Lenders' Liens under applicable law or that is avoidable under the Bankruptcy Code.

5.10     Regulations T, U and X.  Borrower shall not take any action that would result in any non-compliance of the Loans or Letters of Credit with Regulations T, U or X, or any other applicable regulation, of the Board of Governors of the Federal Reserve System.

5.11     Investments, Loans and Guaranties.  Borrower shall not (a) create, acquire or hold any Subsidiary, (b) make or hold any investment in any stocks, bonds or securities of any kind, (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a Guarantor of any kind (other than a Guarantor of Payment under the Prepetition Loan Documents); provided that this Section 5.11 shall not apply to any endorsement of a check or other medium of payment for deposit or collection through normal banking channels or similar transaction in the normal course of business.

5.12     Merger and Sale of Assets.  Borrower shall not merge, amalgamate or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business consistent with past practices or as agreed by Collateral Agent.

5.13     Acquisitions.  No Borrower shall effect an Acquisition without the prior written consent of the Collateral Agent.

5.14     Notice.

(a)      Borrower shall cause a Financial Officer of Borrower to promptly notify Collateral Agent and the Lenders, in writing, whenever a Default or Event of Default may occur hereunder or any representation or warranty made in Article VI hereof or elsewhere in this Agreement or in any Related Writing may for any reason cease in any material respect to be true and complete.

(b)      Promptly upon becoming aware thereof, but in any event, within two (2) Business Days, Borrower will give Collateral Agent and the Lenders written notice about

any condition or event that Borrower determines has or is reasonably likely to have a Material Adverse Effect.

(c)    Borrower shall give Collateral Agent prompt, but in any event, within two (2) Business Days, written notice if the Internal Revenue Service shall allege the nonpayment or underpayment of any tax by Borrower or threaten to make any assessment in respect thereof.

5.15    <u>Restricted Payments</u>.    Borrower shall not make or commit itself to make any Restricted Payment.

5.16    <u>Environmental Compliance</u>.    Borrower shall comply in all material respects with any and all Environmental Laws.  Borrower shall furnish to Collateral Agent and the Lenders, promptly after receipt thereof, a copy of any notice Borrower may receive from any Governmental Authority or private Person or otherwise that any material litigation or proceeding pertaining to any environmental, health or safety matter has been filed or is threatened against Borrower, any real property in which Borrower holds any interest or any past or present operation of Borrower.  Borrower shall not allow the release or disposal of hazardous waste, solid waste or other wastes on, under or to any real property in which Borrower holds any ownership interest or performs any of its operations, in violation of any Environmental Law.  As used in this Section 5.16, "litigation or proceeding" means any demand, claim, notice, suit, suit in equity action, administrative action, investigation or inquiry whether brought by any Governmental Authority or private Person or otherwise. Borrower shall defend, indemnify and hold Collateral Agent and the Lenders harmless against all costs, expenses, claims, damages, penalties and liabilities of every kind or nature whatsoever (including attorneys' fees) arising out of or resulting from the noncompliance of Borrower with any Environmental Law.  Such indemnification shall survive any termination of this Agreement.

5.17    <u>Affiliate Transactions</u>.    Borrower shall, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate (other than a Credit Party) on terms that shall be less favorable to Borrower than those that might be obtained at the time in a transaction with a non-Affiliate.

5.18    <u>Use of Proceeds</u>.

(a)    <u>Use of Proceeds</u>.  The proceeds of all Revolving Loans and the issuance of Letters of Credit may be used for the general corporate and working capital purposes of Borrower solely in accordance with the then current Budget.

(b)    <u>Other Uses</u>.    Notwithstanding anything to the contrary contained in this Agreement, none of the (i) Carve Out, (ii) prepetition or postpetition collateral proceeds or (iii) proceeds of the Revolving Loans shall be used to object to or challenge in any way, any claims, Liens or cash collateral held by or on behalf of the Prepetition Lender; provided that the above identified amounts may be used by the Creditors' Committee to investigate (X) the validity, enforceability, perfection or priority of the Prepetition Liens and the Prepetition Collateral

securing the Prepetition Obligations or (Y) the validity, priority, status or amount of the Prepetition Obligations, in each case within the time period established by the Bankruptcy Court and set forth in the Final Order; provided, further, however, that the aggregate amount of such expenses incurred by the Creditors' Committee for any such investigation herein shall not exceed $10,000.00.  Nothing in this Agreement shall prevent Collateral Agent or any Lender from objecting to any fees and expenses in the Case.

5.19    <u>Corporate Names and Locations of Collateral</u>.  Borrower shall not change its corporate name.  Borrower shall promptly, but in any event, within two (2) Business Days, notify Collateral Agent of (a) any change in any location where Borrower's Inventory or Equipment is maintained, and any new locations where Borrower's Inventory or Equipment is to be maintained; (b) any change in the location of the office where Borrower's records pertaining to its Accounts are kept; (c) the location of any new places of business and the changing or closing of any of its existing places of business; and (d) any change in Borrower's chief executive office.  In the event of any of the foregoing or if deemed appropriate by Collateral Agent, Agent is hereby authorized to file new U.C.C. Financing Statements describing the Collateral and otherwise in form and substance sufficient for recordation wherever necessary or appropriate, as determined in Collateral Agent's sole discretion, to perfect or continue perfected the security interest of Collateral Agent in the Collateral.  Borrower shall pay all filing and recording fees and taxes in connection with the filing or recordation of such U.C.C. Financing Statements and shall promptly reimburse Collateral Agent therefor if Collateral Agent pays the same.  Such amounts shall be Related Expenses hereunder.

5.20    <u>Limitation on Creation of Subsidiary</u>.  Borrower shall not establish, create or acquire any new or additional Subsidiaries.

5.21    <u>Property Acquired Subsequent to the Closing Date and Right to Take Additional Collateral</u>.  Borrower shall provide Collateral Agent with prompt written notice with respect to any real or personal property (other than Accounts and Inventory acquired in the ordinary course of business) acquired by Borrower subsequent to the Closing Date.  In addition to any other right Collateral Agent and the Lenders may have pursuant to this Agreement or otherwise, upon written request of Collateral Agent, whenever made, Borrower shall grant to Collateral Agent as additional security for the Secured Obligations, a first Lien on any real or personal property of Borrower, including, without limitation, such property acquired subsequent to the Closing Date, in which Collateral Agent does not have a first priority Lien.  Borrower agrees, within ten days after the date of such written request, to secure all of such Indebtedness by delivering to Collateral Agent security agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as Collateral Agent may require.  Borrower shall pay all recordation, legal and other expenses in connection therewith.

5.22    [Reserved]

5.23    <u>Amendment of Organizational Documents; Prepetition Obligations</u>.  Without the prior written consent of Collateral Agent, Borrower shall not amend its Organizational Documents.  Borrower shall not amend, modify or change in any manner any agreement relating to any Prepetition Obligation, without the prior written consent of Collateral Agent.

5.24    <u>Collateral</u>.  Borrower shall:

(a)    at all reasonable times allow Collateral Agent or any Lender by or through any of its officers, agents, employees, attorneys, or accountants to (i) examine, inspect, and make extracts from Borrower's books and other records, including, without limitation, the tax returns of Borrower; (ii) arrange for verification of Borrower's Accounts, under reasonable procedures, directly with Account Debtors or by other methods; and (iii) examine and inspect Borrower's Inventory and Equipment, wherever located;

(b)    promptly furnish to Collateral Agent or any Lender upon request (i) additional statements and information with respect to the Collateral, and all writings and information relating to or evidencing any of Borrower's Accounts (including, without limitation, computer printouts or typewritten reports listing the mailing addresses of all present Account Debtors), and (ii) any other writings and information as Collateral Agent or such Lender may reasonably request;

(c)    notify Collateral Agent in writing promptly upon the creation of any Accounts with respect to which the Account Debtor is the United States of America or any other Governmental Authority, or any foreign government or instrumentality thereof or any business that is located in a foreign country;

(d)    notify Collateral Agent in writing whenever a material amount of the Inventory of Borrower is located at a location of a third party (other than Borrower) that is not listed on <u>Schedule 6.9</u> hereto and cause to be executed any bailee's waiver, processor's waiver or similar document or notice that may be required by Collateral Agent or the Lenders;

(e)    immediately notify Collateral Agent and the Lenders in writing of any information that Borrower has or may receive with respect to the Collateral that might in any manner materially and adversely affect the value of the Collateral (taken as a whole) or the rights of Collateral Agent or the Lenders with respect thereto;

(f)    maintain Borrower's equipment in good operating condition and repair, ordinary wear and tear excepted, making all necessary replacements thereof so that the value and operating efficiency thereof shall at all times be maintained and 2preserved;

(g)    deliver to Collateral Agent to hold as security for the Secured Obligations, within ten Business Days upon the written request of Collateral Agent, all certificated investment property owned by a Credit Party, in suitable form for transfer by delivery, or accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Collateral Agent, or in the event such investment property is in the possession of a securities intermediary or credited to a securities account, execute with the related securities intermediary an investment property control agreement over such securities

account in favor of Collateral Agent, in form and substance reasonably satisfactory to Collateral Agent; and

(h)    upon request of Collateral Agent, promptly take such action and promptly make, execute, and deliver all such additional and further items, deeds, assurances, instruments and any other writings as Collateral Agent may from time to time deem necessary or appropriate, require, including, without limitation, chattel paper, to carry into effect the intention of this Agreement, or so as to completely vest in and ensure to Collateral Agent and the Lenders their respective rights hereunder and in or to the Collateral.

Borrower hereby authorizes Collateral Agent to file U.C.C. Financing Statements with respect to the Collateral.  If certificates of title or applications for title are issued or outstanding with respect to any of the Inventory or Equipment of Borrower, Borrower shall, upon request of Collateral Agent, (i) execute and deliver to Collateral Agent a short form security agreement, in form and substance reasonably satisfactory to Collateral Agent, and (ii) deliver such certificate or application to Collateral Agent and cause the interest of Collateral Agent to be properly noted thereon.  Borrower hereby authorizes Collateral Agent, or its respective designated agents (but without obligation by Collateral Agent to do so), to incur Related Expenses (whether prior to, upon, or subsequent to any Default or Event of Default), and Borrower shall promptly repay, reimburse, and indemnify Collateral Agent for any and all Related Expenses.  If Borrower fails to keep and maintain its Equipment in good operating condition, ordinary wear and tear excepted, Collateral Agent may (but shall not be required to) so maintain or repair all or any part of Borrower's Equipment and the cost thereof shall be a Related Expense.  All Related Expenses are payable to Collateral Agent, as applicable, upon demand therefor; Collateral Agent may, at its option, debit Related Expenses directly to any deposit account of Borrower located at Collateral Agent.

5.25    <u>Further Assurances</u>.  Borrower shall, promptly upon request by Collateral Agent (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, (b) provide title insurance, appraisals, environmental reports and other due diligence with respect to the real estate as may be required by Collateral Agent, and (c) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as Collateral Agent may reasonably require from time to time in order to carry out more effectively the purposes of the Loan Documents.

5.26    <u>Communications with Professionals</u>.    Borrower authorizes Collateral Agent, Consultant or any of Collateral Agent's representatives and counsel to communicate directly with Borrower's professionals, including, without limitation, the Financial Officer, Chief Restructuring Officer (if any), Borrower's counsel and other professionals retained by Borrower, and further authorizes such professionals to disclose to Collateral Agent, Consultant, or Collateral Agent's representatives and counsel, as the case may be, such information as may be reasonably requested by any such Person with respect to the business, financial condition or other affairs of Borrower; provided that Borrower's professionals shall not be required to disclose privileged or confidential information to the extent that disclosure cannot be made without compromising such information's privileged or confidential status.

5.27    Executory Contracts.  Prior to the Debtor rejecting any contract or making any motion to reject any contract, Borrower shall notify Collateral Agent in writing of the Debtor's reasons why such rejection will be in the best interests of the Debtor and will not have a Material Adverse Effect on Borrower.

5.28    Limitation on Creation of Bank Accounts.  Borrower will not: (a) establish any bank accounts other than those in existence on the Filing Date without Collateral Agent's prior written consent, or (b) deposit into any payroll accounts any amounts in excess of amounts necessary to pay current payroll and related tax obligations from such accounts.

5.29    Bankruptcy Case.  Borrower will not (a) seek, consent or suffer to exist any modification, stay, vacation or amendment to the Orders, unless Collateral Agent has consented to such modification, stay, vacation or amendment in writing, (b) seek or consent to nor shall the Bankruptcy Court have permitted a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a), 507(b), 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority claim of Collateral Agent and the Lenders in respect of the Obligations, except for the Carve Out, or (c) seek, consent or suffer to exist any Lien on any Collateral, having a priority equal or superior to the Lien in favor of Collateral Agent or the Lenders in respect of the Obligations, or equal or superior to the Prepetition Liens in favor of the Prepetition Lender, except for the Carve Out and Permitted Liens.

5.30    Cash Management Arrangements; Depositary Arrangements.  Borrower shall:

(a)    Maintain in place cash management arrangements in accordance with the First Day Orders in connection with the Case relating to the Debtor's cash management system and in form and substance reasonably satisfactory to Collateral Agent. Without limiting the generality of the foregoing, the parties agree that:

(i)    all cash and cash equivalents held by Borrower and all proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights for which Borrower is an obligee shall be deposited into either the Cash Collateral Account; and

(ii)    all cash and cash equivalents held by Borrower and all such proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights shall, on each Business Day or such other frequency as may be agreed to by Collateral Agent, be transferred to the Cash Collateral Account, to the extent not already transferred to the Cash Collateral Account, for application to the Prepetition Obligations or the Obligations pursuant to the provisions hereof.

(b)    In the event that Borrower receives any cash, checks or other cash proceeds of Collateral promptly upon receipt thereof, in the identical form received (except for any endorsements thereon which may be required by Collateral Agent), cause

such cash, checks and cash proceeds to be paid directly into the Cash Collateral Account.

(c)     Except to the extent that Borrower shall be required to make payments to Collateral Agent or any other Person pursuant to the terms of this Agreement or the other Loan Documents, and subject to the rights and remedies that may from time to time be available to Collateral Agent and the Lenders upon the occurrence of an Event of Default, Borrower may use funds in the Cash Collateral Account for the disbursements set forth in the Budget, subject in any case to the terms and conditions of this Agreement and the other Loan Documents.

5.31    <u>Severance Payments</u>.   Borrower shall make no Severance Payments except as otherwise consented to in writing by Collateral Agent.

5.32    <u>Maximum Disbursements</u>.   Borrower shall not, during any Testing Period (or portion thereof), make or become obligated to make cash disbursements in an aggregate amount exceeding one hundred and ten percent (110%) of the amount of cash disbursements projected for such Testing Period (or portion thereof) as set forth in the Budget in effect during such Testing Period.

5.33    <u>Minimum Sales</u>.   Borrower shall fail, during any Testing Period (or portion thereof), to have sales in an aggregate amount of less than 85% of the amount of sales projected for such Testing Period (or portion thereof) as set forth in the Budget then in effect for such Testing Period.

5.34    <u>Chief Restructuring Officer</u>.   David A. Kebrdle, Managing Partner of Chikol Equities, Inc., shall be retained by Borrower as its chief restructuring officer or such other financial advisor experienced in restructuring operations of distressed companies (the "Chief Restructuring Officer"), reasonably acceptable to Collateral Agent, in each case on terms and conditions acceptable to Collateral Agent and shall continue to retain a Chief Restructuring Officer unless otherwise permitted by Collateral Agent.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

6.1     <u>Corporate Existence; Subsidiaries; Foreign Qualification</u>.   Borrower is duly organized, validly existing and in good standing under the laws of its state or jurisdiction of incorporation or organization, and is duly qualified and authorized to do business and is in good standing as a foreign entity in the jurisdictions set forth opposite its name on <u>Schedule 6.1</u> hereto, which are all of the states or jurisdictions where the character of its property or its business activities makes such qualification necessary, except where a failure to so qualify would not reasonably be expected to have a Material Adverse Effect.  <u>Schedule 6.1</u> hereto sets forth, as of the Closing Date, each Subsidiary of Borrower, if any (and whether such Subsidiary is a Dormant Subsidiary) and each Person that is an owner of Borrower's stock, its state of formation, and its relationship to Borrower, including the percentage of equity owned by a company, each Person that owns the stock or other equity interest of Borrower, the location of its chief executive office and its principal place of business.

6.2     <u>Corporate Authority</u>.  Borrower has the right and power and is duly authorized and empowered to enter into, execute and deliver the Loan Documents to which it is a party and to perform and observe the provisions of the Loan Documents.  The Loan Documents to which each Credit Party is a party have been duly authorized and approved by such Credit Party's board of directors or other governing body, as applicable, and are the valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with their respective terms and the Orders.  The execution, delivery and performance of the Loan Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a Lien (other than Liens permitted under Section 5.9 hereof) upon any assets or property of Borrower under the provisions of, Borrower's Organizational Documents or any material agreement entered into after the Filing Date to which Borrower is a party.

