# EXHIBIT "A"

# EXHIBIT "A"

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**by and among**


**AAI ACQUISITION**,
**a New York limited liability company,**

**as Purchaser,**


**AUBURN ARMATURE INC.**
**a New York corporation,**

**EASA Acquisition I, LLC,**
**a Delaware limited liability company**

**EASA Acquisition II, LLC**
**a Delaware limited liability company**


**as Seller,**


**May 15, 2017**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into on May 15, 2017, by and between AAI ACQUISITION LLC, a New York limited liability company (the "**Purchaser**"), on the one hand, and AUBURN ARMATURE INC., a New York corporation ("**AAI**"), EASA Acquisition I, LLC, a Delaware limited liability company ("**EASA I**"), and EASA Acquisition II, LLC, a Delaware limited liability company ("**EASA II**" and collectively with AAI and EASA I, the "**Seller**").

## RECITALS

A.      No later than ten (10) business days after the date of this agreement (the "**Petition Date**"), the Seller shall file a voluntary bankruptcy petition pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**") and thereafter shall continue in the possession of its assets and in the management of its business pursuant to sections 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Filing**").

B.      The Seller is engaged in the business of the sale and repair of electromechanical equipment-related products and distribution of automation equipment (the "**Business**").

C.      The Purchaser desires to purchase from the Seller, and the Seller desire to sell to the Purchaser, substantially all assets of the Business, other than the exclusions provided for herein, upon the terms and subject to the conditions set forth herein and in accordance with Sections 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION 1
## PURCHASE OF ASSETS

**1.1      Acquired Assets**.  Subject to the terms and conditions hereof, at the Closing, the Seller shall sell, assign, transfer, convey, and deliver to the Purchaser, and the Purchaser shall purchase and accept, all of the Seller's right, title and interest in and to substantially all of the Seller's Business and assets, including but not limited to accounts receivable, inventory, personal property, contracts, leases, general intangibles, intellectual property, and other fixed assets (collectively, the "**Acquired Assets**").  The Acquired Assets will not include those items of personal property, contracts, and/or leases set forth on Schedule A hereto (the "**Excluded Assets**").  At any time up to and through twenty (20) business days after the Closing Date, Purchaser, in its sole discretion by written notice to Seller, may add additional executory contracts or unexpired leases to the Excluded Assets, and such executory contracts or unexpired leases shall not constitute Acquired Assets and Purchaser shall not acquire any rights or assume any liabilities with respect thereto.  Certain of the Acquired Assets shall be assumed by Seller and assigned to Purchaser, pursuant to Bankruptcy Code §365, and the balance of the Acquired Assets shall be conveyed by a Bill of Sale and/or Assignment in a form reasonably acceptable to Purchaser and Seller.

**1.2**   **Sale Free and Clear of Liens**. The Acquired Assets shall be transferred by the Seller, free and clear of all liens, claims and encumbrances (the "**Liens**"), pursuant to Bankruptcy Code §363(f).

**1.3**   **Assumption of Liabilities**. Notwithstanding anything to the contrary in this Agreement, other than the liabilities of Seller specifically set forth on Schedule B hereto, Purchaser shall not assume any liabilities of the Seller or its estate, nor shall Purchaser be deemed to be a successor to the Seller or its bankruptcy estate for any purpose whatsoever.

**1.4**   **Third Party Consents; Assignment and Assumption of Contracts**. At the request of the Purchaser, the Seller shall use commercially reasonable efforts to obtain, prior to the Closing Date, solely those consents of third parties specifically identified on Schedule D hereto which are required to transfer or assign any interest of the Seller in the Seller contracts specifically identified on Schedule D.  At Closing of the transactions contemplated hereby, at the request of Purchaser, Seller shall assume and assign to Purchaser only those contracts specifically identified on Schedule E hereto.  To the extent that the Seller is required to pay any cure amounts with respect to the assumption and assignment of the executory contracts and unexpired leases identified on Schedule E hereto, Purchaser shall pay such amounts directly to the relevant counterparty, with the exception of any unexpired leases of non-residential real property (such amounts, the "**Cure Amounts**").  Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property.

**1.5**   **Sales Agreement**. Simultaneously herewith, the Purchaser and the Seller shall enter into a Sales Agreement, in the form attached hereto as Exhibit A**,** with respect to certain sales that will occur subsequent to the filing of Seller's bankruptcy case.

**SECTION 2
PURCHASE PRICE**

**2.1**   **Purchase Price**. The purchase price for the Acquired Assets (the "**Purchase Price**") shall be calculated as set forth on Schedule C hereto and shall be finally determined in accordance with the procedures set forth in Sections 2.3, 2.4 and 2.5.  On the Closing Date, the Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to (i) the Estimated Purchase Price (as defined below), minus (ii) the Deposit (defined below), minus (iii) the Holdback Amount (the "**Closing Payment**").  Upon receipt of the Closing Payment, the Seller shall deliver the items set forth herein in Section 3.2 to the Purchaser.

**2.2**   **Deposit**.  Upon the execution of this Agreement, the Purchaser shall pay to Seller the sum of Four Hundred Thousand ($400,000) Dollars (the "**Deposit**"), which amount shall be credited against the Purchase Price as described in Section 2.1 hereof.  Upon the Purchaser's material breach of this Agreement, and upon five (5) business days' notice to the Purchaser, the Deposit shall be forfeited to the Seller's bankruptcy estate.  In the event that the Seller enters into a Competing Transaction (defined herein), the Deposit shall be returned to the Purchaser within two (2) business days following the Seller's execution of the agreement to enter into such

2

Competing Transaction.  The Deposit shall be held in an attorney escrow account of the Seller's attorney until its application pursuant to this Section 2.2.

**2.3**    **Determination of Purchase Price**.

(a)    Closing Determination. Five (5) business days before the Closing (defined herein), the Seller shall prepare and deliver to Purchaser a draft statement, and two (2) business days before Closing the Seller shall prepare and deliver to Purchaser a final statement (the "**Estimated Purchase Price Statement**") setting forth the Seller's good faith estimate of the Purchase Price as of the Closing Date (the "**Estimated Purchase Price**"), which shall be calculated in accordance with Schedule C attached to this Agreement and in accordance with the books and records of the Seller and using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation and accrual methodologies that were used in preparation of the Seller's historical financial statements (the "**Accounting Methodologies**").   The Estimated Purchase Price Statement (including the Estimated Purchase Price set forth therein) shall be used for purposes of Closing, absent manifest error.

