**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X
In re:                                                                      :    Chapter 11
                                                                                 :
AUBURN ARMATURE, INC., *et al.*,[1]                  :    Case No. 17-30743-5-MCR
                                                                                 :
                  Debtor.                                 :    **Hearing Date: June 13, 2017 at 9:00 a.m. (ET)**
                                                                                 :    **Objection Deadline: June 9, 2017 at 12:00 p.m. (ET)**
---------------------------------------------------------- X

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363, AND 364(c) AND (d) OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO (i) USE CASH COLLATERAL (ii) OBTAIN POSTPETITION FINANCING ON A PERMANENT BASIS, (iii) BORROW UNDER SUCH POSTPETITION FACILITY ON AN INTERIM BASIS, PENDING A FINAL HEARING ON THE MOTION, (B) PROVIDE PAYMENTS TO CERTAIN SECURED CREDITORS, AND (C) SCHEDULING AN INTERIM AND FINAL HEARING ON THE MOTION, PURSUANT TO BANKRUPTCY RULE 4001**

      The Official Committee of Unsecured Creditors (the "Committee") appointed in the cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned proposed counsel, submits this objection (the "Objection") to the *Debtors' Motion for an Order Pursuant to Sections 363, and 364(C) and (D) of the Bankruptcy Code (A) Authorizing Debtors to (i) Use Cash Collateral (ii) Obtain Postpetition Financing on a Permanent Basis, (iii) Borrow Under Such Postpetition Facility on an Interim Basis, Pending a Final Hearing on the Motion, (B) Provide Payments to Certain Secured Creditors, and (C) Scheduling an Interim and Final Hearing on the Motion, Pursuant to*

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Auburn Armature, Inc. [2853]; EASA Acquisition I, LLC [7967]; and EASA Acquisition II, LLC [0374].

*Bankruptcy Rule 4001* [Docket No. 7] (the "DIP Financing Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtors commenced these Chapter 11 Cases to pursue the sale of their businesses as a going concern. The Committee does not oppose the Debtors' entry into a fair and reasonable DIP financing arrangement that adequately funds a Chapter 11 process with the potential to return significant value to all of the Debtors' stakeholders, including general unsecured creditors. However, the Debtors have yet to provide the Committee with basic information the Committee needs to review in order to analyze the fairness of the DIP Facility (defined below). Based on what the Committee knows to date, certain terms of the proposed DIP Facility appear only to benefit the Debtors' prepetition secured lenders and/or are overly prejudicial to general unsecured creditors, especially in light of the unfortunate reality that there likely will be insufficient proceeds from the sale of the Debtors' businesses to pay all of the Debtors' secured debt in full, not to mention all administrative and priority claims. Therefore, for all of the reasons set forth herein, the DIP Facility should not be approved on a final basis (and any order approving the DIP Facility should be limited to further interim relief with a final hearing to be held on the same date as the sale hearing), unless (a) the Committee is provided sufficient information to analyze the relief sought in the DIP Financing Motion; (b) KeyBank (defined below) and/or other Secured Lenders (defined below) agree to carve-out from their collateral sufficient funding to pay all administrative expense claims (including section 503(b)(9) claims) that will accrue during the pendency of these Chapter 11 Cases, and (c) certain terms of

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Financing Motion.

the financing that are prejudicial to unsecured creditors are modified to address the Committee's concerns set forth herein.

2.    Alternatively, if the Court determines that the DIP Financing Motion should be considered on a final basis (and not limited to interim relief), the Committee requests that the Court adjourn the final hearing and grant the Committee authority to conduct discovery concerning the deficiencies in the DIP Facility as the Debtors have produced no evidence regarding its reasonableness.

## BACKGROUND

3.    On May 19, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  No trustee or examiner has been appointed in the Chapter 11 Cases.

4.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

5.    On June 1, 2017, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and (b) of the Bankruptcy Code.  [Docket No. 50].  On June 5, 2017, only four days ago, the Committee selected Lowenstein Sandler LLP to serve as its counsel, subject to the Court's approval.  To date, the Committee has yet to retain a financial advisor because it is unclear whether there are sufficient funds in the professional fee carve-out to cover the costs.  In addition, the Debtors have yet to explain how the professional fee carve-out is allocated among the various professionals.