6.3     <u>Compliance with Laws and Contracts</u>.  Borrower:

(a)     holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any Governmental Authority necessary for the conduct of its business and is in material compliance with all applicable laws relating thereto;

(b)     is in material compliance with all federal, state, local, or foreign applicable statutes, rules, regulations, and orders including, without limitation, those relating to environmental protection, occupational safety and health, and equal employment practices;

(c)     has ensured that no Person who owns a controlling interest in or otherwise controls Borrower is (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, or any other similar lists maintained by OFAC pursuant to any authorizing statute, executive order or regulation, or (ii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar executive orders;

(d)     is in material compliance with all applicable Bank Secrecy Act ("BSA") and anti-money laundering laws and regulations; and

(e)     is in compliance with the Patriot Act.

6.4     <u>Litigation and Administrative Proceedings</u>.  Except as disclosed on <u>Schedule 6.4</u> hereto and the Case, on the Closing Date there are (a) no lawsuits, actions, investigations, or other proceedings pending or, to the best knowledge of Borrower, threatened against Borrower, or in respect of which Borrower may have any liability, in any court or before any Governmental Authority, arbitration board, or other tribunal, (b) no orders, writs, injunctions, judgments, or decrees of any court or Governmental Authority to which Borrower is a party or by which the property or assets of Borrower are bound, except with respect to the Case, and (c) no grievances, disputes, or controversies outstanding with any union or other organization of the employees of Borrower, or threats of work stoppage, strike, or pending demands for collective bargaining.

6.5    Title to Assets.  Except as set forth on Schedule 6.5 hereto, Borrower has good title to and ownership of all material property it purports to own, which property is free and clear of all Liens, except for Permitted Liens.  As of the Closing Date, Borrower owns the real property listed on Schedule 6.5 hereto.

6.6    Liens and Security Interests.  Upon the entry of the Final Order, except for Permitted Liens, (a) there is and will be no U.C.C. Financing Statement or similar notice of Lien outstanding covering any personal property of Borrower; (b) there is and will be no mortgage outstanding covering any real property of Borrower; and (c) no real or personal property of Borrower is subject to any Lien of any kind.  The Collateral and the Collateral Agent's rights with respect to the Collateral are not subject to any set off, claims, withholding or other defenses other than those arising in the ordinary course of business consistent with past practices.

6.7    Tax Returns.  All federal, state and local tax returns and other reports required by law to be filed in respect of the income, business, properties and employees of Borrower have been filed (or extended as permitted by applicable law) and all taxes, assessments, fees and other governmental charges that are due and payable have been paid, except as otherwise permitted herein.  The provision for taxes on the books of Borrower is adequate for all years not closed by applicable statutes and for the current fiscal year.

6.8    Environmental Laws.  Borrower is in material compliance with all Environmental Laws, including, without limitation, all Environmental Laws in all jurisdictions in which Borrower owns or operates, or has owned or operated, a facility or site, arranges or has arranged for disposal or treatment of hazardous substances, solid waste or other wastes, accepts or has accepted for transport any hazardous substances, solid waste or other wastes or holds or has held any interest in real property or otherwise. No litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to the best knowledge of Borrower threatened, against Borrower, any real property in which Borrower holds or has held an interest or any past or present operation of Borrower. No release, threatened release or disposal of hazardous waste, solid waste or other wastes is occurring, or has occurred (other than those that are currently being remediated in accordance with Environmental Laws), on, under or to any real property in which Borrower holds any interest or performs any of its operations, in violation of any Environmental Law. As used in this Section 6.8, "litigation or proceeding" means any demand, claim, notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by any Governmental Authority or private Person, or otherwise.

6.9    Locations.  As of the Closing Date, Borrower has places of business or maintains its Accounts, Inventory and Equipment at the locations (including third party locations) set forth on Schedule 6.9 hereto, and Borrower's chief executive office is set forth on Schedule 6.9 hereto.  Schedule 6.9 further specifies whether each location, as of the Closing Date, (a) is owned by Borrower, or (b) is leased by Borrower from a third party, and, if leased by Borrower from a third party, if a Waiver has been requested.  As of the Closing Date, Schedule 6.9 correctly identifies the name and address of each third party location where assets of Borrower are located.

6.10    Continued Business.  Other than as disclosed to Lender in connection with the negotiation and execution of that certain Sales Agreement between Borrower and United Electric

Power, Inc., there exists no actual, pending, or, to Borrower's knowledge, any threatened termination, cancellation or limitation of, or any modification or change in the business relationship of Borrower and any customer or supplier, or any group of customers or suppliers, whose purchases or supplies, individually or in the aggregate, are material to the business of Borrower, and other than the filing of the Case, there exists no present condition or state of facts or circumstances that would have a Material Adverse Effect or prevent Borrower from conducting such business or the transactions contemplated by this Agreement in substantially the same manner in which it was previously conducted.

6.11    <u>Employee Benefits Plans</u>.  Borrower is not a member of any Controlled Group nor does it maintain or contribute to any Plan or Multiemployer Plan.

6.12    <u>Consents or Approvals</u>.  Except for the entry of the Orders, no consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person is required to be obtained or completed by Borrower in connection with the execution, delivery or performance of any of the Loan Documents, that has not already been obtained or completed.

6.13    [Reserved]

6.14    <u>Budget</u>.  Borrower has delivered to Collateral Agent the initial Budget, covering the thirteen (13) week period commencing with the week during which the Closing Date occurred.  The Budget has been prepared in good faith based upon assumptions which Borrower believes to be reasonable assumptions.   To the knowledge of Borrower, no facts exist that (individually or in the aggregate) would result in any material change to the Budget.

6.15    <u>Regulations</u>.   Borrower is not engaged principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America). Neither the granting of any Loan nor the use of the proceeds of any Loan will violate, or be inconsistent with, the provisions of Regulation T, U or X or any other Regulation of such Board of Governors.

6.16    <u>Material Agreements</u>.   Except as disclosed on <u>Schedule 6.16</u> hereto, as of the Closing Date, Borrower is not a party to any (a) debt instrument (excluding the Loan Documents); (b) lease (capital, operating or otherwise), whether as lessee or lessor thereunder; (c) contract, commitment, agreement, or other arrangement involving the purchase or sale of any inventory by it, or the license of any right to or by it; (d) contract, commitment, agreement, or other arrangement with any of its "Affiliates" (as such term is defined in the Securities Exchange Act of 1934, as amended); (e) management or employment contract or contract for personal services, with any of its Affiliates that is not otherwise terminable at will or on less than ninety (90) days' notice without liability; (f) collective bargaining agreement; or (g) other contract, agreement, understanding, or arrangement with a third party that, as to subsections (a) through (g), above, if violated, breached, or terminated for any reason, would have or would be reasonably expected to have a Material Adverse Effect.

6.17     Intellectual Property.  Borrower owns, possesses or has the right to use all of the material patents, patent applications, industrial designs, designs, trademarks, service marks, copyrights and licenses, and rights with respect to the foregoing necessary for the conduct of its business without any known conflict with the rights of others.  Except as set forth on Schedule 6.17 hereto, Borrower does not own any intellectual property, including, without limitation, any patents, patent applications, trademarks, service marks, copyrights, licenses, and rights with respect to the foregoing.

6.18     Insurance.  Borrower maintains with financially sound and reputable insurers insurance with coverage and limits as required by law and as is customary with Persons engaged in the same businesses as Borrower.  Schedule 6.18 hereto sets forth all insurance carried by Borrower on the Closing Date, setting forth in detail the amount and type of such insurance and the current expiration date of each insurance policy.

6.19     Deposit Accounts.  Schedule 6.19 hereto lists all banks and other financial institutions at which Borrower maintains deposit or other accounts as of the Closing Date, and Schedule 6.19 hereto correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

6.20     Accurate and Complete Statements.   The Loan Documents and the written statements made by Borrower in connection with any of the Loan Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or in the Loan Documents not misleading.  After due inquiry by Borrower, there is no known fact that Borrower has not disclosed to Collateral Agent and the Lenders that has or is likely to have a Material Adverse Effect.

6.21     Investment Company; Other Restrictions.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (b) any foreign, federal, state or local statute or regulation limiting its ability to incur Indebtedness.

6.22     Defaults.  No Default or Event of Default exists hereunder, nor will any begin to exist immediately after the execution and delivery hereof.

6.23     Existing Indebtedness.  Annex 4 hereto sets forth a true and complete list of all Indebtedness of Borrower as of the Closing Date (the "Existing Indebtedness"), in each case showing the aggregate principal amount thereof and the name of any other entity which directly or indirectly guaranteed such Indebtedness.

ARTICLE VII
EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default hereunder:

7.1     Payments.  If the principal of or interest on any Loan or any amount owing pursuant to Section 2.10(a) or (c) shall not be paid in full when due and payable.

7.2     Covenants.  If Borrower shall fail or omit to perform and observe any agreement or other provision (other than those referred to in Section 7.1) contained or referred to in this Agreement or any Related Writing.

7.3     Representations and Warranties.  If any representation, warranty or statement made in or pursuant to this Agreement or any Related Writing or any other material information furnished by Borrower to Collateral Agent or the Lenders, or any thereof, or any other holder of any Note, shall be false or erroneous.

7.4     Failure to Pay Post-Filing Date Indebtedness, Etc.  Borrower shall (a) fail to pay any Indebtedness arising after the Filing Date when and as the same shall become due and payable (giving effect to any applicable grace period under the instrument evidencing such Indebtedness) (except as may be permitted by the Bankruptcy Code) or (b) fail to comply with any order of the Bankruptcy Court in any material respect.

7.5     Change in Control.  If any Change in Control shall occur.

7.6     Money Judgment.  A final judgment or order for the payment of money shall be rendered against Borrower by a court of competent jurisdiction, that remains unpaid or unstayed and undischarged for a period (during which execution shall not be effectively stayed) of thirty (30) days after the date on which the right to appeal has expired, provided that the aggregate of all such judgments for Borrower shall exceed $25,000.

7.7     Material Adverse Change.  There shall have occurred any condition or event that Collateral Agent or the Required Lenders determine has or is reasonably likely to have a Material Adverse Effect.

7.8     Security.  If any Lien granted in this Agreement or any other Loan Document in favor of Collateral Agent shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement or the Orders and Borrower has failed to promptly execute appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by Collateral Agent, in its reasonable discretion) and Borrower has failed to promptly execute appropriate documents to correct such matters.

7.9     Validity of Loan Documents.  (a) Any material provision, in the reasonable opinion of Collateral Agent, of any Loan Document shall at any time for any reason (other than a partial or full written release in accordance with the terms thereof) cease to be valid, binding and enforceable against any Credit Party; (b) the validity, binding effect or enforceability of any Loan Document against any Credit Party shall be contested by any Credit Party; (c) any Credit Party shall deny that it has any or further liability or obligation under any Loan Document; or (d) any Loan Document shall be cancelled, terminated, revoked, rescinded, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to Agent and the Lenders the benefits purported to be created thereby.

7.10     Default Under Prepetition Credit Agreement.  Except for the commencement of the Case, or as described in that Forbearance and Amendment Agreement dated December 22,

2016, and any amendments thereto, an Event of Default shall have occurred under the Prepetition Credit Agreement.

7.11    Continued Operation of Business.  Borrower shall be enjoined from conducting any part of its business as a debtor-in-possession; there shall occur any act of terrorism or other "force majeure" event disrupting any material portion of the business of Borrower, which in each such case referred to in this Section 7.11 shall continue for a period of five (5) or more days and could reasonably be expected to have a Material Adverse Effect.

7.12    Final Judgment.  There shall remain undischarged for more than thirty (30) days any final judgment arising after the Filing Date or execution action against Borrower, or relief from the automatic stay of Section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of Borrower with respect to assets having an aggregate value in excess of $25,000, or where the deprivation of Borrower of such assets could reasonably be expected to have a Material Adverse Effect.

7.13    [Reserved]

7.14    Relief from Automatic Stay.  Borrower shall default in the payment when due of any principal of or interest on any post-Filing Date Indebtedness, or any pre-Filing Date Indebtedness if, by order of the Bankruptcy Court issued with respect to such Indebtedness, the default thereunder entitles the holder thereof to relief from the automatic stay under Section 362 of the Bankruptcy Code, in excess of $25,000 in the aggregate of such post-Filing Date or pre-Filing Date Indebtedness.

7.15    Modification of Any Order.  The Bankruptcy Court shall enter any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any Order, or any other order with respect to the Case, affecting adversely in any respect this Agreement, (ii) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Case, (iii) dismissing the Case or converting the Case to a Chapter 7 case, or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on a material portion of the assets of Borrower or where the deprivation of such assets of Borrower would reasonably be expected to have a Material Adverse Effect.

7.16    Final Order.  The Bankruptcy Court shall fail to enter the Final Order within twenty (20) days after the entry of the Interim Order.

7.17    Termination Event under Orders.  The occurrence of a Termination Event (as defined in the Orders) under either of the Orders.

7.18    Application for Superpriority Claim.  An application shall be filed by Borrower for the approval of any other Superpriority Claim in the Case which is pari passu with or senior to the claims of Collateral Agent and the Lenders against Borrower unless after giving effect to the transactions contemplated by such application, all Obligations (whether contingent or otherwise) shall be paid in full in cash and the Total Commitment shall be terminated, or the Bankruptcy Court shall determine that any such Superpriority Claim has arisen.

7.19   <u>Motions with Bankruptcy Court</u>.  Borrower shall file a motion in the Case (i)  to use cash collateral of the Lender or of the Prepetition Lender under Section 363(c) of the Bankruptcy Code without the Lender's or the Prepetition Lender's, as applicable, consent, except for the payment of payroll and payroll-related expenses and as otherwise approved in the Orders and the First Day Orders, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, (iii) to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iv) to take any other action or actions adverse to the Lender or the Prepetition Lender or their rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating any of the Prepetition Obligations or Collateral Agent's, the Lender's, or the Prepetition Lender's interest in any of the Collateral.

7.20   <u>Suit against Lenders, etc</u>.  A suit or action against any of Collateral  Agent, the Lenders, the Prepetition Lender shall be commenced by Borrower, any federal, state environmental protection or health and safety agency or any Statutory Committee in the Case, which suit or action asserts any claim or legal or equitable remedy contemplating subordination of any claim or Lien of the Lenders, Collateral Agent, or the Prepetition Lender, and shall remain undismissed for fifteen (15) days after its commencement and, with respect to any suit or action by any such federal or state agency or Statutory Committee, a preliminary order for relief or judgment or decree shall have been entered in such suit or action against the Lenders, Collateral Agent, or the Prepetition Lender and, in the case of a preliminary order, such preliminary order has not been stayed within ten (10) days after its entry.

7.21   <u>Reorganization Plan or Disclosure Statement</u>.  Without the prior written consent of Collateral Agent and the Required Lenders, a reorganization plan or a related disclosure statement or any draft thereof is distributed by or on behalf of Borrower to any Person and such reorganization plan or disclosure statement does not provide for the Payment in Full upon the effectiveness of such plan of reorganization.  Without the prior consent of the Prepetition Lender, a reorganization plan or a related disclosure statement or any draft thereof is distributed by or on behalf of Borrower to any Person and such reorganization plan or disclosure statement provides for the impairment of the rights, claims or interests of the Prepetition Lender.

7.22   [Reserved]

7.23   <u>Plan of Sale</u>.  Borrower shall fail to perform or observe any provision or requirement set forth in the Sales Plan on or before the time set forth in the Sales Plan for the performance or observance or such provision or requirement.

7.24   <u>Resignation or Termination of Chief Restructuring Officer</u>.  The Chief Restructuring Officer shall be terminated, resigns or otherwise ceases service, unless a replacement Chief Restructuring Officer satisfactory to Collateral Agent shall have been (a) in the case of termination retained immediately and (b) in any other case selected not later than the date five (5) Business Days after such resignation or cessation of service, and retained not later than thirty (30) days after, resignation (or other departure or cessation of service) of the existing Chief Restructuring Officer.

ARTICLE VIII
REMEDIES UPON DEFAULT

8.1     Remedies.  If any Event of Default shall occur and then be continuing, Collateral Agent may, and shall upon the written instruction of Required Lenders (which for purposes of such instruction shall include Collateral Agent in its capacity as a Lender), by written notice to Borrower, take any or all of the following actions, without prejudice to the rights of Collateral Agent or any Lender to enforce its claims against Borrower, except as otherwise specifically provided for in this Agreement: (a) declare the Total Commitment terminated, whereupon the Commitment of each Lender shall forthwith terminate immediately and any commitment fees shall forthwith become due and payable without any other notice of any kind; (b) declare the principal of and any accrued interest in respect of all Loans and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower; (c) subject to the notice provisions of the following paragraph, enforce, as Collateral Agent (or direct the Collateral Agent to enforce), any or all of the Liens and security interests created pursuant to the Security Documents; and (d) subject to the notice provisions of the following paragraph, apply any cash collateral held pursuant to this Agreement to repay the Obligations.

In addition to and not in derogation of the above paragraph, upon the occurrence of an Event of Default, Collateral Agent shall provide the Debtor, the United States Trustee for the Northern District of New York and any Statutory Committee with five (5) business days' prior notice of the exercise of remedies under this Section 8.1 and under the Security Documents, which such notice will specify the Event of Default and the basis therefor and will be given by Collateral Agent via facsimile or email.  During such notice period, Borrower shall have the right to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred; provided, that Borrower shall have the right to seek to use the cash Collateral during such notice period, and may use cash collateral for the payment of payroll and payroll-related expenses.  Unless during such notice period Borrower obtain an order of the Bankruptcy Court to the effect that an Event of Default has not occurred, or that Borrower may use cash collateral, upon the expiration of such notice period, Collateral Agent and the Lenders shall have relief from the automatic stay without further notice or court order, and Collateral Agent may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted by the Security Documents and other nonbankruptcy law, including, without limitation, the exercise of rights of setoff, the collection of accounts receivable and application of the proceeds thereof to the Obligations, and occupation of the premises of Borrower to sell the Collateral, and any right of Borrower to use cash collateral shall cease.