(b)    Post-Closing Determination. Within ten (10) business days after the Closing Date, Purchaser shall prepare and deliver to the Seller a statement (the "**Closing Purchase Price Statement**") setting forth its calculation of the Purchase Price as of the Closing Date (the "**Closing Purchase Price**"), which shall be calculated in accordance with Schedule C attached to this Agreement and in accordance with the Accounting Methodologies.  If the Purchaser fails to deliver a Closing Purchase Price Statement, then the Estimated Purchase Price Statement shall be deemed to be the Closing Purchase Price Statement and shall be final and binding on the parties.

(c)    Examination and Review. After receipt of the Closing Purchase Price Statement, the Seller shall have ten (10) business days (the "**Review Period**") to review the Closing Purchase Price Statement.  During the Review Period, the Seller and its accountants shall have full access to the books and records of Purchaser, the personnel of, and work papers prepared by, Purchaser and/or its accountants to the extent that they relate to the Closing Purchase Price Statement and to such historical financial and other information relating to the Closing Purchase Price Statement as the Seller may reasonably request for the purpose of reviewing the Closing Purchase Price Statement and to prepare a Statement of Objections (defined below).

(d)    Objection. On or prior to the last day of the Review Period, the Seller may object to the Closing Purchase Price Statement by delivering to Purchaser a written statement setting forth its objections in reasonable detail and, to the extent possible, specifying the nature and amount of any dispute, together with supporting calculations and information (the "**Statement of Objections**").  If the Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Purchase Price Statement and the Closing Purchase Price reflected in the Closing Purchase Price Statement, shall be deemed final, conclusive and binding on the parties.  If the Seller delivers the Statement of Objections before the expiration of the Review Period, Purchaser and Seller shall negotiate in good faith to resolve such objections

3

within ten (10) business days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Closing Purchase Price and the Closing Purchase Price Statement with such changes as may have been previously agreed in writing by Purchaser and the Seller, shall be final and binding.

(e)    <u>Resolution of Disputes</u>. If the Seller and Purchaser fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") shall be submitted by the Seller for resolution by the Bankruptcy Court, which determination shall be binding on the parties.  If necessary, the Bankruptcy Court may appoint a third-party mediator or independent accountant (the "**Independent Accountant**") to resolve the Disputed Amounts.  If the Bankruptcy Court directs that the Disputed Amounts shall be resolved by an Independent Account, Seller and Purchaser shall each make written submissions to the Independent Accountant promptly (and in any event no later than five (5) business days after the Independent Accountant's engagement), which submissions shall contain such party's computation of the Closing Purchase Price and information, arguments, and support for such party's position.  The Independent Accountant shall review such submissions and base its determination solely on such submissions and the definition of the Purchase Price and Accounting Methodologies included herein, as applicable, and shall not conduct any independent review.  In resolving any disputed item, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by any party or less than the smallest value for such item claimed by any party.

(f)    <u>Fees of the Independent Accountant</u>. The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Purchaser, respectively, bears to the aggregate amount actually contested by the Seller and Purchaser.

(g)    <u>Purchase Price Adjustment</u>.  If the Closing Purchase Price (as finally determined pursuant to this Section 2.3) is less than the Estimated Purchase Price (the difference between such amounts hereinafter referred to as the "**Holdback Reduction Amount**"), then the Purchaser shall reduce the Holdback Amount (defined herein) by the Holdback Reduction Amount.  If the Closing Purchase Price (as finally determined pursuant to this Section 2.3) is greater than or equal to the Estimate Purchase Price, Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to the amount, if any, by which the Closing Purchase Price exceeds the Estimated Purchase Price.

**2.4**    **Holdback Amount**.  At the Closing, the Purchaser shall be permitted to withhold from the Purchase Price the amount of Four Hundred Thousand ($400,000) Dollars (the "**Holdback Amount**").  The Holdback Amount shall be used to adjust the Purchase Price as follows: (i) pursuant to Section 2.3 of this Agreement and (ii) pursuant to Schedule C of this Agreement, in an amount equal to the Rejected Receivables (as defined in Schedule C) and in accordance with the adjustment mechanism described in Section 2.5 below (collectively, (i) and (ii) being referred to herein as the "**Reduction Amounts**").  The Holdback Amount shall serve as

Purchaser's exclusive remedy with respect to any Reduction Amounts and Seller shall not be liable for any Reduction Amounts in excess of the Holdback Amount.

**2.5** **Holdback Amount Adjustment Mechanism**.

(a) <u>Rejected Receivables</u>. On the date that is 120 days following the Closing Date (the "**Receivables Adjustment Date**"), the Holdback Amount shall be reduced by an amount equal to all Rejected Receivables, as determined in accordance with this Agreement and Schedule C attached hereto. On the Receivables Adjustment Date, Purchaser agrees to assign, transfer, convey and deliver to Seller all of Purchaser's right, title and interest in and to all Rejected Receivables pursuant to an assignment and bill of sale reasonably acceptable to Seller. For the avoidance of doubt, Purchaser shall not have the right to reduce the Holdback Amount with respect to any accounts receivable that are not collected by Purchaser as of the Receivables Adjustment Date that Purchaser elects to retain and not to designate in writing as Rejected Receivables in accordance with Schedule C.

(b) <u>Cooperation Covenant</u>. Seller shall reasonably cooperate with Purchaser and take such other commercially reasonable actions as may be reasonably requested by Purchaser to verify the validity and balances of all accounts receivable of Seller, including, without limitation, providing to Purchaser, to the extent practicable and in Seller's possession, copies of all purchase orders, invoices, proofs of delivery, bills of lading and other applicable documents evidencing the existence of such accounts receivable.

(c) <u>Payment of Holdback Amount</u>. On the Receivables Adjustment Date, Purchaser shall pay the Holdback Amount, after any adjustments described in Sections 2.3, 2.4 and 2.5 of this Agreement, if any, to Seller by wire transfer of immediately available funds.

**SECTION 3**
**CLOSING**

**3.1** **Closing**. The closing (the "**Closing**") shall take place no later than the fifth (5th) business day following entry of the Sale Order, provided that consummation of the sale has not been stayed by operation of law, including pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, or a court of competent jurisdiction, or at such other date and place as shall be agreed among the parties hereto (the "**Closing Date**") and shall be effective at 11:59 PM on the Closing Date. Prior to the Seller's Bankruptcy Filing, this Agreement may be terminated by either Purchaser or Seller (i) by mutual agreement or (ii) in the event the Bankruptcy Filing shall not have occurred by May 17, 2017. In the event of the termination of this Agreement pursuant to the preceding sentence, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Purchaser or Seller.