6.    On the Petition Date, the Debtors filed the DIP Financing Motion.  Through the DIP Financing Motion, the Debtors seeks approval of postpetition revolving line of credit facility

-3-

(the "DIP Financing") from KeyBank, National Association ("KeyBank" or the "DIP Lender"), the Debtors' prepetition first-lien lender,[3] in an amount up to $4,000,000.

7. On May 25, 2017, the Court entered an order approving the DIP Financing Motion on an interim basis [Docket No. 36] (the "Interim DIP Order"), which authorized the Debtors to borrow up to $1,800,000 under the DIP Financing. *See* Interim DIP Order at ¶ 6.

8. Pursuant to the Interim DIP Order, the hearing to consider approval of the DIP Financing Motion on a final basis is scheduled for June 13, 2017 at 9:00 a.m.

9. The Committee requested that Key Bank consent to an adjournment of the hearing to be held concurrently with the sale hearing on June 23, 2017, but Key Bank would not consent. In addition, the Debtors have yet to provide the Committee with a proposed order granting the DIP Financing Motion on a final basis, which the Committee requested several days ago.

10. Moreover, to date the Debtors have not provided material information the Committee has requested, including, among other information, (a) the exact amount the Debtors owe to KeyBank; (b) the amount of administrative expenses and priority claims, including those arising under section 503(b)(9) of the Bankruptcy Code, which must be paid to ensure that the Debtors' estates are administratively solvent; (c) the exact amount that the stalking horse purchaser has offered to purchase the Debtors' businesses (which is uncertain due to purchase price adjustments in the stalking horse purchase agreement); (d) the estimated value of avoidance actions; and (e) how the professional fee carve-out is allocated among the various professionals. Also, despite repeated requests, the Committee's professionals have not been given an opportunity to speak with the Debtors' financial advisor, Chikol, which the Debtors employed

---

[3] The Debtors' other pre-petition secured lenders are Patriot Capital II, LP ("Patriot"), DeltaPoint Capital IV, LP and DeltaPoint Capital IV (New York), LP (collectively referred to in the DIP Financing Motion as "Delta"). KeyBank, Patriot and Delta are collectively referred to herein as the "Secured Lenders".

-4-

many months ago and presumably can provide significant relevant information to the Committee.

## OBJECTION

11. The Debtors commenced these Chapter 11 Cases to pursue the sale of its businesses as a going concern. *See* DIP Financing Motion at ¶ 8. Without any evidentiary support, the Debtors claim that, in their business judgment, the proposed DIP financing addresses the Debtors' operational needs while the Debtors pursue the sale of their businesses. *See* DIP Financing Motion at ¶¶ 13, 16, 20.

12. While the Committee is mindful of the Debtors' financial condition and needs, the Court's decision to approve the DIP Financing Motion should balance the interests of the Debtors and the DIP Lender with those of general unsecured creditors. Striking this balance requires that the Debtors demonstrate that the proposed financing comports with basic notions of fairness and equity and that it will ultimately inure to the benefit of the Debtors' estates. *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtors, for the sake of obtaining postpetition financing, cannot abrogate their fiduciary duties to their estates and creditors. *See Ames Department Stores*, 115 B.R. at 38.

13. Section 364 of the Bankruptcy Code is not a "secured lenders act" allowing a creditor to undo the more level "playing field" contemplated by the Bankruptcy Code. The Court in *Ames Department Stores* stated:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11

>   process by preventing motions by parties-in-interest from being
>   decided on their merits.

*Ames Department Stores* 115 B.R. at 37.

14. In these Chapter 11 Cases, the Debtors and their estates will likely be rendered administratively insolvent at the conclusion of the quick sale, which, based on the limited information known to date, likely will only benefit the Secured Lenders to the detriment of administrative, priority and general unsecured creditors. Accordingly, the DIP Financing Motion should be denied on a final basis unless and until any final order approving the financing (the "<u>Final DIP Order</u>") modifies the terms of the proposed DIP Financing that are prejudicial to unsecured creditors in order to strike an appropriate balance among the interests of the Debtors, the Secured Lenders and the Debtors' unsecured creditors.