No remedy herein conferred upon Collateral Agent or the Lenders is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

8.2     [Reserved]

8.3     Offsets.  If there shall occur or exist any Event of Default referred to in Article VII hereof and such Event of Default is not cured within 5 business days of Notice of such Event of Default having been given to Borrower, or if the maturity of the Obligations is accelerated pursuant to Section 8.1 hereof, each Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of the Obligations then owing by Borrower to such Lender (including, without limitation, any participation purchased or to be purchased pursuant to Section 8.4 hereof), whether or not the same shall then have matured, any and all deposit (general or special) balances and all other indebtedness then held or owing by such Lender (including, without limitation, by branches and agencies or any affiliate of such Lender, wherever located) to or for the credit or account of Borrower.

8.4     Application and Sharing of Set-Off Amounts.  Each Lender further agrees with the other Lenders that, if it at any time it shall receive any payment for or on behalf of Borrower on any Indebtedness owing by Borrower to that Lender (whether by voluntary payment, by realization upon security, by reason of offset of any deposit or other Indebtedness, by counterclaim or cross-action, by enforcement of any right under any Loan Document, or otherwise), it shall apply such payment first to any and all Indebtedness owing by Borrower to that Lender pursuant to this Agreement (including, without limitation, any participation purchased or to be purchased pursuant to this Section 8.4 or any other Section of this Agreement).  Each Credit Party agrees that any Lender so purchasing a participation from the other Lenders or any thereof pursuant to this Section 8.4 may exercise all of its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

8.5     Other Remedies.  The remedies in this Article VIII are in addition to, not in limitation of, any other right, power, privilege, or remedy, either in law, in equity, or otherwise, to which the Lenders may be entitled.  Collateral Agent shall exercise the rights under this Article VIII and all other collection efforts on behalf of the Lenders and no Lender shall act independently with respect thereto, except as otherwise specifically set forth in this Agreement.

8.6     Application of Proceeds.

(a)     Payments Prior to Exercise of Remedies.  Prior to the exercise by Collateral Agent on behalf of the Lenders of remedies under this Agreement or the other Loan Documents, all monies received by Collateral Agent shall be applied, unless otherwise required or provided by the terms of this Agreement or the other Loan Documents or by applicable law, as follows (provided that Collateral Agent shall have the right at all times to apply any payment received from Borrower first to the payment of all Obligations (to the extent not paid by Borrower) incurred by Collateral Agent pursuant to Section 11.5 hereof and to the payment of Related Expenses):

(i)     first, to Collateral Agent to be paid to the Prepetition Lender for application to the Prepetition Obligations;

(ii)     second; to Collateral Agent for application to the Obligations; and

(iii)    third, to Collateral Agent to establish a reserve in an aggregate amount not to exceed the aggregate amount of disbursements permitted under the Budget for the period commencing on the date of receipt of such monies and ending on the last date of the then current Budget (the "Cash Reserve").

(b)    <u>Payments Subsequent to Exercise of Remedies</u>.  After the exercise by Collateral Agent or the Lenders of remedies under this Agreement or the other Loan Documents, all monies received by Collateral Agent shall be applied, unless otherwise required by the terms of the other Loan Documents or by applicable law, as follows:

(i)    first, to the payment of all Obligations (to the extent not paid by Borrower) incurred by Collateral Agent pursuant to Section 11.5 hereof and to the payment of Related Expenses;

(ii)    second, to the payment pro rata of (A) interest then accrued and payable on the outstanding Loans, and (B) any fees then accrued and payable to Collateral Agent or the Lenders;

(iii)    third, (A) to the Lenders, on a pro rata basis, based upon each such Lender's Applicable Commitment Percentage, (B) the Indebtedness under any Hedge Agreement with a Lender, such amount to be based upon the net termination obligation of Borrower under such Hedge Agreement, (C) to the Bank Product Obligations owing to Lenders under Bank Product Agreements; with such payment to be pro rata among (A), (B) and (C) hereof; and

(iv)    finally, any remaining surplus after all of the Secured Obligations have been paid in full, to Borrower (for distribution) or to whomsoever shall be lawfully entitled thereto.

ARTICLE IX
PRIORITY AND SECURITY

9.1    <u>Cash Management Arrangements; Depository Arrangements</u>.  Borrower shall:

(a)    Maintain in place cash management arrangements in accordance with the First Day Orders in connection with the Case relating to Borrower's cash management systems and in form and substance reasonably satisfactory to the Collateral Agent. Without limiting the generality of the foregoing, the parties agree that:

(i)    all cash and cash equivalents held by Borrower and all proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights for which any of the Credit Parties is an obligee shall be deposited into either the Cash Collateral Account or any bank accounts of Borrower; and

(ii)     all cash and cash equivalents held by Borrower and all such proceeds of receivables and other accounts, chattel paper, general intangibles, instruments and other payment rights shall, on the last Business Day of each week or such other frequency as may be agreed to by the Collateral Agent, be transferred to the Cash Collateral Account for application to the Obligations pursuant to the provisions hereof.

(b)     In the event that Borrower receives any cash, checks or other cash proceeds of Collateral promptly upon receipt thereof, in the identical form received (except for any endorsements thereon which may be required by the Collateral Agent), cause such cash, checks and cash proceeds to be paid directly into the Cash Collateral Account.

(c)     Except to the extent that Borrower shall be required to make payments to Collateral Agent or any other Person pursuant to the terms of this Agreement or the other Loan Documents, and subject to the rights and remedies that may from time to time be available to the Collateral Agent and the Lenders, upon the occurrence of an Event of Default, Borrower may use funds in the Cash Collateral Account for the purposes set forth in Section 5.18, subject in any case to the terms and conditions of this Agreement and the other Loan Documents, and no such funds may be applied to the Prepetition Obligations except as otherwise provided in this Agreement or any other Loan Document or as permitted by the Bankruptcy Court or in any order entered by the Bankruptcy Court.

9.2    <u>Collections and Receipt of Proceeds by Collateral Agent</u>.  Borrower hereby constitutes and appoints Collateral Agent, or Collateral Agent's designated agent, as Borrower's attorney in fact to exercise, at any time all or any of the following powers which, being coupled with an interest, shall be irrevocable until the complete and full payment of all of the Obligations:

(a)     to receive, retain, acquire, take, endorse, assign, deliver, accept, and deposit, in the name of Collateral Agent or Borrower, any and all of Borrower's cash, instruments, chattel paper, documents, proceeds of Accounts, proceeds of Inventory, collection of Accounts, and any other writings relating to any of the Collateral.  Borrower hereby waives presentment, demand, notice of dishonor, protest, notice of protest, and any and all other similar notices with respect thereto, regardless of the form of any endorsement thereof.  Collateral Agent shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto;

(b)     to transmit to Account Debtors, on any or all of Borrower's Accounts, notice of assignment to Collateral Agent thereof and security interest of Collateral Agent and the Lenders therein, and to request from such Account Debtors at any time, in the name of Collateral Agent or Borrower, information concerning Borrower's Accounts and the amounts owing thereon;

(c)     to transmit to purchasers of any or all of Borrower's Inventory, notice of Collateral Agent's and the Lenders' security interest therein, and to request from such purchasers at any time, in the name of Collateral Agent or Borrower, information concerning Borrower's Inventory and the amounts owing thereon by such purchasers;

(d)     to notify and require Account Debtors on Borrower's Accounts and purchasers of Borrower's Inventory to make payment of their indebtedness directly to Collateral Agent;

(e)     to enter into or assent to such amendment, compromise, extension, release or other modification of any kind of, or substitution for, the Accounts, or any thereof, as Collateral Agent, in its sole discretion, may deem to be advisable;

(f)     to enforce the Accounts or any thereof, or any other Collateral, by suit or otherwise, to maintain any such suit or other proceeding in the name of Collateral Agent or Borrower, and to withdraw any such suit or other proceeding.  Borrower agrees to lend every assistance requested by Collateral Agent in respect of the foregoing, all at no cost or expense to Collateral Agent and including, without limitation, the furnishing of such witnesses and of such records and other writings as Collateral Agent may require in connection with making legal proof of any Account.  Borrower agrees to reimburse Collateral Agent in full for all court costs and attorneys' fees and every other cost, expense or liability, if any, incurred or paid by Collateral Agent in connection with the foregoing, which obligation of Borrower shall constitute Obligations, shall be secured by the Collateral and shall bear interest, until paid, at the Default Rate; and

(g)     to accept all collections in any form relating to the Collateral, including remittances that may reflect deductions, and to deposit the same, into Borrower's Cash Collateral Account or, at the option of Collateral Agent, to apply them as a payment against the Prepetition Obligations, the Loans or any other Obligations in accordance with this Agreement.

9.3    <u>Superpriority Claims and Collateral Security</u>.    Borrower hereby represents, warrants and covenants that, except as otherwise expressly provided in this Section 9.3, upon the entry of the Interim Order with respect to Revolving Loans made pursuant to such Order and thereafter, the Final Order:

(a)     subject to the Carve Out and the Other Prepetition Liens, the Obligations shall be:

(i)     secured pursuant to Section 364(d)(1) of the Bankruptcy Code by first priority security interests in and liens on (A) all of the assets of the Debtor, including, without limitation, all goods (including without limitation, equipment and inventory), deposit accounts, investment property, accounts, chattel paper, instruments, documents, letter-of-credit rights, commercial tort claims, insurance claims, supporting obligations and liens, real estate interests and general intangibles of the Debtor of any nature,

whether now owned or hereafter acquired and (B) any assets of the Debtor in which the Prepetition Lender was not granted a security interest or lien under the terms of the Prepetition Loan Documents, senior in priority to all other security interests and liens (the "First Priority Liens"); and

(ii)     entitled to Superpriority Claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any Superpriority Claim granted as adequate protection in respect to the claims of the Prepetition Lender and any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113 and 1114 of the Bankruptcy Code; and

(b)     the First Priority Liens are not subject to any transfers or liens preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code.

9.4     <u>Collateral Security Perfection</u>.  Borrower agrees to take all actions that Collateral Agent may reasonably request as a matter of nonbankruptcy law to perfect and protect Collateral Agent's and the Lenders' Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental approvals and providing such other instruments and documents in recordable form as Collateral Agent may request.  Borrower hereby irrevocably authorizes Collateral Agent at any time and from time to time to file in any filing office in any U.C.C. jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets of Borrower" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the U.C.C. of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the U.C.C. of any jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  Borrower agrees to furnish any such information to Collateral Agent promptly upon Collateral Agent's request.

9.5     <u>No Discharge; Survival of Claims</u>.  Borrower agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a reorganization plan (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (b) the Superpriority Claim granted to Collateral Agent and the Lenders pursuant to the Orders and the Liens granted to Collateral Agent and the Lenders pursuant to the Orders and the other Security Documents, shall not be affected in any manner by the entry of an order confirming a reorganization plan and (c) Borrower shall not propose or support any reorganization plan that is not conditioned upon the Payment In Full on or prior to the Maturity Date, and, with respect to Obligations arising pursuant to Section 11.5 after such date, thereafter for the Payment in Full of such Obligations in cash when due and payable.

9.6     <u>Application of Collections</u>.  Deposits to the Cash Collateral Account  shall be credited to Borrower as set forth in Section 8.6.

ARTICLE X
THE AGENT

The Lenders authorize KeyBank National Association and KeyBank National Association hereby agrees to act as Collateral Agent for the Lenders under this Agreement and the other Loan Documents upon the terms and conditions set forth elsewhere in this Agreement, and upon the following terms and conditions:

10.1    Appointment and Authorization.  Each Lender hereby irrevocably appoints and authorizes Collateral Agent to take such action as agent on its behalf and to exercise such powers hereunder as are delegated to Collateral Agent by the terms hereof, together with such powers as are reasonably incidental thereto.  Neither Collateral Agent nor any of its affiliates, directors, officers, attorneys or employees shall (a) be liable for any action taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction), or be responsible in any manner to any of the Lenders for the effectiveness, enforceability, genuineness, validity or due execution of this Agreement or any other Loan Documents, (b) be under any obligation to any Lender to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions hereof or thereof on the part of Borrower, or the financial condition of Borrower, (c) be liable to Borrower for consequential damages resulting from any breach of contract, tort or other wrong in connection with the negotiation, documentation, administration or collection of the Loans, Letters of Credit or any of the Loan Documents.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, Collateral Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall Collateral Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in other Loan Documents with reference to Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

10.2    Note Holders.  Collateral Agent may treat the payee of any Note as the holder thereof (or, if there is no Note, the holder of the interest as reflected on the books and records of Collateral Agent) until written notice of transfer shall have been filed with Collateral Agent, signed by such payee and in form satisfactory to Collateral Agent.

10.3    Consultation With Counsel.  Collateral Agent may consult with legal counsel selected by Collateral Agent and shall not be liable for any action taken or suffered in good faith by Collateral Agent in accordance with the opinion of such counsel.

10.4    Documents.  Collateral Agent shall not be under any duty to examine into or pass upon the validity, effectiveness, genuineness or value of any Loan Document or any other Related Writing furnished pursuant hereto or in connection herewith or the value of any

collateral obtained hereunder, and Collateral Agent shall be entitled to assume that the same are valid, effective and genuine and what they purport to be.

10.5    Agent and Affiliates.  KeyBank National Association and its affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Borrower and its Affiliates as though KeyBank National Association was not Collateral Agent hereunder and without notice to or consent of any Lender.  Each Lender acknowledges that, pursuant to such activities, KeyBank National Association or its affiliates may receive information regarding Borrower or any Affiliate (including information that may be subject to confidentiality obligations in favor Borrower or such Affiliate) and acknowledge that Collateral Agent shall be under no obligation to provide such information to other Lenders.  With respect to Loans and Letters of Credit (if any), KeyBank National Association and its affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though KeyBank National Association were not Collateral Agent, and the terms "Lender" and "Lenders" include KeyBank National Association and its affiliates, to the extent applicable, in their individual capacities.

10.6    Notice of Default.  Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless Collateral Agent has received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that Collateral Agent receives such a notice, Collateral Agent shall give notice thereof to the Lenders.  Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that, unless and until Collateral Agent shall have received such directions, Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable, in its discretion, for the protection of the interests of the holders of the Obligations.

10.7    Action by Collateral Agent.  Subject to the other terms and conditions hereof, so long as Collateral Agent shall be entitled, pursuant to Section 10.6 hereof, to assume that no Default or Event of Default shall have occurred and be continuing, Collateral Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights that may be vested in it by, or with respect to taking or refraining from taking any action or actions that it may be able to take under or in respect of, this Agreement. Collateral Agent shall incur no liability under or in respect of this Agreement by acting upon any notice, certificate, warranty or other paper or instrument believed by it to be genuine or authentic or to be signed by the proper party or parties, or with respect to anything that it may do or refrain from doing in the reasonable exercise of its judgment, or that may seem to it to be necessary or desirable in the premises.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Collateral Agent as a result of Collateral Agent's acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

10.8    Release of Collateral.  In the event of a transfer of assets permitted by Section 5.12 hereof (or otherwise permitted pursuant to this Agreement) where the proceeds of such transfer are applied in accordance with the terms of this Agreement to the extent required to be

so applied, Collateral Agent, at the request and expense of Borrower, is hereby authorized by the Lenders to (a) release such Collateral from this Agreement, and (b) duly assign, transfer and deliver to Borrower (without recourse and without any representation or warranty) such Collateral as is then (or has been) so transferred or released and as may be in possession of Collateral Agent and has not theretofore been released pursuant to this Agreement.

10.9    <u>Delegation of Duties</u>.  Collateral Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  Collateral Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct, as determined by a court of competent jurisdiction.

10.10    <u>Indemnification of Agent</u>.  The Lenders agree to indemnify Collateral Agent (to the extent not reimbursed by Borrower) ratably, according to their respective Applicable Commitment Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and expenses) or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against Collateral Agent, in its capacity as Collateral Agent, in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by  Collateral Agent with respect to this Agreement or any other Loan Document, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and expenses) or disbursements resulting from Collateral Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction, or from any action taken or omitted by Collateral Agent in any capacity other than as Collateral Agent under this Agreement or any other Loan Document.  No action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.10.  The undertaking in this Section 10.10 shall survive repayment of the Loans, cancellation of the Notes, if any, termination of the Total Commitment, any foreclosure under, or modification, release or discharge of, any or all of the Loan Documents, termination of this Agreement and the resignation or replacement of the Collateral Agent.