**3.2** **Seller Closing Deliveries**. The Seller shall deliver to the Purchaser the following documents on the Closing Date:

(a) a bill of sale, assignment and general conveyance, in form and substance reasonably satisfactory to the Purchaser and Seller, dated as of the Closing Date, with respect to

5

the Acquired Assets sufficient to vest title in the Acquired Assets in the Purchaser pursuant to the provisions of the Sale Order; and

(b)      all other documents reasonably requested by the Purchaser to be delivered by the Seller in connection with the consummation of the transactions contemplated by this Agreement.

**3.3      Purchaser Closing Deliveries**. The Purchaser shall deliver the following to the Seller on the Closing Date:

(a)      the Purchase Price, less the Holdback Amount, by wire transfer of immediately available funds to an account or accounts designated by the Seller; and

(b)      all other documents reasonably requested by the Seller to be delivered by the Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows. The Seller acknowledges that the Purchaser is relying on the following representations and warranties in entering into this Agreement.

**4.1      Authorization for Agreement and Consents**.  The Seller has all requisite corporate or limited liability company power and authority, as applicable, to enter into this Agreement and to sell, assign, transfer and convey the Acquired Assets to the Purchaser under this Agreement.  The execution, delivery and performance of this Agreement by the Seller is subject to Bankruptcy Court approval.  Subject to approval of the Bankruptcy Court, this Agreement and any documents or instruments to be executed and delivered by Seller pursuant hereto constitute and will constitute, legal, valid and binding obligations of the Seller, as applicable, enforceable in accordance with their terms.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows. The Purchaser hereby acknowledges that the Seller is relying on the following representations and warranties in entering into this Agreement.

**5.1      Authorization for Agreement and Consents**.  The Purchaser has all requisite limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement by the Purchaser and the consummation of the transactions contemplated hereby have been duly authorized by all necessary actions of the Purchaser under applicable law.  This Agreement and any documents or instruments to be executed and delivered by the Purchaser pursuant hereto

6

constitute and will constitute, legal, valid and binding obligations of the Purchaser enforceable in accordance with their terms.

## SECTION 6
## SELLER'S REQUIREMENTS PENDING CLOSING

**6.1**    <u>**Conduct of the Business Pending Closing**</u>. From the date of the Agreement until the Closing, the Seller shall operate the Business in a manner consistent with the Seller's operations during the preceding three (3) month period, provided that Purchaser acknowledges and agrees that the Seller is in severe financial distress, that such operations are not consistent with the Seller's ordinary course historical operations, that Seller has been placed on credit hold by substantially all of Seller's vendors and that Seller is in material default under certain contracts material to the operation of Seller's business.  The Seller shall provide daily reports, as reasonably requested, to the Purchaser of all of the Business's financial and sales data in a form mutually agreed by Purchaser and Seller.  From the date of the Agreement until the Closing, the Purchaser shall have the right to enter and inspect any premises from which the Business operates during normal business hours and upon at least two (2) hours prior notice.  Except as otherwise contemplated under this Agreement or as required by applicable law, from the date hereof until the Closing, without the prior consent of the Purchaser, which shall not be unreasonably, withheld, conditioned or delayed the Seller shall:

(a)    not enter into any contract or agreement to assign, modify, terminate or amend any of the Seller's contracts and leases included in the Acquired Assets except those that expire per terms;

(b)    not sell, lease, license, or otherwise surrender, relinquish, encumber, or dispose of any of the Acquired Assets (other than sales of inventory in the ordinary course);

(c)    not take any action or omit to take any action that would cause any of the representations and warranties of the Seller to become inaccurate; and

(d)    recognizing that the Seller is in severe financial distress, use its commercially reasonable efforts to preserve its relationships with third parties and keep available the services currently provided to the Seller.

provided, however, that (i) nothing in this Section 6 shall restrict the Seller from taking actions otherwise specifically permitted or contemplated by this Agreement or otherwise required by the Bankruptcy Court or the pendency of the Bankruptcy Filing; and provided, further, that nothing in this Section 6 shall restrict the Seller from entering into or consummating the sale or assignment of any of the Excluded Assets on terms consistent with documentation filed with the Bankruptcy Court.

## SECTION 7
## EMPLOYEES

      **7.1**    **Employees; Benefits**. Except as set forth on Schedule F annexed hereto, the Purchaser shall offer employment to commence as of the Closing Date to substantially all persons currently employed by Seller (the "**Employees**"), on terms similar to those currently offered by the Seller to such Employees. The Employees who accept and commence employment with the Purchaser are hereinafter collectively referred to as the "**Newco Employees**". The provisions of this Section 7.1 are for the sole benefit of the parties to this Agreement and nothing herein, expressed or implied, is intended or shall be construed to confer upon or give to any person (including for the avoidance of doubt any Newco Employees), other than the parties hereto and their respective permitted successor and assigns, any legal or equitable or other rights or remedies under any provision of this Agreement.

## SECTION 8
## APPROVAL OF BANKRUPTCY COURT AND COMPETING TRANSACTIONS

      **8.1**    **Submission for Bankruptcy Court Approval**. On or before May 17, 2017, the Seller shall file a motion (the "**Sale Motion**"), notices and proposed orders, as may be appropriate, all in form and substance reasonably satisfactory to Purchaser, seeking (i) approval of this Agreement, the Seller's performance hereunder and the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances (the "**Sale Order**"). The Sale Order shall be entered no later than June 16, 2017, which deadline may be extended one (1) time by the Seller, upon written notice to the Purchaser, for a period of ten (10) days provided that a hearing to consider entry of the Sale Order is scheduled before the Bankruptcy Court before the expiration of such ten (10) day period. Sale Order shall be deemed be to reasonably satisfactory to Purchaser if it contains findings and conclusions by the Bankruptcy Court that, among other things, decree, find and conclude that: (i) this Agreement is approved pursuant to section 363 of the Bankruptcy Code; (ii) the Acquired Assets are being sold to Purchaser free and clear of all liens, claims, interests, and encumbrances of any type whatsoever, including claims otherwise arising under doctrines of successor liability) pursuant to section 363(f) of the Bankruptcy Code, (iii) the actions taken by the Purchaser in connection with the sale were undertaken in good faith, as such term is defined in section 363(m) of the Bankruptcy Code, and the Purchaser is a good faith purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code; (iv) the Purchaser is not liable for any claims held by any Person against the Seller or for any obligations of the Seller arising under or related to the Acquired Assets except as expressly set forth in this Agreement; and (v) the Seller has complied with the notice requirements of Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable rules of the Bankruptcy Court with respect to the transactions contemplated hereby.