### A. The DIP Lender And/Or Other Secured Creditors Must Provide for Administrative Solvency of The Estates

15. As a preliminary matter, the Committee is concerned that the estates will be rendered administratively insolvent by virtue of the sale of the Debtors' assets. The DIP Lender (which is also the Debtors' first-lien prepetition lender) will benefit from the proposed sale by receiving at least a significant payment on account of its prepetition and postpetition claims, while leaving administrative, priority and general unsecured creditors of the estate unpaid. The DIP financing should not be approved on a final basis (nor should the proposed sale be approved) unless the DIP Lender and/or the other Secured Lenders agree to carve-out from their collateral sufficient funding to pay all administrative expenses and priority claims that have accrued and will continue to accrue in these Chapter 11 Cases. If the DIP Lender and/or the other Secured Lenders seek to benefit from the chapter 11 process, they must "pay the freight."

16. A chapter 11 case should not be administered, and DIP financing procured, for the sole benefit of secured lenders. *In re Ames Department Stores, Inc.*, 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.,* 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [secured lender]").

17. Accordingly, courts have concluded that administrative expenses must be paid in full before debtor-in-possession financing can be approved. For example, in *In re Townsends, Inc.*, when the Debtors proposed DIP financing that would pay most administrative claims but leave the section 503(b)(9) claims behind, Judge Sontchi stated, "if it appears that the case is administratively insolvent, I would be inclined to . . . either convert or dismiss the case . . . . " *In re Townsends, Inc., et al.*, Case No. 10-14092 (Bankr. D. Del. January 21, 2011) Tr. at 23:25-24:22. *See, e.g.*, *In re NEC Holdings Corp., et al.*, Case No. 10-10890 (Bankr. D. Del. July 13, 2010) Tr. at 100:17-20; *In re Family Christian, LLC et al.*, Case No. 15-00643 (Bankr. W.D. Mich. April 14, 2015) Tr. at 9:23-12:22 ("I will put everyone on notice now that we're going to have a big problem at the sale hearing if in fact it turns out that the estates are administratively insolvent . . ."). As a result of the *Townsends* Court's refusal to approve DIP financing that did not provide for payment in full of the section 503(b)(9) claims, and after an evidentiary hearing on the matter, the court approved the DIP financing based on a revised budget that included a carve-out with sufficient funds to pay the section 503(b)(9) claims in full. *See Final Order Authorizing the Debtors (A) to Obtain First-Priority Secured Postpetition Financing, and (B) to*

*use Cash Collateral of Secured Lenders and Providing Related Adequate Protection* [D.I. 227], entered on January 28, 2011, *In re Townsends, Inc., et al.,* No. 10-14092.[4]

    18.    The Committee believes, based on the information it has received to date, that the budget included with the Interim DIP Order will not be sufficient to pay all administrative expenses (including section 503(b)(9) claims, which are not included in the budget) that have accrued and will continue to accrue in these Chapter 11 Cases before and after the sale closes. The Committee's concern is exacerbated by the fact that it is unclear how much the stalking horse purchase price actually is (due to various purchase price adjustments in the stalking horse purchase agreement) or how much KeyBank is actually owed. Therefore, the DIP Financing Motion should be denied unless the DIP Lender and/or the other Secured Lenders agree to carve-out from their liens funds sufficient to (a) satisfy all chapter 11 administrative expenses, including professional fees, and priority claims not assumed in any sale transaction, and (b) provide sufficient funding for the expenses that will accrue during the post-sale wind-down period and a Chapter 11 plan process.

    **B. Other Terms of the Proposed DIP Financing are Overly Prejudicial to General Unsecured Creditors and Must be Modified**

    19.    The Debtors' proposed DIP Facility contains other terms that are overly prejudicial to general unsecured creditors, especially in light of the unfortunate reality that, based on the information known to date, there likely will be insufficient proceeds from the sale of the Debtors' businesses to pay the Debtors' secured debt in full and also pay all administrative expenses and priority claims. Therefore, the Committee requests that any Final DIP Order be modified to address the Committee's following concerns:

    (a)    The Debtors should not be permitted, as currently proposed in the Interim DIP Order (subject to entry of the Final DIP Order) to grant KeyBank (a)

---

[4]     Copies of the relevant pages of the transcripts and order are attached hereto as <u>Exhibit A</u>.