10.11    <u>Successor Collateral Agent</u>.  Collateral Agent may resign as Collateral Agent hereunder by giving not fewer than ten (10) days prior written notice to Borrower and the Lenders.  If Collateral Agent shall resign under this Agreement, then either (a) the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders (with the consent of Borrower so long as an Event of Default has not occurred and which consent shall not be unreasonably withheld), or (b) if a successor agent shall not be so appointed and approved within the ten (10) day period following Collateral Agent's notice to the Lenders of its resignation, then Collateral Agent shall appoint a successor agent that shall serve as collateral agent until such time as the Required Lenders appoint a successor collateral agent.  If no successor agent has accepted appointment as Collateral Agent by the date that is ten (10) days following a retiring Collateral Agent's notice of resignation, the retiring Collateral Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of Collateral Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Upon its appointment, such successor

agent shall succeed to the rights, powers and duties as agent, and the term "Collateral Agent" means such successor effective upon its appointment, and the former agent's rights, powers and duties as agent shall be terminated without any other or further act or deed on the part of such former agent or any of the parties to this Agreement.  After any retiring Collateral Agent's resignation as Collateral Agent, the provisions of this Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement and the other Loan Documents.

10.12  <u>No Reliance on Collateral Agent's Customer Identification Program</u>.  Each Lender acknowledges and agrees that neither such Lender, nor any of its affiliates, participants or assignees, may rely on Collateral Agent to carry out such Lender's or its affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other anti-terrorism law, including any programs involving any of the following items relating to or in connection with Borrower, its affiliates or agents, the Loan Documents or the transactions hereunder: (a) any identity verification procedures, (b) any record keeping, (c) any comparisons with government lists, (d) any customer notices or (e) any other procedures required under the CIP Regulations or such other laws.

ARTICLE XI
MISCELLANEOUS

11.1  <u>Lenders' Independent Investigation</u>.  Each Lender, by its signature to this Agreement, acknowledges and agrees that Collateral Agent has not made any representation or warranty, express or implied, with respect to the creditworthiness, financial condition, or any other condition of Borrower or with respect to the statements contained in any information memorandum furnished in connection herewith or in any other oral or written communication between Collateral Agent and such Lender. Each Lender represents that it has made and shall continue to make its own independent investigation of the creditworthiness, financial condition and affairs of Borrower in connection with the extension of credit hereunder, and agrees that Collateral Agent does not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto (other than such notices as may be expressly required to be given by Collateral Agent to the Lenders hereunder), whether coming into its possession before the first Credit Event hereunder or at any time or times thereafter.  Each Lender further represents that it has reviewed each of the Loan Documents.

11.2  <u>No Waiver; Cumulative Remedies</u>.  No omission or course of dealing on the part of Collateral Agent, any Lender or the holder of any Note (or, if there is no Note, the holder of the interest as reflected on the books and records of Agent) in exercising any right, power or remedy hereunder or under any of the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or under any of the Loan Documents. The remedies herein provided are cumulative and in addition to any other rights, powers or privileges held under any Loan Documents or by operation of law, by contract or otherwise.

11.3     Amendments, Waivers and Consents.

(a)     General Rule.  No amendment, modification, termination, or waiver of any provision of any Loan Document nor consent to any variance therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     Exceptions to the General Rule.  Notwithstanding the provisions of subsection (a) of this Section 11.3:

(i)     Subject to subpart (ii) below, consent of each Lender affected thereby shall be required with respect to (A) any increase in the Commitment of such Lender hereunder, (B) the extension of maturity of the Loans, the payment date of interest or scheduled principal thereunder, or the payment date of commitment or other fees payable hereunder, (C) any reduction in the stated rate of interest on the Loans (provided that the institution of the Default Rate and a subsequent removal of the Default Rate shall not constitute a decrease in interest rate pursuant to this Section 11.3), or in any amount of interest or scheduled principal due on any Loan, or any reduction in the stated rate of commitment fees payable hereunder or any change in the manner of pro rata application of any payments made by Borrower to the Lenders hereunder, (D) any change in any percentage voting requirement, voting rights, or the Required Lenders definition in this Agreement, (E) the release of all or substantially all of the Collateral securing the Secured Obligations (in each case, except as expressly provided in the Loan Documents), or (F) any amendment to this Section 11.3(a) or Section 8.4 or 8.6 hereof.

(ii)     Provisions Relating to Special Rights and Duties.  No provision of this Agreement affecting Collateral Agent in its capacity as such shall be amended, modified or waived without the consent of Collateral Agent.

(c)     Generally.  Notice of amendments or consents ratified by the Lenders hereunder shall be forwarded by Collateral Agent to all of the Lenders.  Each Lender or other holder of a Note (or interest in any Loan) shall be bound by any amendment, waiver or consent obtained as authorized by this Section 11.3, regardless of its failure to agree thereto.

11.4     Notices.  All notices, requests, demands and other communications provided for hereunder shall be in writing and, if to Borrower, mailed or delivered to it, addressed to it at the address specified on the signature pages of this Agreement, if to a Lender, mailed or delivered to it, addressed to the address of such Lender specified on the signature pages of this Agreement, or, as to each party, at such other address as shall be designated by such party in a written notice to each of the other parties.  All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when hand delivered, delivered by overnight courier or two Business Days after being deposited in the mails

with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt (if received during a Business Day, otherwise the following Business Day), except that notices from Borrower to Collateral Agent or the Lenders pursuant to any of the provisions hereof shall not be effective until received.  For purposes of Article II hereof, Collateral Agent and the Lenders shall be entitled to rely on telephonic instructions from any person that Collateral Agent or any Lender, as the case may be, in good faith believes is an Authorized Officer, and Borrower shall hold Collateral Agent and each Lender harmless from any loss, cost or expense resulting from any such reliance.

11.5   <u>Costs, Expenses and Taxes</u>.   Borrower agrees to pay on demand all costs and expenses of Collateral Agent and Lenders and all Related Expenses, including but not limited to, (a) syndication, administration, travel and out-of-pocket expenses, including but not limited to attorneys' fees and expenses, of Collateral Agent and each Lender in connection with the preparation, negotiation and closing of the Loan Documents and the administration of the Loan Documents, the collection and disbursement of all funds hereunder and the other instruments and documents to be delivered hereunder, (b) extraordinary expenses of Collateral Agent and each Lender in connection with the administration of the Loan Documents and the other instruments and documents to be delivered hereunder, and (c) the reasonable fees and out-of-pocket expenses of special counsel for Collateral Agent and each Lender, with respect to the foregoing, and of local counsel, if any, who may be retained by said special counsel with respect thereto. Borrower also agrees to pay on demand all costs and expenses of Collateral Agent and the Lenders, including reasonable attorneys' fees and expenses, in connection with the restructuring or enforcement of the Obligations, this Agreement or any Related Writing. In addition, Borrower shall pay any and all stamp, transfer, documentary and other taxes, assessments, charges and fees payable or determined to be payable in connection with the execution and delivery of the Loan Documents, and the other instruments and documents to be delivered hereunder, and agree to hold Collateral Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or failure to pay such taxes or fees.   All obligations provided for in this Section 11.5 shall survive any termination of this Agreement.

11.6   <u>Indemnification</u>.   Borrower agrees to defend, indemnify and hold harmless Collateral Agent and the Lenders (and their respective affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees) or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against Collateral Agent or any Lender in connection with any investigative, administrative or judicial proceeding (whether or not such Lender or Collateral Agent shall be designated a party thereto) or any other claim by any Person relating to or arising out of any Loan Document or any actual or proposed use of proceeds of the Loans or any of the Obligations, or any activities of Borrower or its Affiliates; provided that none of any Lender or Collateral Agent (nor their respective affiliates, officers, directors, attorneys, agents and employees) shall have the right to be indemnified under this Section 11.6 for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction.  All obligations provided for in this Section 11.6 shall survive any termination of this Agreement.

11.7   <u>Obligations Several; No Fiduciary Obligations</u>.   The obligations of the Lenders hereunder are several and not joint. Nothing contained in this Agreement and no action taken by

Collateral Agent or the Lenders pursuant hereto shall be deemed to constitute Collateral Agent or the Lenders a partnership, association, joint venture or other entity. No default by any Lender hereunder shall excuse the other Lenders from any obligation under this Agreement; but no Lender shall have or acquire any additional obligation of any kind by reason of such default. The relationship between Borrower and the Lenders with respect to the Loan Documents and the Related Writings is and shall be solely that of debtor and creditors, respectively, and none of Collateral Agent or any Lender shall have any fiduciary obligation toward any Credit Party with respect to any such documents or the transactions contemplated thereby.

11.8    <u>Execution in Counterparts; Electronic Signature</u>.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts and by facsimile or .pdf signature, each of which counterparts when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

11.9    <u>Binding Effect; Borrower's Assignment</u>.    This Agreement shall become effective when it shall have been executed by Borrower, Collateral Agent (on its own behalf and, by signing as Collateral Agent) and each Lender and thereafter shall be binding upon and inure to the benefit of Borrower, Collateral Agent and each of the Lenders and their respective successors and assigns, except that Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Collateral Agent and all of the Lenders.

11.10    <u>Lender Assignments</u>.

(a)    <u>Assignments of Commitments</u>.    Each Lender shall have the right at any time or times to assign to an Eligible Transferee (other than to a Lender that shall not be in compliance with this Agreement), without recourse, all or a percentage of all of the following: (i) such Lender's Commitment, (ii) all Loans made by that Lender, and (iii) such Lender's Notes, and any participation purchased pursuant to Section 8.4 hereof.

(b)    <u>Prior Consent</u>.    No assignment may be consummated pursuant to this Section 11.10 without the prior written consent of Collateral Agent (other than an assignment by any Lender to any affiliate of such Lender which affiliate is an Eligible Transferee and either wholly-owned by a Lender or is wholly-owned by a Person that wholly owns, either directly or indirectly, such Lender, or to another Lender), which consent of Collateral Agent shall not be unreasonably withheld. Anything herein to the contrary notwithstanding, any Lender may at any time make a collateral assignment of all or any portion of its rights under the Loan Documents to a Federal Reserve Bank, and no such assignment shall release such assigning Lender from its obligations hereunder.

(c)    <u>Minimum Amount</u>.    Each such assignment shall be in a minimum amount of the lesser of $1,000,000 of the assignor's Commitment and interest herein or the entire amount of the assignor's Commitment and interest herein.

(d)     Assignment Fee.  Unless the assignment shall be to an affiliate of the assignor or the assignment shall be due to merger of the assignor or for regulatory purposes, either the assignor or the assignee shall remit to Collateral Agent, for its own account, an administrative fee of $25,000, unless the Collateral Agent waives all or any portion of such fee in writing.

(e)     Assignment Agreement.  Unless the assignment shall be due to merger of the assignor or a collateral assignment for regulatory purposes, the assignor shall (i) cause the assignee to execute and deliver to Borrower and Collateral Agent an Assignment Agreement, and (ii) execute and deliver, or cause the assignee to execute and deliver, as the case may be, to Collateral Agent such additional amendments, assurances and other writings as Collateral Agent may reasonably require.

(f)     Non-U.S. Assignee.  If the assignment is to be made to an assignee that is organized under the laws of any jurisdiction other than the United States or any state thereof, the assignor Lender shall cause such assignee, at least five Business Days prior to the effective date of such assignment, (i) to represent to the assignor Lender (for the benefit of the assignor Lender, Collateral Agent and Borrower) that under applicable law and treaties no taxes will be required to be withheld by Collateral Agent, Borrower or the assignor with respect to any payments to be made to such assignee in respect of the Loans hereunder, (ii) to furnish to the assignor Lender (and, in the case of any assignee registered in the Register (as defined below), Collateral Agent and Borrower) either U.S. Internal Revenue Service Form W-8ECI or U.S. Internal Revenue Service Form W-8BEN, as applicable (wherein such assignee claims entitlement to complete exemption from U.S. federal withholding tax on all payments hereunder), and (iii) to agree (for the benefit of the assignor, Collateral Agent and Borrower) to provide to the assignor Lender (and, in the case of any assignee registered in the Register, to Collateral Agent and Borrower) a new Form W-8ECI or Form W-8BEN, as applicable, upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such assignee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

(g)     Deliveries by Borrower.  Upon satisfaction of all applicable requirements specified in subsections (a) through (f) above, Borrower shall execute and deliver (i) to Collateral Agent, the assignor and the assignee, any consent or release (of all or a portion of the obligations of the assignor) required to be delivered by Borrower in connection with the Assignment Agreement, and (ii) to the assignee, if requested, and the assignor, if applicable, an appropriate Note or Notes.  After delivery of the new Note or Notes, the assignor's Note or Notes, if any, being replaced shall be returned to Borrower marked "replaced".

(h)     Effect of Assignment.  Upon satisfaction of all applicable requirements set forth in subsections (a) through (g) above, and any other condition contained in this

Section 11.10, (i) the assignee shall become and thereafter be deemed to be a "Lender" for the purposes of this Agreement, (ii) the assignor shall be released from its obligations hereunder to the extent that its interest has been assigned, (iii) in the event that the assignor's entire interest has been assigned, the assignor shall cease to be and thereafter shall no longer be deemed to be a "Lender" and (iv) the signature pages hereto and <u>Schedule 1</u> hereto shall be automatically amended, without further action, to reflect the result of any such assignment.

(i) <u>Collateral Agent to Maintain Register</u>.  Collateral Agent shall maintain at the address for notices referred to in Section 11.4 hereof a copy of each Assignment Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, Collateral Agent and the Lenders may treat each Person whose name is recorded in the Register as the owner of the Loan recorded therein for all purposes of this Agreement. The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

11.11  <u>Sale of Participations</u>.  Any Lender may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell participations to one or more Eligible Transferees (each a "Participant") in all or a portion of its rights or obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of the Commitment and the Loans and participations owing to it and the Note, if any, held by it); provided that:

(a) any such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(c) the parties hereto shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Loan Documents;

(d) such Participant shall be bound by the provisions of Section 8.4 hereof, and the Lender selling such participation shall obtain from such Participant a written confirmation of its agreement to be so bound; and

(e) no Participant (unless such Participant is itself a Lender) shall be entitled to require such Lender to take or refrain from taking action under this Agreement or under any other Loan Document, except that such Lender may agree with such Participant that such Lender will not, without such Participant's consent, take action of the type described as follows:

   (i)  increase the portion of the participation amount of any Participant over the amount thereof then in effect, or extend the Commitment Period, without the written consent of each Participant affected thereby; or

   (ii)  reduce the principal amount of or extend the time for any payment of principal of any Loan, or reduce the rate of interest or extend the time for payment of interest on any Loan, or reduce the commitment fee, without the written consent of each Participant affected thereby.

Borrower agrees that any Lender that sells participations pursuant to this Section 11.11 shall still be entitled to the benefits of Article III hereof, notwithstanding any such transfer; provided, however, that the obligations of Borrower shall not increase as a result of such transfer and Borrower shall have no obligation to any Participant.

  11.12 <u>Patriot Act Notice</u>.  Each Lender and Collateral Agent (for itself and not on behalf of any other party) hereby notifies the Credit Parties that, pursuant to the requirements of the Patriot Act, such Lender and Collateral Agent are required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender or Collateral Agent, as applicable, to identify the Credit Parties in accordance with the Patriot Act.  Borrower shall provide, to the extent commercially reasonable, such information and take such actions as are reasonably requested by Collateral Agent or a Lender in order to assist Collateral Agent or such Lender in maintaining compliance with the Patriot Act.

  11.13 <u>Joint and Several Obligations</u>.  All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted by the Lender to any Borrower, failure of the Lender to give any Borrower notice of borrowing or any other notice (except Notice of Default), any failure of the Lender to pursue or preserve its rights against any Borrower, the release by the Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by the Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.  Each Borrower waives all suretyship defenses.  Without limiting the generality of the foregoing, each of the Borrowers hereby acknowledges and agrees that any and all actions, inactions or omissions by any one or more, or all, of the Borrowers in connection with, related to or otherwise affecting this Agreement or any of the other Related Writings are the Obligations of, and inure to and are binding upon, each and all of the Borrowers, jointly and severally.  Each covenant, agreement, obligation, representation and warranty of the Borrowers contained herein constitutes the joint and several undertaking of each Borrower.  Each Borrower acknowledges that the Obligations of such Borrower undertaken herein might be construed to consist, at least in part, of the guaranty of Obligations of the other Borrowers and, in full recognition of that fact, each Borrower consents and agrees that the Lender may, at any time and from time to time, without notice or demand, whether before or after any actual or purported termination, repudiation or revocation of this Agreement by any Borrower, and without affecting the enforceability or continuing effectiveness hereof as to such Borrower, subject to any applicable orders of the Bankruptcy Court:  (a) supplement, restate, modify, amend, increase,

decrease, extend, renew or otherwise change the time for payment or the terms of this Agreement or any part thereof, including any increase or decrease of the rate(s) of interest thereon; (b) supplement, restate, modify, amend, increase, decrease or waive, or enter into or give any agreement, approval or consent with respect to, this Agreement or any part thereof, or any of the Loan Documents, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder; (c) accept partial payments; (d) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer or enforce any security or guarantees, and apply any security and direct the order or manner of sale thereof as the Lender, in its sole and absolute discretion may determine; (e) release any Person from any personal liability with respect to this Agreement or any part thereof; (f) settle, release on terms satisfactory to the Lender or by operation of applicable law or otherwise liquidate or enforce any security or guaranty in any manner, consent to the transfer of any security and bid and purchase at any sale; or (g) consent to the merger, change or any other restructuring or termination of the corporate or partnership existence of any Borrower, or any other Person, and correspondingly restructure the Obligations evidenced hereby, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the Obligations evidenced hereby. Each Borrower states and acknowledges that:  (w) pursuant to this Agreement, the Borrowers desire to utilize their borrowing potential on a consolidated basis to the same extent possible as if they were merged into a single corporate entity and that this Agreement reflects the establishment of credit facilities which would not otherwise be available to such Borrower if each Borrower were not jointly and severally liable for payment of the Obligations; (x) it has determined that it will benefit specifically and materially from the advances of credit contemplated by this Agreement; (y) it is both a condition precedent to the Obligations of  the Lender hereunder and a desire of the Borrowers that each Borrower execute and deliver to the Lender this Agreement; and (z) the Borrowers have requested and bargained for the structure and terms of and security for the advances contemplated by this Agreement. Each Borrower agrees if such Borrower's joint and several liability hereunder, or if any Liens securing such joint and several liability, would, but for the application of this Section 11.13, be unenforceable under applicable law, such joint and several liability and each such Lien shall be valid and enforceable to the maximum extent that would not cause such joint and several liability or such Lien to be unenforceable under applicable law, and such joint and several liability and such Lien shall be deemed to have been automatically amended accordingly at all relevant times.