      **8.2**    **Competing Transaction**. The Purchaser acknowledges that, from the date hereof until the entry of the Sale Order, the Seller has a fiduciary duty to, and to cause its representatives and affiliates to consider submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its affiliates, agents, and representatives) in connection with any sale or other disposition, directly or indirectly, in one or more transactions, of the Acquired Assets or any portion thereof, whether such transaction is structured as an asset sale, stock sale, merger, recapitalization or otherwise (each, a "**Competing Transaction**"). In addition, Purchaser acknowledges that from the date hereof until the issuance of the Sale Order by the Bankruptcy Court, the Seller shall have the responsibility and obligation to respond to any inquires or offers to purchase all or any part of the Acquired Assets and perform any and all

other acts related thereto which are required under the Bankruptcy Code or other applicable legal requirements, including, without limitation, supplying information relating to the Business and the Acquired Assets to prospective purchasers. The Seller shall provide copies of all written bids to the Purchaser no later than forty-eight (48) hours after such written bids are received by the Seller. Prior to Seller's consideration of any Competing Transaction, such Competing Transaction shall result in a benefit to Seller's bankruptcy estate of at least Two Hundred Thousand ($200,000) Dollars more than the transaction contemplated by this Agreement, after consideration of the Termination Fee (defined herein).

**8.3** **Bid Protections**. In consideration for the Purchaser having expended considerable time and expense in connection with this Agreement, the negotiation thereof, and the identification and quantification of assets of the Seller, the Seller believes that the Purchaser is entitled to certain bid protections to be approved by the Bankruptcy Court. Seller agrees to promptly seek approval of the bid protections set forth in this Agreement.

**8.4** **Termination Fee**. Subject to approval by the Bankruptcy Court, if Seller enters into a Competing Transaction, then Seller shall, or shall cause the purchaser in a Competing Transaction, as applicable, to pay to the Purchaser a termination fee of Two Hundred Thousand ($200,000) Dollars (the "**Termination Fee**") upon consummation of the Competing Transaction from the proceeds of such Competing Transaction paid at the closing thereof. The Termination Fee payable to the Purchaser under this Agreement shall be entitled to administrative expense priority in the Seller's bankruptcy case pursuant to sections 503(b) and 507(a) of the Bankruptcy Code.

## SECTION 9
## CONDITIONS PRECEDENT

**9.1** **Conditions Precedent to the Obligations of the Purchaser**. The obligations of the Purchaser hereunder are subject to the satisfaction on or prior to the Closing of the conditions set forth below (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Purchaser, unless such a waiver is prohibited by law).

(a) <u>Compliance with Agreement</u>. The Seller shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by Seller prior to or on the date of the Closing.

(b) <u>No Order</u>. No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any governmental authority or arbitrator, including without limitation the Bankruptcy Court, that prohibits, restrains, enjoins, or materially restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and no claim, action, suit, arbitration, inquiry, adverse proceeding or investigation (each, an "**Action**") shall be pending (other than an Action that has been or would be vitiated by the Sale Order) by or before any governmental authority or arbitrator against the Purchaser or the Seller, seeking to restrain, enjoin or materially restrict the transactions contemplated by this Agreement; provided, however,

that the provisions of this Section shall not apply if the Purchaser has directly solicited or encouraged any such Action.

(c)    <u>Release</u>.  The Sale Order shall provide that the Purchaser is released from any and all claims of any kind or nature whatsoever, through and including the Closing Date, which could be asserted by the Seller, the Seller's bankruptcy estate or any party having standing to take action on behalf of the Seller's bankruptcy estate.

(d)    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order as described herein.

**9.2    <u>Conditions Precedent to the Obligations of the Seller</u>**.  The obligations of the Seller hereunder are subject to the satisfaction on or prior to the Closing of the conditions set forth below (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Seller, unless such a waiver is prohibited by law).

(a)    <u>Representations and Warranties True</u>.  The representations and warranties made by the Purchaser in this Agreement shall be true and correct, in each case as of the Closing Date (other than those representations and warranties that address matters as of a particular date), with the same effect as though such representations and warranties had been made or given on and as of such date.

(b)    <u>Compliance with Agreement</u>.  The Purchaser shall have performed and complied in all material respects with all of their obligations under this Agreement which are to be performed or complied with by Purchaser prior to or on the date of the Closing Date.

(c)    <u>No Order</u>.  No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any governmental authority or arbitrator, including without limitation the Bankruptcy Court, that prohibits, restrains, enjoins, or materially restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and no Action shall be pending (other than an Action that has been or would be vitiated by the Sale Order) by or before any governmental authority or arbitrator against the Purchaser or the Seller, seeking to restrain, enjoin or materially restrict the transactions contemplated by this Agreement.

(d)    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order as described herein, and such Sale Order shall not be subject to any stay.

**SECTION 10**
**MISCELLANEOUS**

**10.1    <u>Expenses</u>**.  Except as provided in Sections 2.2(f) and 8.4 above, each party will be responsible for the payment of its own costs and expenses (including, without limitation, professional fees of its attorneys, accountants and other advisors) in connection with the transactions contemplated herein.

**10.2** **Notice of Litigation**. During the period from the date of this Agreement to the Closing Date, each party will promptly inform the other party in writing of any litigation commenced or, to the knowledge of such party, threatened against such party in respect of the transactions contemplated by this Agreement or the Business.

**10.3** **Assignment**. Purchaser may, without the prior written consent of the Seller, transfer or assign by operation of law or otherwise this Agreement to one or more parents, subsidiaries, or affiliates of the Purchaser.

**10.4** **Good Faith**. The Seller and the Purchaser shall cooperate in all reasonable respects and in good faith in seeking (i) entry by the Bankruptcy Court of the Sale Order and (ii) the consummation of the transactions contemplated hereby.

**10.5** **Governing Law**. This Agreement shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

**10.6** **Jurisdiction and Jury Waiver**. The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or any other agreement entered into by the Parties in connection herewith, or the breach hereof or thereof, and each of the Parties hereby consents to the personal jurisdiction of such court (and of the appropriate appellate courts) in any such action or proceeding and waives any right to trial by jury and any objection, including, but not limited to, any objection to the laying of venue or on the grounds of *forum non conveniens*, which any of them may now or hereafter have to the bringing of such action or proceeding in such jurisdiction. Each Party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding.

**10.7** **Amendment and Modification**. No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by the Purchaser and the Seller party hereto.