-8-

        liens on avoidance actions or other causes of action (or such commercial tort claims for which KeyBank does not already have valid and perfected liens) or the proceeds thereof; or (b) superpriority administrative expense claims payable from the proceeds of avoidance actions or other causes of action. *See* Interim DIP Order at ¶¶ 12, 22. Avoidance actions, a distinct creature of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors, are not truly property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567 (3d Cir. 2000) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . ."); *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (recognizing "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid a preference."). Accordingly, avoidance actions and their proceeds should not be subject to KeyBank's post-petition, replacement or adequate protection liens, and KeyBank's superpriority administrative expense claims should not be payable from proceeds of avoidance actions.

    (b)    Pursuant to the Interim DIP Order, the Committee's current deadline to investigate the validity of KeyBank's prepetition liens, security interests and claims is July 31, 2017 (60 days after the date on which the Committee was appointed) (the "<u>Investigation Termination Date</u>"). *See* Interim DIP Order at ¶ 9.[5] If the Committee does not commence a challenge against KeyBank within 10 days after the Investigation Termination Date, the Committee will be bound to the Debtors' stipulations regarding the validity of KeyBank's liens, security interests and claims, which will effectively grant KeyBank a waiver from all claims and causes of action relating to its prepetition loans. *Id*. In light of the broad relief KeyBank is requesting, the Investigation Termination Date should be extended to 90 days from the Committee's appointment, which is August 30, 2017. This short extension is necessary to allow the Committee to complete a comprehensive investigation of KeyBank's liens, claims and any other potential money damage causes of action. In addition, the Interim DIP Order provides that the Committee may use up to only $10,000 from the professional fee carve-out in connection with its

---

[5]     Pursuant to the terms of the Interim DIP Order, the Investigation Termination Date only applies to challenges against KeyBank. Thus, there is no challenge deadline as to the Debtors' other Secured Lenders.

investigation.  *Id*.  This amount is insufficient (and likely an attempt to stifle the Committee's investigation) and must be significantly increased.

(c) Any Final DIP Order should grant the Committee automatic standing to pursue any claims related to the Debtors' obligations to its prepetition Secured Lenders.  This will avoid the need for the Committee to incur costs to seek standing from the Court.[6]

(d) The Interim DIP Order directs the Debtors to pay to KeyBank for application to the prepetition indebtedness all collections on accounts and sales of inventory.  *See* Interim DIP Order at ¶ 22.  The Committee's ability to challenge KeyBank's prepetition liens, security interests and claims must not expire upon repayment of KeyBank's prepetition debt, regardless of this rollup.  Thus, any Final DIP Order must provide that in the event it is determined that KeyBank's liens or claims are not valid, the rollup of KeyBank's prepetition debt should not be given any effect and should be entirely unwound and any payment KeyBank received must be returned to the Debtors' estate.

(e) The Interim DIP Order requires the Debtors to make certain adequate protection payments to KeyBank "for the purpose of, among other things, protecting [KeyBank's] claims and obligations, and collateral interest from [the Debtors' use of KeyBank's collateral] and the potential depreciation and deterioration of the collateral as a result thereof."  *See* Interim DIP Order at ¶ 22(b).  Any Final DIP Order should clarify, in accordance with section 361 of the Bankruptcy Code, that all such adequate protection payments are limited to the diminution in value of KeyBank's prepetition collateral.

(f) Any Final DIP Order must provide that if it is ultimately determined that any of the Debtors' prepetition Secured Lenders are undersecured, any postpetition payments of interest, fees (including professional fees), costs, etc. must be recharacterized as payments of principal and/or disgorged.

(g) Any Final DIP Order must ensure that the Committee's challenge rights are preserved in the event that there is a credit bid for purchase of the Debtors' businesses.  The Final DIP Order must require that if the Secured

---

[6] Courts have routinely approved DIP financing agreements that grant standing to the creditors' committee without the need for a standing motion.  *See, e.g.*, *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006); *In re Prestige Industries LLC*, Case No. 17-10186 (Bankr. D. Del. Mar. 13, 2017); *In re American Safety Razor, LLC*, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); *In re PCAA Parent LLC*, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009).  Alternatively, courts also frequently approve DIP financing orders providing that the Committee's filing of a standing motion satisfies the requirement of commencing an adversary proceeding within a specified time period.  *See, e.g.*, *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005).

        Lenders wish to credit bid the Secured Lenders to disgorge cash in the event of a successful lien or other challenge. Moreover, if a credit bid is allowed, the proposed Final DIP Order must make clear that the Secured Lenders' alleged liens and security interests are not *ipso facto* found valid by the entry of a Final DIP Order. According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent and validity of their liens and also prevents a lien challenge.