   11.14  <u>Severability of Provisions; Captions; Attachments</u>.    Any provision of this Agreement that shall be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. The several captions to sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement.  Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

   11.15  <u>Investment Purpose</u>.  Each of the Lenders represents and warrants to Borrower that it is entering into this Agreement with the present intention of acquiring any Note issued pursuant hereto (or, if there is no Note, the interest as reflected on the books and records of Agent) for investment purposes only and not for the purpose of distribution or resale, it being

understood, however, that each Lender shall at all times retain full control over the disposition of its assets.

11.16  Entire Agreement.  This Agreement, any Note and any other Loan Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

11.17  Legal Representation of Parties.  The Loan Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other Loan Document to be construed or interpreted against any party shall not apply to any construction or interpretation hereof or thereof.

11.18  Governing Law; Submission to Jurisdiction.

(a)  Governing Law.  This Agreement, each of the Notes and any Related Writing shall be governed by and construed in accordance with the laws of the State of New York and the respective rights and obligations of Borrower, Collateral Agent and the Lenders shall be governed by New York law, without regard to principles of conflicts of laws.

(b)  Submission to Jurisdiction.  Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or federal court sitting in Syracuse, New York, and the Bankruptcy Court over any action or proceeding arising out of or relating to this Agreement, the Obligations or any Related Writing, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court or the Bankruptcy Court.  Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts, and waives any claim that any such courts lack jurisdiction over Borrower.  Borrower, on behalf of itself and its Subsidiaries, if any, hereby irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in any action or proceeding in any such court as well as any right it may now or hereafter have to remove such action or proceeding, once commenced, to another court on the grounds of FORUM NON CONVENIENS or otherwise.  Borrower agrees that a final, nonappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

11.19  JURY TRIAL WAIVER.  TO THE EXTENT PERMITTED BY LAW, BORROWER, COLLATERAL AGENT AND EACH LENDER WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG BORROWER, COLLATERAL AGENT AND THE LENDERS, OR ANY THEREOF, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG

THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed and delivered this Debtor in Possession Credit Agreement as of the date first set forth above.

Address:                                          Auburn Armature, Inc.
Auburn Armature, Inc.
70 Wright Circle                                  By:_____
Auburn, NY 13021                                  Name:_____
Attention: Ben Carter                             Title:_____
Telephone: (315) 253-9721
Facsimile: (315) 255-2889
Email: ben.carter@aainy.com


EASA Acquisition I, LLC                           EASA Acquisition I, LLC
70 Wright Circle
Auburn, NY 13021                                  By:_____
Attention: Ben Carter                             Name:_____
Telephone: (315) 253-9721                         Title:_____
Facsimile: (315) 255-2889
Email: ben.carter@aainy.com


EASA Acquisition II, LLC                          EASA Acquisition II, LLC
70 Wright Circle
Auburn, NY 13021                                  By:_____
Attention: Ben Carter                             Name:_____
Telephone: (315) 253-9721                         Title:_____
Facsimile: (315) 255-2889
Email: ben.carter@aainy.com


Address:                                          KeyBank National Association,
KeyBank National Association                       as Collateral Agent and as a Lender
127 Public Square
Cleveland, Ohio 44114                             By:_____
Attention: KeyBank Business Capital,              Name:_____
Linda Skinner                                     Title:_____
Telephone: (216) 689-3166
Facsimile: (216) 689-8470
Email: linda_r_skinner@keybank.com


[Signature Page to Debtor In Possession Credit Agreement]

**SCHEDULE 1**

|  | REVOLVING CREDIT COMMITMENT PERCENTAGE | INTERIM ORDER COMMITMENT | FINAL ORDER COMMITMENT |
|---|---|---|---|
| KeyBank National Association | 100.0% | $1,800,000.00 | Up to an additional $3,700,000.00 |
|  |  |  |  |
|  |  |  |  |
| TOTALS | 100% | $1,800,000.00 | $3,700,000.00 |
|  |  |  |  |
|  |  | Total Commitment | Up to $5,500,000.00 |
|  |  |  |  |
|  |  |  |  |

EXHIBIT A
FORM OF
REVOLVING CREDIT NOTE


Principal Amount: Up to $_____

Maturity Date: [_____ ___,] 2017                                   Cleveland, Ohio

                                                                          May ___, 2017

FOR VALUE RECEIVED, the undersigned, AUBURN ARMATURE, INC., EASA ACQUISITION I, LLC, and EASA ACQUISITION II, LLC (individually or collectively, as the context may require, "Borrower"), promises to pay, jointly and severally, on the last day of the Commitment Period, as defined in the Credit Agreement (as hereinafter defined), to the order of KEYBANK NATIONAL ASSOCIATION ("Lender") at the main office of 127 Public Square, Cleveland, Ohio 44114, as Collateral Agent, as hereinafter defined, the aggregate unpaid principal amount of all Revolving Loans, as defined in the Credit Agreement, made by Lender to Borrower pursuant to Section 2.2(a) of the Credit Agreement in lawful money of the United States of America.

As used herein, "Credit Agreement" means the Debtor in Possession Credit Agreement dated as of May ___, 2017, among Borrower and Lender, as the same may from time to time be further amended, restated or otherwise modified. Each capitalized term used herein that is defined in the Credit Agreement and not otherwise defined herein shall have the meaning ascribed to it in the Credit Agreement.

Borrower also promises to pay interest on the unpaid principal amount of each Revolving Loan from time to time outstanding, from the date of such Revolving Loan until the payment in full thereof, at the rates per annum that shall be determined in accordance with the provisions of Section 2.5(a) of the Credit Agreement. Such interest shall be payable on each date provided for in such Section 2.5(a); provided that interest on any principal portion that is not paid when due shall be payable on demand.

The portions of the principal sum hereof from time to time representing Base Rate Loans, interest owing thereon, and payments of principal and interest of any thereof, shall be shown on the records of Lender by such method as Lender may generally employ; provided that failure to make any such entry shall in no way detract from the obligations of Borrower under this Note.

If this Note shall not be paid at maturity, whether such maturity occurs by reason of lapse of time or by operation of any provision for acceleration of maturity contained in the Credit Agreement, the principal hereof and the unpaid interest thereon shall bear interest, until paid, at a rate per annum equal to the Default Rate (as defined in the Credit Agreement). All payments of principal of and interest on this Note shall be made in immediately available funds.

This Note is the Revolving Credit Note referred to in the Credit Agreement. Reference is made to the Credit Agreement for a description of the right of the undersigned to anticipate payments hereof, the right of the holder hereof to declare this Note due prior to its stated maturity, and other terms and conditions upon which this Note is issued.

Except as expressly provided in the Credit Agreement, Borrower expressly waives presentment, demand, protest and notice of any kind.  This Note shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws provisions.

AUBURN ARMATURE, INC.

By:_____
Name:_____
Title:_____

EASA ACQUISITION II, LLC

By:_____
Name:_____
Title:_____

EASA ACQUISITION I, LLC

By:_____
Name:_____
Title:_____

FORM OF
BORROWING BASE CERTIFICATE

EXHIBIT G
FORM OF
NOTICE OF LOAN


_____, 2017


KeyBank National Association
127 Public Square
Cleveland, Ohio 44114
Attention: KeyBank Business Capital,
Attn.: Linda Skinner


Ladies and Gentlemen:

The undersigned, Auburn Armature, Inc. refers to the Debtor in Possession Credit Agreement, dated as of May ___, 2017 (as amended, restated or otherwise modified from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned and the Lender, and hereby gives you notice, pursuant to Section 2.7 of the Credit Agreement that Borrower hereby requests a Loan under the Credit Agreement, and in connection therewith sets forth below the information relating to the Loan (the "Proposed Loan") as required by Section 2.7 of the Credit Agreement:

(a)     The Business Day of the Proposed Loan is _____, 20__.

(b)     The amount of the Proposed Loan is $_____.

The undersigned hereby certifies on behalf of Borrower that the following statements are true on the date hereof, and will be true on the date of the Proposed Loan:

(i)     the representations and warranties contained in each Loan Document are correct, before and after giving effect to the Proposed Loan and the application of the proceeds therefrom, as though made on and as of such date;

(ii)     no event has occurred and is continuing, or would result from such Proposed Loan, or the application of proceeds therefrom, that constitutes a Default or Event of Default; and

(iii)     the conditions set forth in Section 2.7 and Article IV of the Credit Agreement have been satisfied.

AUBURN ARMATURE, INC.

By:_____
Name:_____
Title:_____

EXHIBIT H
FORM OF
COMPLIANCE CERTIFICATE

For Fiscal Quarter ended _____

THE UNDERSIGNED HEREBY CERTIFIES THAT:

(1)    I am the **[Financial Officer/Chief Restructuring Officer]** of AUBURN ARMATURE, INC., a New York corporation ("Empire");

(2)    I am familiar with the terms of that certain Debtor in Possession Credit Agreement, dated as of May ____, 2017, among the undersigned, the lenders from time to time named on Schedule 1 thereto (together with their respective successors and assigns, collectively the "Lenders"), and KeyBank National Association as Collateral Agent (as the same may from time to time be amended, restated or otherwise modified, the "Credit Agreement", the terms defined therein being used herein as therein defined), and the terms of the other Loan Documents, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Empire during the accounting period covered by the attached financial statements;

(3)    The review described in paragraph (2) above did not disclose, and I have no knowledge of, the existence of any condition or event that constitutes or constituted a Default or Event of Default, at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate;

(4)    The representations and warranties made by Borrower contained in each Loan Document are true and correct as though made on and as of the date hereof; and

(5)    Set forth on Attachment I hereto are calculations of the financial covenants set forth in Section 5.7 of the Credit Agreement, which calculations show compliance with the terms thereof.

IN WITNESS WHEREOF, I have signed this certificate the ____ day of _____, 2017.

AUBURN ARMATURE, INC.

By:_____
Name:_____
Title:_____

EXHIBIT J
FORM OF
REAFFIRMATION OF GUARANTY

## REAFFIRMATION OF GUARANTY

**DATED: MAY \_\_\_, 2017**

The undersigned is a guarantor of certain indebtedness, obligations and liabilities of Auburn Armature, Inc., EASA Acquisition I, LLC, and EASA Acquisition II, LLC, pursuant to the provisions of that certain Prepetition Credit Agreement (as defined above) (the "Guaranty"), including, without limitation, the waivers and releases by guarantor contained therein. The undersigned hereby agrees that the terms and provisions of the Guaranty are ratified and confirmed and remain in full force and effect; and all of his obligations, liabilities and agreements under and pursuant to the Guaranty remain unmodified and in full force and effect. The undersigned acknowledges that he has read and understands this Reaffirmation of Guaranty and that he has had the assistance of legal counsel in connection with such review and prior to executing this Reaffirmation of Guaranty.

IN WITNESS WHEREOF, the undersigned has caused this Reaffirmation of Guaranty to be duly executed and delivered in _____, New York as of the day and year first above written.

ELECTRICAL SUPPLY ACQUISITION, INC.

By:_____
Name:_____
Title:_____

# EXHIBIT "B"

# EXHIBIT "B"

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**(SYRACUSE DIVISION)**       x

In re:                    :     Case No. _____-MCR
                          :
    AUBURN ARMATURE, INC.,      :     Chapter 11
                          :     Joint Administration Pending
                 Debtor.     x

**EMERGENCY INTERIM ORDER APPROVING THE DEBTORS'
EMERGENCY MOTION FOR ORDER AUTHORIZING THE DEBTORS
TO INCUR POST-PETITION SENIOR SECURED, SUPER-PRIORITY
INDEBTEDNESS, AND PROVIDING ADEQUATE PROTECTION,
ALL PURSUANT TO SECTIONS 361, 363 AND 364 OF THE
BANKRUPTCY CODE AND NOTICE OF FINAL HEARING**

Upon the Emergency Motion For Order Authorizing Debtors to Incur Post-

Petition Senior Secured, Super-Priority Indebtedness, and Providing Adequate Protection,

all Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code (the "Motion") dated

May 19, 2017 of Auburn Armature, Inc. ("AAI"), EASA Acquisition I, LLC ("EASA I"),

and EASA Acquisition II, LLC ("EASA II"), each as a debtor and a debtor-in-possession

(collectively, the "Debtors") filed in the above-captioned case (the "Case"):

(a) seeking the Court's authorization, pursuant to Sections 105, 361, 362, 363,

and 364 of title 11 of the United States Code (11 U.S.C. § 101 et seq., as amended, the

"Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for the Debtors to obtain from KeyBank, National

Association ("Key" or the "DIP Lender"), direct borrowings (the "Loans") and for the

Debtors and Borrowers and the Non-Debtor Guarantor (defined below), to cross-guaranty

the obligations of each Borrower, pursuant to that certain DEBTOR-IN-POSSESSION

CREDIT AGREEMENT, dated as of May ___, 2017 (the "DIP Loan Agreement"), by

and among the DIP Lender, the Debtors, as borrowers (the "Borrowers" and each a

"Borrower"), and Electrical Supply Acquisition Company, Inc. ("ESA" or the "Non-

Debtor Guarantor"): (i) to fund the ongoing working capital needs of the Debtors, (ii) to

permit the Borrowers, on the basis described below, and as may be provided in a Final

Order, to refinance (only to the extent that such sums are not otherwise paid from funds

held by the Borrowers on the Effective Date (as defined in the DIP Loan Agreement) with

the approval of the Bankruptcy Court, and subject to the terms of the DIP Loan

Agreement and the other agreements defined as "Loan Documents" therein (the "DIP

Loan Documents")), those certain obligations owed pursuant to that certain Amended and

Restated Credit and Security Agreement dated as of March 31, 2014, by and among Key

and the Borrowers (as amended, supplemented or otherwise modified from time to time,

the "Pre-Petition Loan Agreement") (which obligations are stipulated by the Borrowers to

be secured by substantially all of the assets of the Borrowers), (iii) subject to the terms of

the DIP Loan Agreement and this Interim Order, to pay fees, costs, expenses,

disbursements to professionals retained by the Debtors, or any official committees

subsequently appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code

(hereinafter, collectively, the "Committees"), the costs and expenses of the members of

the Committees, as approved by the Court, and bankruptcy related charges as allowed by

the Court and as permitted by the DIP Loan Documents, and (iv) to pay fees and expenses

(including, without limitation, reasonable attorneys' fees and expenses) owed to Key

STM/234346.4

under the DIP Loan Agreement and the other DIP Loan Documents (as such term is

defined below);

(b) requesting, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, that

the financing under the DIP Loan Agreement: (i) have priority over any and all

administrative expenses, including, without limitation, the kind specified in Sections

503(b) and 507(b) of the Bankruptcy Code, except for Carve-Out Expenses up to the

Carve-Out Amount as provided for herein; (ii) be secured by a first priority security

interest in, and lien upon, all existing and hereafter acquired property of the Debtors and

the Debtors' estates, of whatever kind or nature, real or personal, whether acquired pre-

petition or post-petition, including without limitation and by way of general description

only, all of the Debtors' stock, membership interests, real estate interests; all interests

under leases, licenses or occupancy agreements covering personal or real property; all

motor vehicles; all accounts and accounts receivable; all agreements, contracts, contract

rights, copyrights, trademarks and patents and other general intangibles; all deposit

accounts, including all blocked accounts, concentration accounts, depository accounts,

disbursement accounts, and all other bank accounts and all deposits therein; instruments;

documents; chattel paper; all loan proceeds; all other obligations in whatever form owing

to the Debtors; all rights in the farm products, merchandise or services which give rise to

any of the foregoing; all inventory, including, without limitation, machinery, equipment,

furniture, furnishings, fixtures and other personal property acquired for use primarily in

the Debtors' businesses; all causes of action, whether arising in contract, tort or

otherwise; all collateral as defined in the Pre-Petition Loan Agreement; and all other

claims and property recovered by or on behalf of the Debtors or the estates of the Debtors

(but pending the Final Hearing, exclusive of any avoidance actions (the "Avoidance

Actions") available to the bankruptcy estates of the Debtor Borrowers pursuant to

Sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code) (all of

the foregoing, collectively, the "Collateral"), as provided for by Sections 364(c) and (d)

of the Bankruptcy Code, provided that the DIP Lender's first priority security interest in,

and lien upon the Collateral shall be subordinate to only the valid, perfected and

unavoidable senior liens (if any) defined as "Permitted Liens" in the DIP Loan Agreement

(the "Senior Claims") and the Carve-Out Expenses up to the Carve-Out Amount as

provided for herein, and provided further that any and all claims and security interests of

the Pre-Petition Lenders in or upon the Collateral shall be expressly subordinate to the

liens, claims and interests granted to the DIP Lender under the DIP Loan Documents and

this Interim Order; and (iii) be secured by a second priority security interest in and lien

upon all Collateral otherwise encumbered by Senior Claims, all as provided by Sections

364(c) and (d) of the Bankruptcy Code;

     (c)  seeking the Court's authorization pursuant to Sections 361(a), 363(c) and

364(d)(1) of the Bankruptcy Code to provide adequate protection to the Pre-Petition

Lenders on account of their claims under the Pre-Petition Loan Agreement, which claims

are to be "primed" by the financing provided for herein, until such claims are paid in full

pursuant and subject to the terms hereof and the Final Order;

     (d)  requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the

"Emergency Interim Hearing") be held before this Court on an emergency basis to

STM/234346.4

consider entry of an interim order (this "Interim Order") authorizing the Debtor

Borrowers to obtain the financing contemplated in the DIP Loan Agreement, and further

requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to

consider entry of a final order (the "Final Order") authorizing the financing contemplated

by the DIP Loan Agreement, as set forth in the Motion and the DIP Loan Agreement and

the other loan documents related thereto (collectively, with the DIP Loan Agreement, the

"DIP Loan Documents");

(e)  pursuant to Bankruptcy Rule 4001(c)(1), priority mail notice of the Emergency

Interim Hearing having been given to: (i) the United States Trustee (the "U.S. Trustee"),

(ii) counsel for Key, (iii) counsel for the Pre-Petition Lenders, (iv) the twenty largest

unsecured creditors of the Debtors, (v) the landlords of all property leased by the Debtors;

(vi) the holders of any liens upon the Debtors' assets; and

(f)  the Emergency Interim Hearing having been held on May ___, 2017, and upon

all of the pleadings filed with the Court and all of the proceedings held before the Court,

and upon the record of the Emergency Interim Hearing and after due deliberation and

consideration and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, FOUND, DECREED, AND, AS**

**APPLICABLE, STIPULATED** that:

**1**   **Disposition**.  The Motion is granted in its entirety on an interim basis, and any

objections thereto that have not previously been withdrawn are overruled.  Subject to the

terms hereof, this Interim Order is valid immediately and is fully effective upon its entry.

The terms of this Interim Order, and any authorizations granted hereunder, shall expire

STM/234346.4

upon the earlier of: (i)  June 8, 2017; or (ii) the date on which the Final Hearing is

conducted.  Other than as provided in Paragraphs 7 and 23 hereof, each factual finding

and conclusion of law set forth within this Interim Order shall be of an interim nature,

and shall be limited to, and only effective to the extent of, moneys advanced, lent or used

pursuant to this Interim Order.

     **2**　　**Jurisdiction**.  This Court has jurisdiction over these proceedings and the

parties and property affected hereby pursuant to 28 U.S.C. § 1334 and this is a core

proceeding pursuant to 28 U.S.C. § 157.

     **3**　　**Purpose and Necessity of Financing**.  The Debtors require immediate

interim financing, among other things, to finance the ongoing working capital needs of

the Debtors until such time as a Final Hearing may be conducted.  The Debtors are unable

to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy

Code as an administrative expense and are unable to obtain, within the time required by

their needs to avoid immediate and irreparable harm, other financing under Sections

364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than the DIP Loan

Agreement and the other DIP Loan Documents.  A facility in the amount provided by the

DIP Loan Agreement and the other DIP Loan Documents is unavailable to the Debtors

without the Debtors granting to the DIP Lender, pursuant to Sections 364(c) and (d) of the

Bankruptcy Code, (i) priority claims, with respect to all Loans advanced post-petition,

and all other obligations under the DIP Loan Agreement and the other DIP Loan

Documents (collectively, the "Post-Petition Obligations"), having priority over any and

all administrative expenses, including, without limitation, the kind specified in Sections

{34164/31825/JAD/01378267.DOC}-6-

105, 503(b) and 507(b) of the Bankruptcy Code (except as otherwise expressly provided herein) and (ii) as security for all such Post-Petition Obligations, a first priority senior security interest in the Collateral that is not otherwise encumbered by Senior Claims and a second priority security interest in and lien upon all Collateral otherwise encumbered by allowed Senior Claims (except as otherwise expressly provided herein).

The Debtors' and Non-Debtor Guarantor's collective execution of the DIP Loan Agreement, and the collective procurement of the Loans to finance the working capital needs of the Debtors is necessary because the Borrowers' business is a mutual and collective enterprise and the consolidation of all loans and other financial accommodations under the DIP Loan Agreement will enhance the aggregate borrowing power of the Borrowers and will facilitate the administration of the Chapter 11 Cases. The DIP Lender's willingness to extend financial accommodations to the Borrowers is done solely in consideration, and in furtherance, of the Borrowers' mutual and collective enterprise and the Non-Debtor Guarantor's execution of the Guaranty.

**4**   **Exigency**.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtors' estates and creditors thereof, so that the business need for the Debtors to be operating under normal business terms may be met. The preservation and maintenance of the going concern value of the Debtors is integral to a successful sale of the Debtors' business pursuant to the provisions of Chapter 11 of the Bankruptcy Code.  Absent entry of this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

{34164/31825/JAD/01378267.DOC}-7-

STM/234346.4

**5**  <u>**Good Faith Bargaining**</u>.   The DIP Loan Agreement and the other DIP Loan

Documents have been negotiated in good faith and at arms'-length between the

Borrowers and the DIP Lender, and any Loans extended and other financial

accommodations made to the Debtors the DIP Lender pursuant to the DIP Loan

Agreement shall be deemed to have been extended by the DIP Lender in good faith, as

that term is used in Section 364(e) of the Bankruptcy Code. The extension of credit under

the DIP Loan Documents, and the fees to be paid thereunder: (a) are fair, reasonable, and

the best available under the circumstances, (b) reflect the Debtors' exercise of prudent

business judgment consistent with their fiduciary duties, and (c) are supported by

reasonably equivalent value and consideration. The DIP Lender is entitled to the

protections and benefits of Section 364(e) of the Bankruptcy Code.

**6**  <u>**Borrowing and Guaranty Authorization**</u>.  The Debtors are immediately

authorized to borrow or obtain Loans pursuant to the DIP Loan Agreement and the other

DIP Loan Documents up to an aggregate amount of $1,800,000.00 in principal, in

accordance with the availability and terms and conditions under the DIP Loan Agreement,

and the Debtors are hereby authorized to cross-guaranty any and all obligations of the

Borrowers pursuant to the terms of the DIP Loan Agreement and the other DIP Loan

Documents.  Such financing is necessary to avoid immediate and irreparable harm to the

Debtors' estates until the Final Hearing is held.  Available financing and advances under

the DIP Loan Agreement until the Final Hearing will be made only to fund the

Borrowers' ordinary working capital and general corporate needs, as set forth in the

budget attached hereto as Exhibit "A" (the "Budget"), in accordance with this Interim

STM/234346.4

Order and the DIP Loan Agreement and other amounts required or allowed to be paid pursuant to the DIP Loan Agreement.

**7**    <u>**Stipulations**</u>.  In providing for the advancement of post-petition financing under the DIP Loan Agreement, each of the Borrowers, the Non-Debtor Guarantor, and the DIP Lender stipulate and agree that:

(a)  The Pre-Petition Loan Agreement (including any and all guaranties executed in connection therewith) is in all respects a valid and binding agreement and obligation of each of the Borrowers and the Non-Debtor Guarantor;

(b)  the aggregate principal balance of the loans outstanding under the Pre-Petition Loan Agreement as of May 19, 2017 (excluding interest, fees, costs and legal and other expenses) was approximately (i) $4,946,853.33 on the Second Amended and Restated Revolving Note dated as of April 14, 2014, and (ii) $180,907.36 on the Amended and Restated CapEx Note Loan dated as of April 14, 2014 (all of the afore-detailed indebtedness, including accrued and unpaid interest, the fees, costs and legal and other expenses, being collectively referred to as the "Pre-Petition Indebtedness," such term including all "Indebtedness" owing under and as defined in the Pre-Petition Loan Agreement);

(c)  the liens and security interests granted by the Borrowers and the Non-Debtor Guarantor and held by the Pre-Petition Lender under the Pre-Petition Loan Agreement, are valid, enforceable, properly perfected and non-avoidable (the "Pre-Petition Liens");

(d)  other than as provided in <u>Subparagraph (f)</u> of this <u>Paragraph 7</u>, the Borrowers and the Non-Debtor Guarantor are not aware of any claim, counterclaim, setoff or defense

STM/234346.4

of any kind or nature which would in any way: (i) affect the validity, enforceability and non-voidability of the Pre-Petition Indebtedness owing to the Pre-Petition Lenders or any of the Pre-Petition Liens or (ii) reduce or affect the obligations of the Borrowers and the Non-Debtor Guarantor to pay any of such Pre-Petition Indebtedness;

(e) the Borrowers and the Non-Debtor Guarantor are not aware of any claim, counterclaim, setoff or defense of any kind or nature which would in any way: (i) affect the validity, enforceability and non-voidability of the Post-Petition Obligations owing to DIP Lender and the DIP Loan Agreement and the other DIP Loan Documents or (ii) reduce or affect the obligations of the Borrowers and/or the Non-Debtor Guarantor to pay any of such Post-Petition Obligations;

(f) pursuant to the terms of the DIP Loan Agreement and DIP Loan Documents, the terms of this Interim Order and Bankruptcy Code Section 364(d), the Pre-Petition Liens and the Pre-Petition Indebtedness are each made subordinate in all respects to the liens and claims granted to the DIP Lender pursuant to the DIP Loan Agreement, the other DIP Loan Documents and this Interim Order;

(g) in entering into the DIP Loan Documents, the Borrowers and the Non-Debtor Guarantor have obtained all authorizations, consents and approvals necessary from, and made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Borrowers and/or the Non-Debtor Guarantor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which each Borrower and/or Non-Debtor Guarantor is a party; and

(h) in entering into the DIP Loan Documents, and as consideration therefor, the Borrowers and the Non-Debtor Guarantor hereby agree that until such time as all Post-Petition Obligations are indefeasibly paid in full in cash, the Borrowers and the Non-Debtor Guarantor shall not in any way prime the liens provided to the DIP Lender under Paragraphs 10 and 12 of this Interim Order, by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code.

The foregoing stipulations shall be binding on the Borrowers, the Non-Debtor Guarantor, and each of their successors and assigns for all purposes in these Cases, but shall not bind the Committee with respect to subparagraphs (a), (b), (c) and (d) until the passing of the Investigation Termination Date (as defined below) with no objection, adversary proceeding or appropriate litigation being initiated in accordance with <u>Paragraph 9</u> of this Interim Order.

**8** <u>**Power to Execute Necessary Documents**</u>.  The Debtors are expressly authorized and empowered to enter into and deliver, among other documents: (i) the DIP Loan Agreement and the other attendant DIP Loan Documents in substantially the form presented at the initial hearing to consider the Motion.  The Debtors also are authorized, empowered and directed to perform all of their obligations under the DIP Loan Agreement and the other attendant DIP Loan Documents and such other agreements as may be required by the DIP Lender to give effect to the terms of the financing provided for in this Interim Order.   The Debtors are authorized to perform and do all acts that may be required in connection with the DIP Loan Agreement and the other DIP Loan

Documents, including, without limitation, the payment of fees and the reimbursement of

present and future reasonable costs and expenses and paid or incurred by the DIP Lender

as provided in this Interim Order, the DIP Loan Agreement and the other DIP Loan

Documents, all of which unpaid fees, commissions, costs and expenses shall be and are

included as part of the principal amount of the Post-Petition Obligations, and secured by a

first priority lien and security interest in all of the Collateral, as provided for in this

Interim Order, the DIP Loan Agreement and the other DIP Loan Documents. The DIP

Loan Agreement and the other DIP Loan Documents shall constitute valid and binding

obligations of each of the Debtors and the Non-Debtor Guarantor enforceable against

each of the Debtors and the Non-Debtor Guarantor, and each of their successors and

assigns, in accordance with their terms, subject to the terms of this Interim Order.  The

Debtors and the Non-Debtor Guarantor may enter into any non-material amendments or

modifications to the DIP Loan Agreement and the other DIP Loan Documents without the

need of further notice and hearing or Order of this Court provided that, such

modifications or amendments do not materially and adversely affect the rights of any

creditor, equity holder or party-in-interest.  For purposes of this Interim Order, non-

material amendments or modifications to the DIP Loan Agreement and the DIP Loan

Documents shall include, without limitation, clarifications of procedures and reporting

requirements, insertions of incomplete information, corrections of any errors, any waivers

or consents that the DIP Lender can exercise at its discretion, or any amendments to any

budget to the extent authorized in the DIP Loan Agreement or the other DIP Loan

Documents and to the extent that such amendments or modifications do not cause an

STM/234346.4

increase in the maximum amount available to be borrowed pursuant to the DIP Loan

Agreement and the other DIP Loan Documents.

**9**    <u>**Investigation Rights**</u>.  Notwithstanding anything herein to the contrary, until

the earlier of: (i) sixty (60) days after the appointment of any committee, or (ii) ninety

(90) days after the Petition Date (the "Investigation Termination Date"), the Committee,

or any other party-in-interest with requisite standing, shall be entitled to investigate the

validity, perfection and enforceability of the Pre-Petition Liens and the Pre-Petition

Indebtedness.  If the Committee determines that there may be a challenge to the Pre-

Petition Liens or Pre-Petition Indebtedness by the Investigation Termination Date, subject

to any requirements of legal standing, such Committee or other party-in-interest shall be

permitted to file and prosecute an objection or claim related thereto, and shall have an

additional ten (10) days following the Investigation Termination Date to file such

objection or otherwise initiate an appropriate action or adversary proceeding on behalf of

the Debtors' estates setting forth the basis of any such challenge.  If such motion is not

filed on or before ten (10) days following the Investigation Termination Date (or such

other later date as extended by the written consent of the Debtors and the Pre-Petition

Lender), the stipulations contained in subsections (a) through (i) of <u>Paragraph 7</u> of this

Interim Order shall be irrevocably binding on the Committee, interest holders, and all

other parties in interest, without further action by any party or this Court.  Unless the Pre-

Petition Lenders and the Debtor each consents in writing to an extension, the

Investigation Termination Date may not be extended, unless cause therefor is shown and

only after notice to the Pre-Petition Lender and the Debtors and a hearing on the request

STM/234346.4

to extend the Investigation Termination Date being held before the expiration of the

Investigation Termination Date.  To the extent that any such challenge is commenced, the

Pre-Petition Lender shall be entitled to include the costs and expenses, including, but not

limited to, reasonable and documented attorneys' fees and disbursements, incurred in

responding to any inquiry, producing documents and/or witnesses in response to formal

or informal discovery requests, or otherwise defending the objection or complaint, as part

of the Pre-Petition Indebtedness owed under the Pre-Petition Loan Agreement. Only up to

$10,000 of the Carve-Out Amount may be used by the Committee in connection with its

investigation.