**10.8** **Notices**. All notices, requests, demands and other communications hereunder shall be made in writing. Notices, requests, demands and other communications shall be deemed to be duly given upon the date of delivery, if delivered by hand; upon the date of sending, if delivered by email; upon the second business day after mailing, if mailed by certified or registered mail with postage prepaid; or upon the first day after dispatch, if sent by nationally-recognized overnight courier as follows:

If to the Seller:

Auburn Armature, Inc.
70 Wright Circle

11

> Auburn, NY 13021
> Attn: Geoff Murphy
> Geoff.Murphy@aainy.com

With a copy to:

> Harter Secrest & Emery LLP
> 1600 Bausch & Lomb Place
> Rochester, New York 14604
> Attn: William A. Hoy, Esq.
> whoy@hselaw.com

If to the Purchaser:

> AAI Acquisition LLC
> 270 Park Avenue
> New Hyde Park, New York 11040
> Attn: Gerald J. DiCunzolo
> Jerry.DiCunzolo@UnitedElectricPower.com

With a copy to:

> SilvermanAcampora LLP
> 100 Jericho Quadrangle, Suite 300
> Jericho, New York 11753
> Attn: Ronald J. Friedman, Esq.
> RFriedman@SilvermanAcampora.com

or to such other addresses as any party may provide to the other parties in writing.

**10.9    Entire Agreement**.    This Agreement, together with its schedules and the certificates, agreements, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the Purchaser and the Seller with respect to the subject matter hereof and supersedes all prior understandings, agreements, or representations by or among the Purchaser and the Seller, written or oral, to the extent they relate in any way to the subject matter hereof or the transactions contemplated hereby.

**10.10    Successors**.  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and to their respective successors and permitted assigns.

**10.11    Counterparts and Electronic Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.  Signatures in Portable Document Format or other similar electronic format shall constitute original signatures for the purposes of this Agreement.

5933322_14

**10.12**    **Severability**. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions hereof.

**10.13**    **Drafting Presumption**.    The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.14**    **Headings**. The headings used in this Agreement are for convenience only and shall not constitute a part of this Agreement.

**10.15**    **Schedules**.    All of the Schedules attached hereto are incorporated herein and made a part of this Agreement by reference.

**10.16**    **Third Party Beneficiaries**.    This Agreement is solely for the benefit of the parties hereto and their respective successors and permitted assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim of liability or reimbursement, cause of action, or other right.

*(Signature page to follow.)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**PURCHASER:**

**AAI ACQUISITION LLC**

By: _Gerald J. DiCunzolo_
Name: Gerald J. DiCunzolo
Title: President

**SELLER:**

**AUBURN ARMATURE INC.**

By: _Geoff Murphy_
Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION I, LLC**

By: _Geoff Murphy_
Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION II, LLC**

By: _Geoff Murphy_
Name:  Geoff Murphy
Title:  Chief Executive Officer

**SCHEDULE A**
**EXCLUDED ASSETS**

Excluded Assets shall include:

- Any and all employment contracts set forth on Schedule F hereto;

- The Excluded Receivables, as defined on Schedule C hereto;

- All executory contracts and unexpired leases related to Seller's Rochester, New York location;

- All executory contracts and unexpired leases added by Purchaser pursuant to Section 1.1 hereof.

15

## SCHEDULE B
## ASSUMED LIABILITIES

Purchaser shall assume the following liabilities of Seller subject to the terms hereof:

- Thirty-Eight (38%) of the liability to IMARK Group, Inc. members, up to a maximum of $650,000.00.

- The Cure Amounts.

16

## SCHEDULE C
## PURCHASE PRICE

The Purchase Price shall be equal to the sum of the following:

- The product determined by multiplying (x) the gross value (total) of the Seller's accounts receivable on the books and records of the Seller as of the Closing Date, <u>minus</u> the Excluded Receivables[1], by (y) 0.8; <u>plus</u>

- Thirty-five percent (35%) of the book value of Seller's inventory; <u>plus</u>

- Sixty percent (60%) of the book value of the Seller's fixed assets, including but not limited to intellectual property, vehicles, equipment, and fixtures; <u>plus</u>

- The total of the assumed liabilities on Schedule B hereto.[2]

The Purchase Price may also be adjusted by reduction of the Holdback Amount in accordance with Sections 2.4 and 2.5 of the Asset Purchase Agreement.

The Estimated Purchase Price shall be equal to the sum of the following:

- The product determined by multiplying (x) the gross value (total) of the Seller's accounts receivable on the books and records of the Seller as of the Closing Date, <u>minus</u> the Excluded Receivables, by (y) 0.8; <u>plus</u>

- Thirty-five percent (35%) of the book value of Seller's inventory; <u>plus</u>

- Sixty percent (60%) of the book value of the Seller's fixed assets, including but not limited to intellectual property, vehicles, equipment, and fixtures; <u>plus</u>

- The total of the assumed liabilities on Schedule B hereto.

The Closing Purchase Price Statement shall set forth Purchaser's calculation of the Purchase Price using the same formula as set forth above in connection with calculating the

---

[1] "<u>Excluded Receivables</u>" shall mean: (i) all accounts receivable of Seller that as of the Closing Date are aged more than 120 days past the due date, except for those accounts receivable that as of the Closing Date are aged more than 120 days past the due date that are specifically designated in writing by the Purchaser as Acquired Assets, plus (ii) the accounts receivable payable by Rando Machine to Seller in the aggregate amount of $73,652.36, to the extent that such accounts receivable payable by Rando Machine to Seller are not included in subsection (i) as excluded receivables.

[2] Seller shall assume and assign to Purchaser only those contracts specifically identified on Schedule E hereto. To the extent that the Seller is required to pay any cure amounts with respect to the assumption and assignment of the executory contracts and unexpired leases identified on Schedule E hereto, Purchaser shall pay such amounts directly to the relevant counterparty, with the exception of any unexpired leases of non-residential real property. Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property. At any time up to and through twenty (20) business days after the Closing Date, Purchaser, in its sole discretion by written notice to Seller, may add additional executory contracts or unexpired leases to the Excluded Assets, and such executory contracts or unexpired leases shall not constitute Acquired Assets and Purchaser shall not acquire any rights or assume any liabilities with respect thereto.

17

Estimated Purchase Price.

If the Closing Purchase Price (as finally determined pursuant to Section 2.3) is less than the Estimated Purchase Price, then the Purchaser shall reduce the Holdback Amount by the Holdback Reduction Amount.  If the Closing Purchase Price (as finally determined pursuant to Section 2.3) is greater than or equal to the Estimate Purchase Price, Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to the amount, if any, by which the Closing Purchase Price exceeds the Estimated Purchase Price.

At Closing, the $400,000 Deposit shall be credited towards the Purchase Price as set forth in Section 2.2 of the Asset Purchase Agreement.