(h)      KeyBank has advised that of the $683,000 professional fee carve-out, only $40,000 has been budgeted for the Committee's professionals. *See* Interim DIP Order at ¶ 10(b). The Committee has not seen any document providing for this allocation, however, this amount is inadequate and must be significantly increased to allow the Committee to properly exercise its statutory and fiduciary duties.

(i)      A section 506(c) waiver is inappropriate in the Chapter 11 Cases because it is unlikely that there will be sufficient sale proceeds to pay all administrative expenses in full. *See* Interim DIP Order at ¶ 11.[7] Thus, any Final DIP Order must clearly provide that the Debtors are not waiving their rights to surcharge the Secured Lenders' collateral under section 506(c). Any Final DIP Order should also provide that the Debtors are not waiving their rights to seek an order: (i) excluding postpetition proceeds

---

[7]     The DIP financing package proposed in *Sports Authority Holdings, Inc., et. al.* illustrates courts' reluctance to grant a Bankruptcy Code section 506(c) surcharge waiver in situations where a case may be administratively insolvent. In *Sports Authority,* Judge Walrath refused to approve a Bankruptcy Code section 506(c) waiver in connection with the debtors' DIP financing facility, reasoning that to the extent administrative claims remained unpaid at the end of the cases, there would be a claim against the lenders for those costs under Bankruptcy Code section 506(c) to the extent necessary for the preservation or realization of the lenders' collateral. In pertinent part, the Court ruled:

> And it's clear, I think, in all my prior rulings, that if a case is being run for the benefit of the lenders in order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes professional fees.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> The debtor is correct under Montgomery Ward, you don't have to pay the stub rent on the first day of the case. But in a case where the landlords and other administrative claims are clearly not budgeted or being paid while the landlord – excuse me, while the secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that.
> I think the fix is no 506(c) waiver for anybody. And to the extent that administrative claims are not paid at the end of this case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> If the lenders won't agree, then I'm prepared to convert the case today because I just -- they can go to State Court and liquidate their collateral, but you can't do it in bankruptcy without paying the freight, as was argued.

*See* Tr. of DIP Hr'g at 194-96, *In re Sports Authority Holdings, Inc., et al.*, No. 16-10527 (MFW) (Bankr. D. Del. April 26, 2016). A copy of the relevant pages of the transcript is attached hereto as <u>Exhibit B.</u>

       from the prepetition collateral based on the equities of the case under section 552(b) of the Bankruptcy Code, or (ii) marshaling assets.

(j)     Any Final DIP Order should require that the Committee be provided simultaneous copies of any notices or reports between the Debtors and KeyBank regarding the DIP Facility.

(k)     The Committee is currently investigating the reasonableness of the DIP Financing's various fees and interest rates, which may be excessive. The Committee reserves all rights to object to such fees and rates if it determines that they are unreasonable.

## **RESERVATION OF RIGHTS**

The Committee reserves all rights with respect to the DIP Financing Motion, including the right to supplement this Objection and seek discovery in connection with terms and reasonableness of the proposed DIP Facility through document requests and depositions due to the fact that the Debtors have not provided any evidence concerning the reasonableness of the DIP Facility. Nothing contained in, or omitted from, this Objection constitutes an admission or stipulation by the Committee, any member of the Committee, or any other party with respect to any alleged claims against the Debtors or any Secured Lender, including but not limited to the amount, validity, or enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

**WHEREFORE**, the Committee respectfully requests that the Court (a) limit any order approving the DIP Financing Motion to further interim relief only (and not be granted on a final basis), unless it is modified to address the Committee's concerns set forth herein; or, in the alternative, (b) adjourn the hearing to consider approval of the DIP Financing Motion on a final basis and grant the Committee authority to conduct discovery concerning the relief sought in the DIP Financing Motion; and (c) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: June 9, 2017

**LOWENSTEIN SANDLER LLP**
/s/ Jeffrey Cohen
Jeffrey Cohen, Esq.
Eric S. Chafetz, Esq. (*pro hac vice pending*)
Barry Z. Bazian, Esq. (*pro hac vice pending*)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 262-6700
Email: jcohen@lowenstein.com
echafetz@lowenstein.com
bbazian@lowenstein.com

*Proposed Counsel to the Official
Committee of Unsecured Creditors*