**10**  **Lien Status and Priority**.  **(a)**  For all of the Post-Petition Obligations the

DIP Lender is hereby granted pursuant to Sections 361, 362, 363(e), 364(c)(1) and 364(d)

of the Bankruptcy Code an allowed claim having priority over any and all administrative

expenses, including, without limitation, the kind specified in Sections 105, 503(b) and

507(b) of the Bankruptcy Code and fees of the U.S. Trustee, all as more fully set forth

herein below, subject only to certain unpaid fees, costs, expenses and disbursements

incurred after the Petition Date and which are unpaid on the Termination Date (as defined

in the DIP Loan Agreement), and which have been, or may be, awarded by the Court

pursuant to Sections 330 and 331 of the Bankruptcy Code in an aggregate amount not to

exceed the Carve-Out Amount (as that term is defined herein, determined without regard

to fees and expenses that may be awarded and paid on an interim basis or any pre-petition

retainer paid to Debtors' counsel in connection with or related to the Cases), all as more

fully set forth herein below.  Further, the respective liens and security interests granted

STM/234346.4

herein to the DIP Lender in the Collateral or, as the case may be, the priorities accorded to

the Post-Petition Obligations as set forth in this Interim Order, shall be subject only to the

Senior Claims and the Carve-Out Expenses (which Carve- Out Expenses shall have an

administrative priority superior to that granted by this Interim Order) up to the Carve-Out

Amount, and shall otherwise have the priority and senior secured status afforded by

Sections 364(c) and 364(d)(1) of the Bankruptcy Code, as applicable.  The "priming" of

any liens and claims as provided for in this Interim Order shall specifically relate and be

applicable to the liens, claims and interests of the Pre-Petition Lenders in and with respect

to the Collateral.  So long as an Event of Default shall not have occurred and be

continuing, the Debtors shall be permitted to pay court-approved administrative expenses

of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary

course of business of the Debtors' or otherwise permitted hereunder, and court-approved

administrative expenses related to compensation and reimbursement of expenses allowed

and payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be due

and payable, within the parameters of this Interim Order and the amounts to be advanced

pursuant to the DIP Loan Agreement, and further provided such amounts are included in

the Budget and/or paid from any pre-petition retainer paid by the Debtors.  As used in the

preceding sentence, "court-approved administrative expenses" shall include payments

made pursuant to any Court approved procedure for monthly or other payment of

administrative expenses to which DIP Lender may consent; provided that nothing

contained herein shall be read to exempt those persons hereafter receiving interim

compensation payments or reimbursement of expenses pursuant to any such Court

approved procedure for monthly or other payment of administrative expenses from

otherwise applicable provisions of bankruptcy law, including but not limited to

requirements that such compensation or reimbursement be allowed on a final basis, and

when applicable, any subsequent order of this Court requiring that such payments be

disgorged; provided further that nothing contained herein shall be construed as consent to

the allowance of any fees and expenses referred to above and shall not affect any right of

the DIP Lender to object to the reasonableness of such amounts; and provided further that

the Debtors shall not be permitted hereunder to pay any fees or expenses incurred by any

party, including the Debtors or any Committee, in connection with the preparation,

initiation, prosecution or defense of any claims, causes of action, adversary proceedings

or other litigation against the DIP Lender and/or the Pre-Petition Lenders, including,

without limitation, challenging the amount, validity, priority or enforceability of, or

asserting any defense, counterclaim, or offset to the Pre-Petition Indebtedness, Post-

Petition Obligations or the security interests or liens of the Pre-Petition Lender and/or

DIP Lender in respect thereof.  No other liens or priority status, other than the Senior

Claims and the Carve-Out Expenses up to the Carve-Out Amount, having a lien or

administrative priority superior to or pari passu with that granted by this Interim Order to

the DIP Lender, shall be granted while any portion of the Post-Petition Obligations or the

Commitments under the DIP Loan Agreement remains outstanding, absent the consent of

the DIP Lender.

(b)  As used in this Interim Order and the DIP Loan Agreement, Carve-Out

Expenses shall mean:  unpaid fees and expenses incurred on and after the Petition Date by

professionals retained in these Cases pursuant to Sections 327 or 1103 of the Bankruptcy

Code, by the Debtors, or by any official committee appointed in the Cases pursuant to

Section 1102 of the Bankruptcy Code (the "Bankruptcy Professionals"), and any

statutorily mandated costs and fees of the Clerk of the Court and the U.S. Trustee with

respect to the Cases (collectively, the "Professional Fees") up to a maximum aggregate

amount not to exceed $683,000 (such dollar amount being referred to herein as the

"Carve-Out Amount" without regard to any pre-petition retainers paid to Debtors'

counsel in connection with the Cases); provided that the Carve-Out Expenses shall not

include (i) any other claims that are or may be senior to or pari passu with any of the

Carve-Out Expenses or any Professional Fees and expenses of a Chapter 7 trustee, or (ii)

any fees and/or expenses of the Bankruptcy Professionals incurred in connection with the

commencement or continuation of any suit, motion, action or other proceeding

challenging the extent, validity, perfection, enforceability or priority of the Post-Petition

Obligations or the security interests or liens of the DIP Lender in respect thereof.

     **11** **Limitation Upon Additional Surcharges**.  Nothing in this Interim Order

shall be deemed a consent by the Pre-Petition Lender or the DIP Lender to any charge,

lien, assessment, or claim against the Collateral, the DIP Liens, the Pre-Petition

Collateral, or the adequate protection liens under section 506(c) of the Bankruptcy Code

or otherwise.  With the exception of the Carve-Out Expenses and except as otherwise

permitted by the DIP Loan Agreement, neither the Collateral, the Pre-Petition Collateral,

the Pre-Petition Lender, nor the DIP Lender shall be subject to surcharge, pursuant to

Section 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in

interest, without the prior written consent of the DIP Lender and Pre-Petition Lender, and

no such consent shall be implied from any other action, inaction, or acquiescence by the

DIP Lender or Pre-Petition Lender in this proceeding, including but not limited to

acceptance of the Budget or funding of the Borrowers' ongoing operations by the DIP

Lender.  In no event shall the DIP Lender or Pre-Petition Lender be subject to the

equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or

the Pre-Petition Collateral.

     **12** <u>**Lien to Secure Post-Petition Obligations**</u>.  (a)  As security for all of the Post-

Petition Obligations, the DIP Lender is hereby granted (effective immediately and without

the necessity of the execution or filing by the Borrowers and/or the Non-Debtor

Guarantor of a security agreement, financing statements, trademark, copyright, tradename

or patent assignment filings with the United States Patent and Trademark Office or

Copyright Office, mortgages, landlord lien waivers, bailee waivers, licensee consents or

otherwise), pursuant to Sections 364(c) and (d) of the Bankruptcy Code, a first priority

security interest in and lien upon all of the Collateral, senior in all respects to any and all

present and future liens or claims, if any, that encumber the Collateral (including, without

limitation: (i) any and all liens and security interests held by the Pre-Petition Lenders

pursuant to the Pre-Petition Loan Agreement, (ii) liens and security interests, if any, of

pre-petition and post-petition landlords and bailees, and (iii) liens and security interests, if

any, granted in favor of any governmental authority for any liability under federal or state

environmental laws or regulations or for damages arising from or costs incurred by such

governmental authority in response to a release or threatened release of a hazardous or

toxic waste, substance or constituent, or other substance into the environment or

otherwise) except as provided in subparagraph (b) hereof, and subject only to the Senior

Claims and the Carve-Out Expenses up to the Carve-Out Amount, and a second priority

security interest in and lien upon all Collateral otherwise encumbered by allowed Senior

Claims.  The security interests and liens in the Collateral granted to the Agent and the

DIP Lender hereunder include, but are not limited to: (i) those items and types of

collateral in which security interests may be created under Article 9 of the Uniform

Commercial Code and all Collateral in which the Pre-Petition Lenders have a security

interest pursuant to the Pre-Petition Loan Agreement (which security interests are and

shall be "primed" by the liens granted the Agent and the DIP Lenders pursuant to this

Interim Order), (ii) those items and types of Collateral not governed by Article 9 of the

Uniform Commercial Code, including without limitation, licenses issued by any federal

or state regulatory authority and any leasehold or other real property interests; and (iii) the

products and proceeds of any of the foregoing.  Notwithstanding anything to the contrary

herein, and pending the Final Hearing, the Collateral shall not include any Avoidance

Actions under Chapter 5 of the Bankruptcy Code.  Said liens and security interests

discussed herein shall not be (i) subject to any lien or security interest that is avoided and

preserved for the benefit of the Debtors' estate under Section 551 of the Bankruptcy

Code, or (ii) subordinated to or made pari passu with any other lien or security interest

under Section 364(d) of the Bankruptcy Code or otherwise.  The security interest arising

hereunder shall be and hereby is a fully perfected security interest, such that no additional

steps need be taken by the Agent to perfect said interest.  Pursuant to Sections 363(b)(1)

STM/234346.4

and 364(c)(2) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties in order for the Debtors to pledge, grant, sell, transfer or otherwise transfer any such leasehold interest or the proceeds thereof or other Collateral are and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and are and shall have no force and effect with respect to the transactions granting the DIP Lender a priority security interest in such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtors in favor of the DIP Lender in accordance with the terms of the DIP Loan Agreement.

(b) Notwithstanding anything herein to the contrary, the liens and security interests granted to DIP Lender in any Collateral pursuant to this Paragraph 12 or otherwise hereunder shall be superior in all events and in all respects to the claims and liens of the Pre-Petition Lenders upon such Collateral, and the DIP Loan Agreement and the DIP Loan Documents shall govern the respective rights of the DIP Lender vis-à-vis the Pre-Petition Lenders with respect to said Collateral to the extent such DIP Loan Agreement and DIP Loan Documents do not conflict with this Interim Order.

(c) For purposes of clarity, nothing set forth in any order entered by this Court with respect to the First Day Pleadings (as hereinafter defined) shall be deemed to affect the super-priority administrative priority and senior secured status granted in favor of Pre-Petition Lender pursuant to this Interim Order, and any claims which may arise from or on account of any orders entered with respect to the First Day Pleadings are and shall be subordinate to the claims and interests the DIP Lender.  "First Day Pleadings" shall mean:

{34164/31825/JAD/01378267.DOC}-20-

(1)      Motion of the Debtors for an Order Pursuant to Sections 105 and 363(b) of the Bankruptcy Code Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits and Authorizing and Directing Financial Institutions to Honor and Process Checks and Wire Transfers Related to Such Obligation;

(2)      Motion of the Debtors Pursuant to Sections 105(a) and 541 of the Bankruptcy Code for Authority to Pay Prepetition Sales and Use Taxes; and

(3)      Motion of the Debtors Pursuant to Sections 105(a), 363(c), and 364(a) of the Bankruptcy Code for Authorization to (I) Continue to Operate the cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Waive Requirements of Section 345(b) of the Bankruptcy Code.

**13  Additional Perfection Measures**.  The liens and priority granted to the DIP

Lender pursuant to this Interim Order and the DIP Loan Agreement shall be perfected by

operation of law upon execution of this Interim Order by the Court.  The DIP Lender shall

not be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee

waivers or warehouseman waivers or to file or record financing statements, mortgages,

deeds of trust, leasehold mortgages, notices of lien or similar instruments in any

jurisdiction, or obtain consents from any licensor or similar party-in-interest, or take any

other action in order to validate and to perfect the security interest and lien granted to the

DIP Lender pursuant to this Interim Order.  If the DIP Lender, in its sole discretion,

chooses to obtain consents from any licensor or similar party-in-interest, to file such

financing statements, notices of lien or similar instruments, or to otherwise confirm

perfection of such security interests and liens: (i) all such documents shall be deemed to

have been recorded and filed as of the time and on the date of entry of this Interim Order,

and (ii) no defect in any such act shall affect or impair the validity, perfection and

enforceability of the liens granted hereunder.  In lieu of obtaining such consents or filing

such financing statements, notices of lien or similar instruments, the DIP Lender may, in

its sole discretion, choose to file a certified copy of this Interim Order in any place at

which any such instruments would or could be filed, together with a description of

Collateral located within the geographic area covered by such place of filing, and such

filing by the DIP Lender shall have the same effect as if such financing statements,

notices of lien or similar instruments had been filed or recorded at the time and on the

date of entry of this Interim Order.

      **14 <u>Access to Collateral -- No Landlord's Liens</u>**.  Each landlord waiver,

mortgagee waiver and bailee letter executed in connection with the Pre-Petition Loan

Agreement shall continue to govern the rights of the respective parties thereto, and such

waivers and letters shall also be equally applicable to, and shall govern the rights of such

parties vis-a-via the DIP Lender in connection with, the DIP Loan Agreement.

Notwithstanding anything contained herein to the contrary and without limiting any other

rights or remedies of the Agent and the DIP Lenders contained in this Interim Order or

the DIP Loan Documents, or otherwise available at law or in equity, and subject to the

terms of the DIP Loan Agreement, upon written notice to the landlord of any leased

premises that a default has occurred and is continuing under the DIP Loan Documents,

the DIP Lender may, subject to any separate agreement by and between such landlord and

the DIP Lender, enter upon any leased premises of the Debtors for the purpose of

exercising any remedy with respect to Collateral located thereon and shall be entitled to

STM/234346.4

all of the Debtor Borrowers' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the DIP Lender shall only pay rent and additional rent obligations of the Debtors that first arise after the DIP Lender's written notice referenced above and that are payable during the period of such occupancy by the DIP Lender, calculated on a per diem basis.  Nothing herein shall require the DIP Lender to assume any lease as a condition to the rights afforded to the DIP Lender in this paragraph.  Furthermore, any title, landlord's lien, right of distraint or levy, security interest or other interest that any landlord or mortgagee may have in any Collateral of the Debtors located on such leased premises, to the extent the same is not void under Section 545 of the Bankruptcy Code, is hereby expressly subordinated to the lien of the DIP Lender in such Collateral.

     **15**   **No Responsible Person**.  In making the decision to make Loans and to extend other financial accommodations to the Debtors under the DIP Loan Agreement or to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a responsible person or owner or operator with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or any similar Federal or State statute).

     **16**   **Enabling Clause**.  The Debtors are authorized to perform all acts, to make, execute and deliver all instruments and documents, and to pay fees which may be required or necessary for their performance under the DIP Loan Agreement and the other

STM/234346.4

DIP Loan Documents, including, without limitation, the execution and delivery of the

DIP Loan Agreement and the other DIP Loan Documents.

**17 <u>Automatic Stay Modified</u>**.  Subject only to the provisions of the DIP Loan

Agreement, the automatic stay provisions of Section 362 of the Bankruptcy Code are

vacated and modified to the extent necessary so as to permit the DIP Lender:

(a)  whether or not an Event of Default has occurred, to require all cash, checks or

other collections or proceeds from Collateral received by the Borrowers to be deposited in

accordance with the DIP Loan Agreement, and to apply amounts deposited in any such

account and other amounts paid to or received by the DIP Lender under the DIP Loan

Agreement and the other DIP Loan Documents as respectively provided in the DIP Loan

Agreement;

(b)  upon the occurrence of an Event of Default and subject to five (5) business

days' written notice to the Debtors, the United States Trustee and any Committee, to

exercise all rights and remedies provided for in the DIP Loan Agreement and the other

DIP Loan Documents, pursuant and subject to the provisions of the DIP Loan Agreement

without requiring prior authorization of this Court in order to exercise such rights and

remedies.  The automatic stay shall be deemed terminated as provided herein without the

necessity of any further action by the Court, the Debtors, the Committee, the DIP Lender

or any of them, in the event that the Debtors or the Committee have not obtained an Order

from this Court to the contrary within five (5) business days after receiving written notice

from the DIP Lender pursuant to this <u>Paragraph 17(b)</u>.  The Debtors and/or the

STM/234346.4

Committee shall have the burden of proof at any hearing on any request by the Debtors and/or the Committees to re-impose or continue the automatic stay as provided for herein;

(c)  notwithstanding the provisions of subparagraph (b) of this <u>Paragraph 17</u>, following the occurrence of an Event of Default the DIP Lender shall not take possession of or foreclose upon the Collateral until the earlier of the Final Hearing or entry of a subsequent Order of the Court; and

(d) this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this <u>Paragraph 17</u> and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

**18**  <u>**Successors and Assigns**</u>.  The DIP Loan Agreement and the other DIP Loan Documents and the provisions of this Interim Order shall be binding upon, the DIP Lender, the Pre-Petition Lender, the Debtors and their respective successors and assigns and the same shall inure to the benefit of the DIP Lender, the Pre-Petition Lender, the Debtors and their respective successors and assigns.

**19**  <u>**Cash Management Systems**</u>.  Unless and until new procedures are established as may be required pursuant to the DIP Loan Agreement and the other DIP Loan Documents, the Debtors are authorized and directed to maintain their pre-petition cash management system as in effect on the date of this Interim Order, and as described in the DIP Loan Agreement and the other DIP Loan Documents, subject to the Borrowers establishing certain new disbursement accounts as may be more fully set forth in the DIP Loan Agreement and the other DIP Loan Documents.  The cash management system set forth in the DIP Loan Agreement, including all accounts established in relation thereto,

shall be used for the purposes, and on the terms and conditions set forth in the DIP Loan

Agreement and the other DIP Loan Documents without the necessity of any further action

by the DIP Lender or the Debtors.  As part of the foregoing cash management system, the

DIP Lender shall be authorized to apply any and all proceeds and collections received

with respect thereto in accordance with <u>Paragraph 17</u> of this Interim Order.  The Debtors

are authorized to enter into any additional appropriate agreements providing for on-going

lockboxes, blocked accounts or similar arrangements in favor of the DIP Lender for

purposes of facilitating cash collections in accordance with the financing provided for by

this Interim Order and as required by the terms of the DIP Loan Agreement.

  **20  <u>Binding Nature of Agreement</u>**.  Each of the DIP Loan Documents to which

the Debtors and/or the Non-Debtor Guarantor are and will become a party shall constitute

legal, valid and binding obligations of the Debtors and/or the Non-Debtor Guarantor,

enforceable in accordance with their respective terms.  The DIP Loan Documents have

been duly executed and delivered to the DIP Lender by the Debtors and the Non-Debtor

Guarantor.  The rights, remedies, powers, privileges, liens and priorities of the DIP

Lender provided for in this Interim Order and in any other DIP Loan Document shall not

be modified, altered or impaired in any manner by any subsequent order (including a

confirmation order) or by any plan of reorganization or liquidation in these Cases or in

any subsequent case under the Bankruptcy Code unless the Post-Petition Obligations have

first been paid in full and completely satisfied.

  **21  <u>Pre-Petition Loan Agreement Commitments Terminated</u>**.  The Pre-Petition

Lender's commitment to make advances under the Pre-Petition Loan Agreement is hereby

terminated; provided, however, that all other terms and conditions and other claims

thereunder, and the liens and security interests provided for therein and in the Loan

Documents as defined in the Pre-Petition Loan Agreement, and except as otherwise noted

herein, shall remain in full force and effect, except to the extent that the security interests,

liens and claims under the DIP Loan Agreement "prime" such pre-petition claims and

interests as provided for herein and in the DIP Loan Agreement and the DIP Loan

Documents.