The Holdback Amount of $400,000 shall be used to adjust the Purchase Price as follows:

- Pursuant to Section 2.3 of the Asset Purchase Agreement;

- In an amount equal to the Rejected Receivables[3], in accordance with the provisions of Section 2.5 of the Asset Purchase Agreement;

The Holdback Amount shall serve as Purchaser's exclusive remedy with respect to any Reduction Amounts (as defined in Section 2.4 of the Asset Purchase Agreement).

The Holdback Amount shall be paid to Seller in accordance with Section 2.5(c).

---

[3] "Rejected Receivables" shall mean those accounts receivable of Seller that are purchased at Closing by Purchaser pursuant to this Agreement, that are not collected by Purchaser as of the date that is 120 days following the Closing Date and that Purchaser elects in writing to assign to Seller in accordance with Section 2.5 of this Agreement.  For the avoidance of doubt, the value of the Rejected Receivables shall be zero dollars ($0) for purposes of calculating the Estimated Purchase Price and Closing Purchase Price.

18

**SCHEDULE D**
**THIRD PARTY CONSENTS**

None

19

**SCHEDULE E**
**CONTRACTS ASSUMED AND ASSIGNED**

Except to the extent included in the Excluded Assets, all non-residential commercial leases to which Seller is a party.  Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property.

20

## SCHEDULE F
## EXCLUDED EMPLOYEES

The Purchaser shall not offer employment to the following employees of the Seller:

- All employees of the Seller's Rochester location.

5933322_14

# EXHIBIT "B"

# EXHIBIT "B"

## EXHIBIT B

### Sale Procedures

**I.      Assets to Be Sold**

The assets to be sold consist of substantially all of the assets of the Debtors including but not limited to inventory, accounts receivable, machinery and equipment, customer contracts and distribution agreements (the "Sale Assets").  A detailed description and information regarding the Sale Assets can be obtained by any Potential Bidder through the process described in Section II below.

The Debtors will provide to each Potential Bidder (as defined below) a copy of the asset purchase agreement (the "Stalking Horse APA") executed by, AAI Acquisition, LLC (the "Stalking Horse") to consummate the transactions contemplated.  The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined below)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed.  The Sale Assets will be sold without warranty or representation of any kind or nature, whether express or implied, and are being purchased by the Successful Bidder(s) or Reserve Bidder(s), as the case may be (each as defined below) on an "As Is, Where Is" basis and are being sold "With All Faults."

It is the Debtors' intention to sell substantially all of the Sale Assets as a going concern pursuant to the Bidding Procedures.  However, the Debtors may also entertain offers for less than substantially all of the Sale Assets pursuant to these Bidding Procedures.

**II.      Due Diligence**

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by that Potential Bidder,  to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets.  The Debtors will furnish (subject to applicable law) as promptly as practicable to the Potential Bidder any and all such information as that Potential Bidder may reasonably request related to the Sale Assets.

**III.      Initial Determinations by the Debtor**

The Debtors, in consultation with its lenders, shall (a) determine (with the assistance of its financial advisors and investment banker) whether any person or entity is a Potential Bidder;

(b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d) negotiate one or more competing asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below except for Key, DeltaPoint, Patriot, or any Committee.

## IV.    Bid Deadline

A person that desires to make a bid shall deliver written and electronic copies of its bid to the Debtors' investment banker, League Park ("LP"), Attn: Wayne Twardokus, 1100 Superior Avenue East, Suite 1650, Cleveland, Ohio 44114, email: wtwardokus@leaguepark.com, so as to be received by no later than 5:00 p.m. (Eastern Time) on or before June 12, 2017 (the "Bid Deadline"). The Debtors' attorneys will send copies of each bid and information submitted under Section VI below to counsel for the Debtors' secured lenders, and to counsel for any Official Committee of Unsecured Creditors (the "Committee") within 24 hours of the Debtors' receipt of that bid.

## V.    Determination of "Qualified Bidder" Status

In order to participate in the Bidding Process, a Potential Bidder must be deemed by the Debtors to be a "Qualified Bidder." To be deemed a Qualified Bidder, a Potential Bidder must deliver to the Debtors (in care of LP) the most current audited (if available) and the most current unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction, or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a Potential Bidder is a Qualified Bidder, the Debtors shall provide that Qualified Bidder with access to all relevant business and financial information necessary to enable that Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

Notwithstanding the foregoing, Key shall be deemed a Qualified Bidder.

## VI.    Requirements of a "Qualified Bid"

To be deemed a "Qualified Bid" that may be considered at the Auction (defined in Section IX below), a bid must:

a.       be in writing;

b.      be submitted by a Qualified Bidder;

c.      identify clearly the assets that are included in the purchase and related  purchase price;

d.      specify the amount of the purchase price or the formula for determining the purchase price, and provide that the purchase price shall be paid in full in cash upon closing;

e.      be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price), *provided*, *however*, Key shall not be required to pay a deposit in connection with any credit bid under section 363(k) of the Bankruptcy Code;

f.      confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.      be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by order of the Bankruptcy Court;

h.      be accompanied by a fully executed APA (and a redline that reflects  any modifications made by the Qualified Bidder to the Stalking Horse APA), which shall include the Qualified Bidder's terms for the assumption and assignment of any executory contracts, unexpired leases, or operating liabilities relating to the assets to be purchased;

i.      designate all executory contracts and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.      indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such "cure costs", and (iii) the amount of "cure costs" that the Qualified Bidder believes are or will be required to be paid in order to consummate its transaction;

k.      demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.      not contain any financing contingencies of any kind, and shall include (i) evidence that the Qualified Bidder (and any related guarantor) has the financial resources readily available and that are sufficient in the aggregate to purchase those Sale Assets (either some or all) that the Qualified Bidder is proposing to

purchase, (ii) evidence that the Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts that it proposes to assume, and (iii) evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA; and

m.      be accompanied by an affirmative statement from the Qualified Bidder that it is completely compliant, and will continue to completely comply, with these Sale Procedures.

The Debtors will make a determination regarding whether each bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 9:00 p.m. (Eastern Time) on June 12, 2017. The Debtors reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VI, if a Qualified Bidder submits a bid that fails to meet the qualifications to become a Qualified Bid, the Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 12 hours to cure any deficiencies to its bid.

The Debtors reserve the right, subject to consultation with its lenders and any Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid.

## VII.    Stalking Horse Bidder(s)

The Debtors have executed an APA (the "Stalking Horse Bid") with AAIA (the "Stalking Horse Bidder"). A copy of the Stalking Horse APA will be provided to a Qualified Bidder upon request.