    **22** **Replacement Liens and Adequate Protection**.  (a) Until all Pre-Petition

Indebtedness has been paid and the Investigation Termination Date has passed with no

action taken or challenge made to the Pre-Petition Liens or the Pre-Petition Indebtedness

in accordance with Paragraph 9 of this Interim Order, and in an effort to provide adequate

protection, pursuant to Section 361, of the interests of the Pre-Petition Lender under the

Pre-Petition Loan Agreement, the Pre-Petition Lender is hereby granted, a valid, perfected

and enforceable security interest in and replacement liens upon all of the assets of the

Debtors created after the Petition Date, including, without limitation, the Collateral, and

all of the Debtor's  accounts, contract rights, inventory, general intangibles and such other

collateral in which the Pre-Petition Lender had an interest prior to the Petition Date and

all improvements thereof, all books and records with respect thereto and all products and

proceeds of the foregoing (collectively, the "Pre-Petition Collateral"), provided that any

and all such replacement liens granted to the Pre-Petition Lender by operation of this

Paragraph 22 shall be subordinate in all respects to the liens, claims and security interests

granted to the DIP Lender under the terms of the DIP Loan Documents and this Interim

Order.  The security interests and liens granted to the Pre-Petition Lender in this

Paragraph 22 shall be effective immediately and without the necessity of the execution or

filing by the Debtors of a security agreement, financing statements, trademark, copyright,

tradename or patent assignment filings with the United States Patent and Trademark

Office or Copyright Office, mortgages, landlord lien waivers, licensee consents or

otherwise.

     (b) Subject to the provisions of the DIP Loan Agreement, the DIP Loan

Documents, and this Interim Order, until all Pre-Petition Indebtedness has been paid and

the Investigation Termination Date has passed with no action taken or challenge made to

the Pre-Petition Liens or the Pre-Petition Indebtedness in accordance with Paragraph 9 of

this Interim Order, and in an effort to provide adequate protection, pursuant to Section

361, of the interests of the Pre-Petition Lender under the Pre-Petition Loan Agreement,

unless and until the occurrence of an Event of Default pursuant to and as defined in the

DIP Loan Agreement, the Debtors are authorized and directed to pay to the Pre-Petition

Lender for application to the Pre-Petition Indebtedness all collections on accounts and

sales of inventory, including current interest on the Pre-Petition Indebtedness as adequate

protection payments to the Pre-Petition Lender, all as set forth in the DIP Loan

Agreement. All such payments are adequate protection payments and are to be afforded

the full and complete protection given to such payments under the Bankruptcy Code.

These payments are to be made to the Pre-Petition Lender because, among other things,

the Debtors will continue to use the pre-petition collateral that secures the claims and

obligations owing under the Pre-Petition Credit Agreement. Such payments are being

STM/234346.4

made for the purpose of, among other things, protecting the Pre-Petition Lender's claims

and obligations, and collateral interest from such use and the potential depreciation and

deterioration of the collateral as a result thereof.  In addition, the Debtors shall timely

make regular payments of principal and interest on the 1st day of each month under the

Amended and Restated CapEx Note Loan dated as of April 14, 2014 (as the same has

been amended, amended and restated or modified from time to time).

     (c)  In order to provide adequate protection for all of the Pre-Petition

Indebtedness owed to the Pre-Petition Lender, the Pre-Petition Lender is hereby granted

pursuant to Sections 361, 362, 363(e), 364(c)(1) and 364(d) of the Bankruptcy Code an

allowed claim having priority over any and all administrative expenses, including,

without limitation, the kind specified in Sections 105, 503(b) and 507(b) of the

Bankruptcy Code and fees of the U.S. Trustee, all as more fully set forth herein below,

subject only to (i) certain unpaid fees, costs, expenses and disbursements incurred after

the Petition Date and which are unpaid on the Termination Date (as defined in the DIP

Loan Agreement), and which have been, or may be, awarded by the Court pursuant to

Sections 330 and 331 of the Bankruptcy Code in an aggregate amount not to exceed the

Carve-Out Amount (as that term is defined herein, determined without regard to fees and

expenses that may be awarded and paid on an interim basis or any pre-petition retainer

paid to Debtors' counsel in connection with or related to the Cases), all as more fully set

forth herein, and (ii) the allowed administrative claim granted to the DIP Lender pursuant

to paragraph 10(a) above.

STM/234346.4

**23** **Fees for DIP Loan Agreement**.  The fees to be paid to the DIP Lender pursuant to the DIP Loan Agreement and the other DIP Loan Documents are reasonable, fully-earned when due, and non-refundable when paid.

**24** **Subsequent Reversal or Modification**.  This Interim Order is entered pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code.  The DIP Lender is entitled to all protection afforded by Sections 364(e) and 363(m) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect: (y) the validity of any obligation, indebtedness or liability incurred post-petition hereunder by any of the Debtors to the DIP Lender prior to the date of receipt of written notice to the DIP Lender of the effective date of such reversal, stay, modification or vacation; or (z) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement or the other DIP Loan Documents.  Notwithstanding any such reversal, stay, modification or vacation, any indebtedness, obligation or liability incurred post-petition hereunder by any of the Debtors to the DIP Lender prior to written notice to the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the DIP Loan Agreement and the other DIP Loan Documents with respect to all such indebtedness, obligation or liability.

25 **No Waiver**.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that DIP Lender may have to bring or be heard on any matter brought before this Court.

26 **No Dismissal; No Sale**.  The Debtors shall not request any order dismissing or converting any of these Cases under Section 1112 unless each and every Obligation of the Borrowers to the DIP Lender shall have be paid indefeasibly in full in cash and completely satisfied prior to the entry thereof.  No order providing for the sale of any of the Debtors or the sale of all or substantially all of any of the Debtor's assets under Section 363 or otherwise shall be entered unless either: (i) all Post-Petition Obligations shall have be paid indefeasibly in full in cash and completely satisfied as part of such transaction; or (ii) the DIP Lender expressly consents otherwise.

27 **Supremacy of Terms**.  To the extent of any conflict between or among the express terms or provisions of any of the Pre-Petition Loan Documents, DIP Loan Documents, the Motion, any other order of this Court, or any other agreements and the express written terms and provisions of this Interim Order, the terms and provisions of this Interim Order shall govern.  Notwithstanding any contrary provision within any order, document or agreement, except as expressly provided in this Interim Order, the DIP Loan Agreement or the other DIP Loan Document, or as consented to by the DIP Lender in writing, (i) no other liens or priority status, other than the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, having a lien or administrative priority superior to or pari passu with that granted by this Interim Order to the Agent and the DIP Lender, shall be granted while any portion of the Post-Petition Obligations or the

STM/234346.4

Commitments under the DIP Loan Agreement remains outstanding, and (ii) the DIP

Lender shall have no obligation to make loans available to or for the benefit of the

Debtors, to fund the Debtor's operations, or to pay expenses incurred by the Debtors prior

or subsequent to the entry of this Interim Order.

      **28  Proofs of Claim.**  The Pre-Petition Lenders and the DIP Lender will not be

required to file proofs of claim in the Cases or in any successor cases.

      **29  <u>Final Hearing</u>**.  The Final Hearing on the Motion is scheduled for _____

\_\_\_\_, 2017, at \_\_\_\_\_ \_\_.m. before this Court at the United States Bankruptcy Court for

the Northern District of New York, Syracuse Division, 100 S. Clinton Street, Syracuse,

New York.

      **30  <u>Adequate Notice</u>**.  The notice given by the Debtors of the Emergency Interim

Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  The Debtors shall

promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice

Parties.  Any party-in-interest objecting to the relief sought in the Final Hearing shall

cause such objection to be made in writing and electronically filed by five (5) business

days prior to the Final Hearing, and which filing shall constitute service on  (i) proposed

counsel for the Debtors, Menter, Rudin & Trivelpiece, P.C., , Attn: Jeffrey Dove, Esq.

(ii) counsel for Key, McDonald Hopkins, LLC, Attn: Scott N. Opincar, Esq. and (iii) the

U.S. Trustee.

SO ORDERED, this        day of May, 2017.

_____

Hon. Margaret Cangilos-Ruiz
United States Bankruptcy Court Judge

[CONSENT SIGNATURES ON NEXT PAGE]

{34164/31825/JAD/01378267.DOC}-33-

Consented to and Approved
as to Form and Substance:

Proposed Counsel for the Debtors and
Debtors-in-Possession:

_____
Jeffrey Dove, Esq.
Menter, Rudin & Trivelpiece, P.C.

Counsel for Non-Debtor Borrowers:

_____
William  A. Hoy, IV, Esq.
Harter, Secrest & Emery, LLP

Counsel for Key Bank, National Association:

_____
Scott N. Opincar, Esq.
McDonald Hopkins, LLC

# EXHIBIT "C"

# EXHIBIT "C"

DIP BUDGET

| 5/12/2017 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Auburn Armature Inc.** DIP LOC Projections | Projected 5/26/2017 | Projected 6/2/2017 | Projected 6/9/2017 | Projected 6/16/2017 | Projected 6/23/2017 | Projected 6/30/2017 | Projected 7/7/2017 | Projected 7/14/2017 | Projected 7/21/2017 |
| **Cash Receipts** | | | | | | | | | |
| From AR (<90 Days Old) | 433,162 | 324,871 | 324,871 | 216,581 | 216,581 | 108,290 | 2 | - | - |
| AR - Due Date | 46,558 | 60,016 | 1,102,543 | 424,816 | 354,230 | 157,546 | 37,146 | 217,075 | 29,593 |
| Post Filing Sales Projection | - | - | 22,256 | 66,769 | 106,830 | 289,330 | 356,099 | 389,483 | 422,867 |
| **Cash Receipts** | 479,719 | 384,887 | 1,449,671 | 708,166 | 677,641 | 555,167 | 393,247 | 606,558 | 452,461 |
| | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | |
| Vendor Payments | 302,899 | 242,319 | 302,899 | 302,899 | 302,899 | 302,899 | 242,319 | 302,899 | 302,899 |
| IMARK | - | - | - | - | - | - | - | - | - |
| Credit Cards | | | | | | | | | |
| Payroll & Taxes | 124,000 | 218,000 | 124,000 | 124,000 | 124,000 | 163,000 | 124,000 | 124,000 | 124,000 |
| Freight | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Bank & Credit Card Fees | - | - | 3,200 | - | - | - | 3,200 | - | - |
| Shop Supplies | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 | 4,400 |
| Telephone & Internet | 4,000 | 7,280 | 520 | 246 | 4,000 | 7,280 | - | 520 | 246 |
| Health Ins & Life & other | - | 53,000 | - | - | - | - | 53,000 | - | - |
| Debt Payments - Key Bank | - | 42,000 | - | - | - | - | 42,000 | - | - |
| Rent | - | 78,036 | - | - | - | - | 78,036 | - | - |
| Utilities | 1,500 | 5,270 | 6,945 | 1,750 | 1,500 | - | 5,270 | 6,945 | 1,750 |
| Insurance | - | 17,867 | - | - | - | - | 17,867 | - | - |
| Travel | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| Auto & Fuel | 3,300 | 3,300 | 3,300 | 10,000 | 3,300 | 3,300 | 3,300 | 10,000 | 3,300 |
| Professional Fees | - | - | - | - | - | - | - | 493,000 | - |
| Other Operating Expenses | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Taxes | 30,000 | - | - | - | 30,000 | - | - | - | - |
| **Total Disbursements** | 495,599 | 696,972 | 470,764 | 468,795 | 495,599 | 506,379 | 598,892 | 967,264 | 462,095 |
| | | | | | | | | | |
| **BBR** | | | | | | | | | |
| AR - Beginning Balance | 5,555,373 | 5,520,777 | 5,491,989 | 4,487,442 | 4,224,400 | 3,991,883 | 3,881,840 | 3,844,692 | 3,683,258 |
| Sales | 445,124 | 356,099 | 445,124 | 445,124 | 445,124 | 445,124 | 356,099 | 445,124 | 445,124 |
| Collections | (479,719) | (384,887) | (1,449,671) | (708,166) | (677,641) | (555,167) | (393,247) | (606,558) | (452,461) |
| Adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending AR** | 5,520,777 | 5,491,989 | 4,487,442 | 4,224,400 | 3,991,883 | 3,881,840 | 3,844,692 | 3,683,258 | 3,675,921 |
| | | | | | | | | | |
| Ineligibles | | | | | | | | | |
| > 90 Days | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) | (1,025,738) |
| Other Ineligibles | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

DIP BUDGET

| Auburn Armature Inc. DIP LOC Projections | Projected 5/26/2017 | Projected 6/2/2017 | Projected 6/9/2017 | Projected 6/16/2017 | Projected 6/23/2017 | Projected 6/30/2017 | Projected 7/7/2017 | Projected 7/14/2017 | Projected 7/21/2017 |
|---|---|---|---|---|---|---|---|---|---|
| Acct 9151, 9351 Cash Sales | (1,666) | (1,666) | (1,666) | (1,666) | (1,666) | (1,666) | (1,666) | (1,666) | (1,666) |
| 50% Tainted (Cross Aged) | (178,583) | (178,583) | (178,583) | (178,583) | (178,583) | (178,583) | (178,583) | (178,583) | (178,583) |
| Credits Addbacks - Over 90 PID* | (5,037) | (5,037) | (5,037) | (5,037) | (5,037) | (5,037) | (5,037) | (5,037) | (5,037) |
| Down Payments | (49,855) | (49,855) | (49,855) | (49,855) | (49,855) | (49,855) | (49,855) | (49,855) | (49,855) |
| Contra Accounts | (31,158) | (31,158) | (31,158) | (31,158) | (31,158) | (31,158) | (31,158) | (31,158) | (31,158) |
| Total Ineligibles | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) | (1,292,036) |
| | | | | | | | | | |
| Net AR | 4,228,741 | 4,199,953 | 3,195,406 | 2,932,364 | 2,699,847 | 2,589,803 | 2,552,656 | 2,391,221 | 2,383,884 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Total Eligible AR | 3,594,430 | 3,569,960 | 2,716,095 | 2,492,509 | 2,294,870 | 2,201,333 | 2,169,757 | 2,032,538 | 2,026,302 |
| | | | | | | | | | |
| Gross Inventory | 4,295,983 | 4,270,983 | 4,245,983 | 4,220,983 | 4,195,983 | 4,170,983 | 4,145,983 | 4,120,983 | 4,095,983 |
| Reduction in Inventory | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Net Inventory | 4,270,983 | 4,245,983 | 4,220,983 | 4,195,983 | 4,170,983 | 4,145,983 | 4,120,983 | 4,095,983 | 4,070,983 |
| Slow Moving & Obsolete - per exam | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) | (1,561,000) |
| WIP | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Test Count Reserve | (69,000) | (69,000) | (69,000) | (69,000) | (69,000) | (69,000) | (69,000) | (69,000) | (69,000) |
| Drop | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| Consignment plus drop | (34,157) | (34,157) | (34,157) | (34,157) | (34,157) | (34,157) | (34,157) | (34,157) | (34,157) |
| In Transit | (51,955) | (51,955) | (51,955) | (51,955) | (51,955) | (51,955) | (51,955) | (51,955) | (51,955) |
| Osram | (8,605) | (8,605) | (8,605) | (8,605) | (8,605) | (8,605) | (8,605) | (8,604) | (8,603) |
| Total Eligible Inventory | 2,446,266 | 2,421,266 | 2,396,266 | 2,371,266 | 2,346,266 | 2,321,266 | 2,296,266 | 2,271,267 | 2,246,268 |
| | | | | | | | | | |
| Advance Rate | 53.55% | 53.55% | 53.55% | 53.55% | 53.55% | 53.55% | 53.55% | 53.55% | 53.55% |
| Eligible Inventory | 1,309,976 | 1,296,588 | 1,283,201 | 1,269,813 | 1,256,426 | 1,243,038 | 1,229,651 | 1,216,264 | 1,202,877 |
| | | | | | | | | | |
| Total Eligible Collateral | 4,904,405 | 4,866,548 | 3,999,295 | 3,762,322 | 3,551,295 | 3,444,371 | 3,399,408 | 3,248,802 | 3,229,178 |
| | | | | | | | | | |
| Loan Balance - Prior | 4,261,000 | 4,276,879 | 4,588,964 | 3,610,058 | 3,370,687 | 3,188,645 | 3,139,857 | 3,345,503 | 3,706,209 |
| Advances | 495,599 | 696,972 | 470,764 | 468,795 | 495,599 | 506,379 | 598,892 | 967,264 | 462,095 |
| Adjustments | | | | | | | | | |
| Outstanding Checks | | | | | | | | | |
| Collections | (479,719) | (384,887) | (1,449,671) | (708,166) | (677,641) | (555,167) | (393,247) | (606,558) | (452,461) |
| Loan Balance | 4,276,879 | 4,588,964 | 3,610,058 | 3,370,687 | 3,188,645 | 3,139,857 | 3,345,503 | 3,706,209 | 3,715,843 |
| | | | | | | | | | |
| Availability | 627,526 | 277,583 | 389,238 | 391,635 | 362,650 | 304,514 | 53,905 | (457,407) | (486,665) |