The Stalking Horse Bid, is subject to higher or better bids pursuant to the terms of these Sale Procedures and applicable law. The Debtor, will seek approval for a break-up fee and reimbursement of reasonable expenses for the Stalking Horse Bidder (the "Stalking Horse Protection Fee") in an amount equal to $200,000 of the Stalking Horse Bid. The Debtors will also seek approval of a minimum initial bid increment of $200,000.

## VIII.   Auction Process

In the event that the Debtors receive more than one Qualified Bid for some or all of the Sale Assets, the Debtors will conduct an auction (the "Auction") for the Sale Assets. The Auction will take place at 10:00 a.m. (Eastern Time) on June 13, 2017, at the offices of Menter, Rudin & Trivelpiece, P.C., 308 Maltbie Street, Suite 200, Syracuse, New York 13204. The Debtors shall have the right, at their discretion, to have a court reporter attend the Auction and transcribe the proceedings at the Auction.

The Debtors will have the right to issue detailed procedures consistent with these Sale Procedures for the conduct at the Auction at any time prior to the start of the Auction. Persons entitled to attend the Auction shall include the Debtors, Key, DeltaPoint, Patriot, the Committee, the Qualified Bidders who have submitted a Qualified Bid and the Stalking Horse Bidder, and those persons' respective counsel or other authorized representatives. The Stalking Horse Bidder and each Qualified Bidder who has submitted a Qualified Bid shall appear at the Auction in person, or through a representative who provides appropriate evidence of such representative's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse, shall be entitled to make bids at the Auction.

The Stalking Horse APA shall serve as the Baseline Bid for consideration of any overbids made by the other Qualified Bidders at the Auction.

At the Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse APA. Each Qualified Bidder who has submitted a Qualified Bid will have the right to make additional modifications to its APA at the Auction.

The Auction will be conducted in rounds and in whatever order the Debtors determine. At the end of every round, the Debtors shall declare the highest or best bid or bids at that time for the assets under consideration. Each Qualified Bidder who has submitted a Qualified Bid shall have the right to continue to improve its respective bid at the Auction.

The initial minimum overbid amount by a Qualified Bidder(s) shall not be less than the sum of (a) the Stalking Horse's opening bid, plus (b) an enhancement to the estate of not less than $200,000, as compared to the Stalking Horse APA.

After the initial overbid is made, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase shall not be less than $50,000 of additional enhancement to the estate.

The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification of its or others' bids at any time, including, without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Auction.

The Auction will continue with the Qualified Bidders until the Debtors determine (subject to Bankruptcy Court approval) that they have received the highest or best offer(s) for the Sale Assets from the Qualified Bidder(s) or, if applicable, the Stalking Horse (the "Successful Bid") and the next highest or best Qualified Bid submitted at the Auction (a "Reserve Bid"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)."

The Successful Bidder shall have 48 hours after the conclusion of the auction to provide an additional deposit to the extent necessary to make its total deposit equal 10% of the amount of the Successful Bid.

The Debtors reserve the right, in their business judgment, to make one or more modifications of the procedures governing the Auction, and/or to make one of more adjournments of the Auction, to, among other things: (i) facilitate discussions among the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow each Qualified Bidder to consider how it wishes to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in its business judgment may require.

## IX.    Notice of Auction Results

The Debtors will file with a Notice of Successful Bidder on June 14], 2017.

## X.    Credit Bidding

Key, Patriot, and DeltaPoint shall have right to credit bid under Section 363(k) of the Bankruptcy Code (a "Credit Bid Party") up to the full amount of that party's claim, which is not subject to challenge, in any sale of the Sale Assets.

## XI.    The Sale Hearing

The Sale Hearing will be held on June 16, 2016, at 10:00 a.m. (Eastern Time) before the Honorable Margaret Cangilos-Ruiz, Chief United States Bankruptcy Judge for the Northern District of New York, at the United States Bankruptcy Court, Federal Building, 100 South Clinton Street, Syracuse, New York (the "Sale Hearing"). All objections to the relief requested at the Sale Hearing shall be filed and served by June 15, 2017. The Sale Hearing may be adjourned or rescheduled from time to time. The Debtors shall provide notice of such adjournment or rescheduling to: (i) the Office of the U.S. Trustee; (ii) counsel to Key; (iii) counsel to Delta; (iv) counsel to Patriot; (v) counsel to the Committee; (vi) all Qualified Bidders; (vii) all persons that have filed a timely objection to the sale; (viii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (ix) all persons that have filed written requests for notice in the Debtors' bankruptcy case.

## XII.    Failure to Consummate Purchase

Following the Sale Hearing, if the Successful Bidder(s) fails to consummate the closing of the sale because of a breach or failure to perform on the part of that Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further motion, notice, or order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors (and the Successful Bidder(s) shall

forfeit any right to any Stalking Horse Protection Fee, if applicable).  Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

## XIII.   Return of Deposit

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby.  If a Successful Bidder fails to close the transactions contemplated by the Successful Bid, then that Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bid(s); provided, however, that if a Successful Bidder fails to close the transactions when and as provided in its Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated by the Reserve Bid(s).  If a Reserve Bidder fails to close the transactions contemplated by its Reserve Bid, then that Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Auction.

The Debtor reserves all of its rights regarding any return of deposits, and the failure by the Debtor to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

## XIV.   Modification or Amendment of Sale Procedures

The Debtors may modify or amend these Sale Procedures, in their reasonable business judgment, with the consent of Key, at any time and in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described in the Sale Procedures.

## XV.   Closing

The closing of any sale of the Assets (the "Closing") will occur in accordance with the terms of each Successful Bidder's APA, and shall occur no later than June 26, 2017,  unless otherwise approved by the Court.

## XVI.   Retention of Necessary Books and Records.

Upon completion of any Court-approved Sale, the Debtors will maintain copies of the Debtors' books and records that the Debtors determine are necessary to complete the administration of their bankruptcy cases.  In addition, any Successful Bidder(s) will be asked and

required to cooperate with the Debtors in good faith in the event that the Debtors need any other records after the Closing that are in the possession of the Successful Bidder(s).

## XVII.  Debtors' Consultation With Key Parties

In the context of these Sale Procedures, the Debtors will consult with Key, DeltaPoint, Patriot, and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) establishing procedures for the Auction; (v) choosing the Successful Bid(s) and Reserve Bid(s); and (vi) modifying or amending these Sale Procedures.

# EXHIBIT "C"

# EXHIBIT "C"

## EXHIBIT C

### Contracts and Leases

- Lease with Fat Tire LLC for non-residential real property located at 70 Wright Circle, New York 13021

- Lease with Vincent Crisafulli Testament Trust for non-residential real property located at 875 Broadway, Albany, New York 12207

- Lease with JMAG Associates, LLC for non-residential real property located at 161 North Jensen Road, Vestal, New York 13850

- Lease with Cheektowaga Allied Drive Partners, LLC for non-residential real property located at 75 Allied Drive, Cheektowaga, New York 14227

- Lease with Carrier Circle Business Complex LLC for non-residential real property located at 6500 New Venture Gear Drive, East Syracuse, New York 13057

# EXHIBIT "D"

# EXHIBIT "D"

Date of Auction:               _____, 2017
Auction Time:                10:00 a.m.
Auction Location             Syracuse, New York
Bid Deadline:                _____, 2017 (12:00 noon)
Sale Approval Hearing:     _____, 2017
Sale Approval Hearing Time:  11:00 a.m.
Sale Approval Hearing Location:  Syracuse, New York
Sale Approval Objection Deadline:  _____, 2017

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

----------------------------------------- x

In re:                       :   Case No. 17-_____-5-MCR

                          :

AUBURN ARMATURE, INC., *et al.*, [1]  :   Jointly Administered

                        :   Chapter 11

               Debtors.   x

----------------------------------------- x

## NOTICE OF AUCTION AND SALE HEARING

### *PLEASE TAKE NOTICE OF THE FOLLOWING:*

1.      On May 19, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Orders Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 (A) (i) Authorizing the Sale of Substantially All of the Debtors' Assets; Free and Clear of All Liens, Claims, and Encumbrances, Subject to the Terms of the Asset Purchase Agreement and Subject to Higher and/or Better Offers; (ii) Authorizing and Approving a Certain Asset Purchase Agreement with AAI Acquisition, LLC; and (iii) Authorizing Debtors to Consummate All Transactions Related to the Proposed Sale; (B) Approving Bidding Procedures and Other Related Relief; and (C) Authorizing Debtors to Assume Certain Executory Contracts and Unexpired Leases and Assign Such Contracts and Leases to Purchase AAI Acquisition, LLC Pursuant to 11 U.S.C. §§ 365(a), (b), and (c) and Bankruptcy Rule 6006(e)(1)* (the "Sale Motion")[2].

2.      The Debtors are seeking to sell all or substantially all of their assets (the "Assets") to the Successful Bidder or Backup Bidder, prior to the confirmation of a Chapter 11 Plan. Approval of the sale of Assets to either the Successful Bidder or Backup Bidder may result in, among other things, the assumption, assignment and/or transfer by the Debtors of certain executory contracts and leases.  If you are a party to an executory contract or lease with the Debtors, you will receive a separate notice that contains relevant dates and other information that may impact you as a party to an executory contract or lease.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Auburn Armature, Inc. [2853]; EASA Acquisition I, LLC [7967]; and EASA Acquisition II, LLC [0374].

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion and/or the Bidding Procedures Order, as applicable.

3.      The Debtors have over $16 million in secured debt and approximately $8 million in unsecured debt. It is expected that the proceeds of the sale of the Assets will only be sufficient to pay the claims of the first and second priority secured creditors, KeyBank National Association and Patriot Capital II, LP.  Unless an agreement is negotiated to the contrary, no other class of creditors will receive a distribution from the proceeds of the proposed sale.  It is not anticipated that any material assets will remain after the proposed sale.  The Debtors are proposing the sale of the Assets to maximize the return to creditors and to preserve an on-going business for its employees and customers (which may also have the effect of reducing claims against the estate).

4.      On May ____, 2017, the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") entered an order approving bidding procedures and granting other relief related to the Debtors' proposed sale (the "Bidding Procedures Order"). The Bidding Procedures approved by the Court are attached to the Bidding Procedures Order. Pursuant to the Bidding Procedures, if the Debtors receive more than one Qualified Bid for the Assets, an Auction for the Assets shall take place on _____, **2017, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Menter, Rudin & Trivelpiece, P.C., 308 Maltbie Street, Suite 200, Sryacuse, New York 13204-1439.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures by no later than _____, **2017 at 12:00 noon (prevailing Eastern Time)** (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

3.      The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder or Backup Bidder free and clear of all liens, claims, and encumbrances will be held before the Honorable Margaret Cangilos-Ruiz, Chief United States Bankruptcy Court for the Northern District of New York, at the United States Courthouse located at the James M. Hanley Federal Building, 100 South Clinton Street, Syracuse, New York, on _____, **2017 at _____ __.m. (prevailing Eastern Time)**, or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

4.      Objections, if any, to the sale, or the relief requested in the Motion (other than with respect to the assumption and assignment of executory contracts and unexpired leases which are the subject of a separate notice) must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Northern District of New York, on or before **4:00 p.m. (prevailing Eastern Time) no later than seven (7) days prior to the date of the Sale Hearing** in accordance with Local Rule 9013-1(c); and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) counsel to the Debtors, Menter, Rudin & Trivelpiece, P.C., 308 Maltbie Street, Suite 200, Syracuse, New York 13204-1439, Attn:  Jeffrey A. Dove, Esq.; (ii) the Office of the United States Trustee for the Northern District of New York, 10 Broad Street, Room 105, Utica, New York 13501, Attn: Guy A. Van Baalen, Esq.; (iii) Counsel for AAI Acquisition, LLC, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn:  Ronald J. Friedman, Esq.; (iv) counsel for KeyBank, National Association, McDonald Hopkins LLC, 600 Superior Avenue East, Suite 2100, Cleveland, Ohio 44114, Attn:  Scott N.

Opincar, Esq.; and (v) counsel for any committee(s) of creditors that may be appointed in these cases (collectively, the "Notice Parties").  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING OR NOTICE.

5.      This notice is subject to the fuller terms and conditions of the Sale Motion and the Bidding Procedures Order, which shall control in the event of any conflict and the Debtors encourage parties-in-interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of the Assets or obtaining a copy of any of the foregoing documents may make a written request to counsel to the Debtors, Menter, Rudin & Trivelpiece, P.C., 308 Maltbie Street, Suite 200, Syracuse, New York 13204-1439, Attn: Jeffrey A. Dove, Esq.  In addition, copies of the Motion, the Bidding Procedures Order and this Notice can be found on the Bankruptcy Court's electronic case management website, http://ecf.nynb.uscourts.gov and are on file with the Clerk of the Bankruptcy Court.

Dated:   May 19, 2017                    **MENTER, RUDIN & TRIVELPIECE, P.C.**

By*:*   ___/s/Jeffrey A. Dove_____
Jeffrey A. Dove, Esq. (Bar Roll No. 101532)
*Proposed Attorneys for Debtors and*
*Debtors in Possession*
Office and Post Office Address
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1439
Telephone:    (315) 474-7541
Facsimile:    (315) 474-4040