# EXHIBIT "A"

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**by and among**

**AAI ACQUISITION,**
**a New York limited liability company,**

**as Purchaser,**

**AUBURN ARMATURE INC.**
**a New York corporation,**

**EASA Acquisition I, LLC,**
**a Delaware limited liability company**

**EASA Acquisition II, LLC**
**a Delaware limited liability company**

**as Seller,**

**May 15, 2017**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into on May 15, 2017, by and between AAI ACQUISITION LLC, a New York limited liability company (the "**Purchaser**"), on the one hand, and AUBURN ARMATURE INC., a New York corporation ("**AAI**"), EASA Acquisition I, LLC, a Delaware limited liability company ("**EASA I**"), and EASA Acquisition II, LLC, a Delaware limited liability company ("**EASA II**" and collectively with AAI and EASA I, the "**Seller**").

### RECITALS

A.       No later than ten (10) business days after the date of this agreement (the "**Petition Date**"), the Seller shall file a voluntary bankruptcy petition pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**") and thereafter shall continue in the possession of its assets and in the management of its business pursuant to sections 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Filing**").

B.       The Seller is engaged in the business of the sale and repair of electromechanical equipment-related products and distribution of automation equipment (the "**Business**").

C.       The Purchaser desires to purchase from the Seller, and the Seller desire to sell to the Purchaser, substantially all assets of the Business, other than the exclusions provided for herein, upon the terms and subject to the conditions set forth herein and in accordance with Sections 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

### SECTION 1
### PURCHASE OF ASSETS

**1.1     Acquired Assets**.  Subject to the terms and conditions hereof, at the Closing, the Seller shall sell, assign, transfer, convey, and deliver to the Purchaser, and the Purchaser shall purchase and accept, all of the Seller's right, title and interest in and to substantially all of the Seller's Business and assets, including but not limited to accounts receivable, inventory, personal property, contracts, leases, general intangibles, intellectual property, and other fixed assets (collectively, the "**Acquired Assets**").  The Acquired Assets will not include those items of personal property, contracts, and/or leases set forth on Schedule A hereto (the "**Excluded Assets**").  At any time up to and through twenty (20) business days after the Closing Date, Purchaser, in its sole discretion by written notice to Seller, may add additional executory contracts or unexpired leases to the Excluded Assets, and such executory contracts or unexpired leases shall not constitute Acquired Assets and Purchaser shall not acquire any rights or assume any liabilities with respect thereto.  Certain of the Acquired Assets shall be assumed by Seller and assigned to Purchaser, pursuant to Bankruptcy Code §365, and the balance of the Acquired Assets shall be conveyed by a Bill of Sale and/or Assignment in a form reasonably acceptable to Purchaser and Seller.

**1.2** **Sale Free and Clear of Liens**. The Acquired Assets shall be transferred by the Seller, free and clear of all liens, claims and encumbrances (the "**Liens**"), pursuant to Bankruptcy Code §363(f).

**1.3** **Assumption of Liabilities**. Notwithstanding anything to the contrary in this Agreement, other than the liabilities of Seller specifically set forth on Schedule B hereto, Purchaser shall not assume any liabilities of the Seller or its estate, nor shall Purchaser be deemed to be a successor to the Seller or its bankruptcy estate for any purpose whatsoever.

**1.4** **Third Party Consents; Assignment and Assumption of Contracts**. At the request of the Purchaser, the Seller shall use commercially reasonable efforts to obtain, prior to the Closing Date, solely those consents of third parties specifically identified on Schedule D hereto which are required to transfer or assign any interest of the Seller in the Seller contracts specifically identified on Schedule D. At Closing of the transactions contemplated hereby, at the request of Purchaser, Seller shall assume and assign to Purchaser only those contracts specifically identified on Schedule E hereto. To the extent that the Seller is required to pay any cure amounts with respect to the assumption and assignment of the executory contracts and unexpired leases identified on Schedule E hereto, Purchaser shall pay such amounts directly to the relevant counterparty, with the exception of any unexpired leases of non-residential real property (such amounts, the "**Cure Amounts**"). Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property.

**1.5** **Sales Agreement**. Simultaneously herewith, the Purchaser and the Seller shall enter into a Sales Agreement, in the form attached hereto as Exhibit A, with respect to certain sales that will occur subsequent to the filing of Seller's bankruptcy case.

**SECTION 2**
**PURCHASE PRICE**

**2.1** **Purchase Price**. The purchase price for the Acquired Assets (the "**Purchase Price**") shall be calculated as set forth on Schedule C hereto and shall be finally determined in accordance with the procedures set forth in Sections 2.3, 2.4 and 2.5. On the Closing Date, the Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to (i) the Estimated Purchase Price (as defined below), minus (ii) the Deposit (defined below), minus (iii) the Holdback Amount (the "**Closing Payment**"). Upon receipt of the Closing Payment, the Seller shall deliver the items set forth herein in Section 3.2 to the Purchaser.

**2.2** **Deposit**. Upon the execution of this Agreement, the Purchaser shall pay to Seller the sum of Four Hundred Thousand ($400,000) Dollars (the "**Deposit**"), which amount shall be credited against the Purchase Price as described in Section 2.1 hereof. Upon the Purchaser's material breach of this Agreement, and upon five (5) business days' notice to the Purchaser, the Deposit shall be forfeited to the Seller's bankruptcy estate. In the event that the Seller enters into a Competing Transaction (defined herein), the Deposit shall be returned to the Purchaser within two (2) business days following the Seller's execution of the agreement to enter into such

2

Competing Transaction. The Deposit shall be held in an attorney escrow account of the Seller's attorney until its application pursuant to this Section 2.2.

### 2.3    Determination of Purchase Price.

(a)    Closing Determination. Five (5) business days before the Closing (defined herein), the Seller shall prepare and deliver to Purchaser a draft statement, and two (2) business days before Closing the Seller shall prepare and deliver to Purchaser a final statement (the "**Estimated Purchase Price Statement**") setting forth the Seller's good faith estimate of the Purchase Price as of the Closing Date (the "**Estimated Purchase Price**"), which shall be calculated in accordance with Schedule C attached to this Agreement and in accordance with the books and records of the Seller and using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation and accrual methodologies that were used in preparation of the Seller's historical financial statements (the "**Accounting Methodologies**"). The Estimated Purchase Price Statement (including the Estimated Purchase Price set forth therein) shall be used for purposes of Closing, absent manifest error.

(b)    Post-Closing Determination. Within ten (10) business days after the Closing Date, Purchaser shall prepare and deliver to the Seller a statement (the "**Closing Purchase Price Statement**") setting forth its calculation of the Purchase Price as of the Closing Date (the "**Closing Purchase Price**"), which shall be calculated in accordance with Schedule C attached to this Agreement and in accordance with the Accounting Methodologies. If the Purchaser fails to deliver a Closing Purchase Price Statement, then the Estimated Purchase Price Statement shall be deemed to be the Closing Purchase Price Statement and shall be final and binding on the parties.

(c)    Examination and Review. After receipt of the Closing Purchase Price Statement, the Seller shall have ten (10) business days (the "**Review Period**") to review the Closing Purchase Price Statement. During the Review Period, the Seller and its accountants shall have full access to the books and records of Purchaser, the personnel of, and work papers prepared by, Purchaser and/or its accountants to the extent that they relate to the Closing Purchase Price Statement and to such historical financial and other information relating to the Closing Purchase Price Statement as the Seller may reasonably request for the purpose of reviewing the Closing Purchase Price Statement and to prepare a Statement of Objections (defined below).

(d)    Objection. On or prior to the last day of the Review Period, the Seller may object to the Closing Purchase Price Statement by delivering to Purchaser a written statement setting forth its objections in reasonable detail and, to the extent possible, specifying the nature and amount of any dispute, together with supporting calculations and information (the "**Statement of Objections**"). If the Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Purchase Price Statement and the Closing Purchase Price reflected in the Closing Purchase Price Statement, shall be deemed final, conclusive and binding on the parties. If the Seller delivers the Statement of Objections before the expiration of the Review Period, Purchaser and Seller shall negotiate in good faith to resolve such objections

3

within ten (10) business days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Closing Purchase Price and the Closing Purchase Price Statement with such changes as may have been previously agreed in writing by Purchaser and the Seller, shall be final and binding.

(e)    _Resolution of Disputes_. If the Seller and Purchaser fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") shall be submitted by the Seller for resolution by the Bankruptcy Court, which determination shall be binding on the parties. If necessary, the Bankruptcy Court may appoint a third-party mediator or independent accountant (the "**Independent Accountant**") to resolve the Disputed Amounts. If the Bankruptcy Court directs that the Disputed Amounts shall be resolved by an Independent Account, Seller and Purchaser shall each make written submissions to the Independent Accountant promptly (and in any event no later than five (5) business days after the Independent Accountant's engagement), which submissions shall contain such party's computation of the Closing Purchase Price and information, arguments, and support for such party's position. The Independent Accountant shall review such submissions and base its determination solely on such submissions and the definition of the Purchase Price and Accounting Methodologies included herein, as applicable, and shall not conduct any independent review. In resolving any disputed item, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by any party or less than the smallest value for such item claimed by any party.

(f)    _Fees of the Independent Accountant_. The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Purchaser, respectively, bears to the aggregate amount actually contested by the Seller and Purchaser.

(g)    _Purchase Price Adjustment_. If the Closing Purchase Price (as finally determined pursuant to this Section 2.3) is less than the Estimated Purchase Price (the difference between such amounts hereinafter referred to as the "**Holdback Reduction Amount**"), then the Purchaser shall reduce the Holdback Amount (defined herein) by the Holdback Reduction Amount. If the Closing Purchase Price (as finally determined pursuant to this Section 2.3) is greater than or equal to the Estimate Purchase Price, Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to the amount, if any, by which the Closing Purchase Price exceeds the Estimated Purchase Price.

**2.4**    **Holdback Amount**. At the Closing, the Purchaser shall be permitted to withhold from the Purchase Price the amount of Four Hundred Thousand ($400,000) Dollars (the "**Holdback Amount**"). The Holdback Amount shall be used to adjust the Purchase Price as follows: (i) pursuant to Section 2.3 of this Agreement and (ii) pursuant to Schedule C of this Agreement, in an amount equal to the Rejected Receivables (as defined in Schedule C) and in accordance with the adjustment mechanism described in Section 2.5 below (collectively, (i) and (ii) being referred to herein as the "**Reduction Amounts**"). The Holdback Amount shall serve as

4

Purchaser's exclusive remedy with respect to any Reduction Amounts and Seller shall not be liable for any Reduction Amounts in excess of the Holdback Amount.

**2.5** **Holdback Amount Adjustment Mechanism.**

(a) Rejected Receivables. On the date that is 120 days following the Closing Date (the **"Receivables Adjustment Date"**), the Holdback Amount shall be reduced by an amount equal to all Rejected Receivables, as determined in accordance with this Agreement and Schedule C attached hereto. On the Receivables Adjustment Date, Purchaser agrees to assign, transfer, convey and deliver to Seller all of Purchaser's right, title and interest in and to all Rejected Receivables pursuant to an assignment and bill of sale reasonably acceptable to Seller. For the avoidance of doubt, Purchaser shall not have the right to reduce the Holdback Amount with respect to any accounts receivable that are not collected by Purchaser as of the Receivables Adjustment Date that Purchaser elects to retain and not to designate in writing as Rejected Receivables in accordance with Schedule C.

(b) Cooperation Covenant. Seller shall reasonably cooperate with Purchaser and take such other commercially reasonable actions as may be reasonably requested by Purchaser to verify the validity and balances of all accounts receivable of Seller, including, without limitation, providing to Purchaser, to the extent practicable and in Seller's possession, copies of all purchase orders, invoices, proofs of delivery, bills of lading and other applicable documents evidencing the existence of such accounts receivable.

(c) Payment of Holdback Amount. On the Receivables Adjustment Date, Purchaser shall pay the Holdback Amount, after any adjustments described in Sections 2.3, 2.4 and 2.5 of this Agreement, if any, to Seller by wire transfer of immediately available funds.

## SECTION 3
## CLOSING

**3.1** **Closing.** The closing (the **"Closing"**) shall take place no later than the fifth (5th) business day following entry of the Sale Order, provided that consummation of the sale has not been stayed by operation of law, including pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, or a court of competent jurisdiction, or at such other date and place as shall be agreed among the parties hereto (the **"Closing Date"**) and shall be effective at 11:59 PM on the Closing Date. Prior to the Seller's Bankruptcy Filing, this Agreement may be terminated by either Purchaser or Seller (i) by mutual agreement or (ii) in the event the Bankruptcy Filing shall not have occurred by May 17, 2017. In the event of the termination of this Agreement pursuant to the preceding sentence, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Purchaser or Seller.

**3.2** **Seller Closing Deliveries.** The Seller shall deliver to the Purchaser the following documents on the Closing Date:

(a) a bill of sale, assignment and general conveyance, in form and substance reasonably satisfactory to the Purchaser and Seller, dated as of the Closing Date, with respect to

5

the Acquired Assets sufficient to vest title in the Acquired Assets in the Purchaser pursuant to the provisions of the Sale Order; and

(b)    all other documents reasonably requested by the Purchaser to be delivered by the Seller in connection with the consummation of the transactions contemplated by this Agreement.

**3.3    Purchaser Closing Deliveries**. The Purchaser shall deliver the following to the Seller on the Closing Date:

(a)    the Purchase Price, less the Holdback Amount, by wire transfer of immediately available funds to an account or accounts designated by the Seller; and

(b)    all other documents reasonably requested by the Seller to be delivered by the Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows. The Seller acknowledges that the Purchaser is relying on the following representations and warranties in entering into this Agreement.

**4.1    Authorization for Agreement and Consents**.    The Seller has all requisite corporate or limited liability company power and authority, as applicable, to enter into this Agreement and to sell, assign, transfer and convey the Acquired Assets to the Purchaser under this Agreement.  The execution, delivery and performance of this Agreement by the Seller is subject to Bankruptcy Court approval.  Subject to approval of the Bankruptcy Court, this Agreement and any documents or instruments to be executed and delivered by Seller pursuant hereto constitute and will constitute, legal, valid and binding obligations of the Seller, as applicable, enforceable in accordance with their terms.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows. The Purchaser hereby acknowledges that the Seller is relying on the following representations and warranties in entering into this Agreement.

**5.1    Authorization for Agreement and Consents**. The Purchaser has all requisite limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution, delivery and performance of this Agreement by the Purchaser and the consummation of the transactions contemplated hereby have been duly authorized by all necessary actions of the Purchaser under applicable law.  This Agreement and any documents or instruments to be executed and delivered by the Purchaser pursuant hereto

6

constitute and will constitute, legal, valid and binding obligations of the Purchaser enforceable in accordance with their terms.

## SECTION 6
## SELLER'S REQUIREMENTS PENDING CLOSING

**6.1**    **Conduct of the Business Pending Closing**. From the date of the Agreement until the Closing, the Seller shall operate the Business in a manner consistent with the Seller's operations during the preceding three (3) month period, provided that Purchaser acknowledges and agrees that the Seller is in severe financial distress, that such operations are not consistent with the Seller's ordinary course historical operations, that Seller has been placed on credit hold by substantially all of Seller's vendors and that Seller is in material default under certain contracts material to the operation of Seller's business. The Seller shall provide daily reports, as reasonably requested, to the Purchaser of all of the Business's financial and sales data in a form mutually agreed by Purchaser and Seller. From the date of the Agreement until the Closing, the Purchaser shall have the right to enter and inspect any premises from which the Business operates during normal business hours and upon at least two (2) hours prior notice. Except as otherwise contemplated under this Agreement or as required by applicable law, from the date hereof until the Closing, without the prior consent of the Purchaser, which shall not be unreasonably, withheld, conditioned or delayed the Seller shall:

(a)    not enter into any contract or agreement to assign, modify, terminate or amend any of the Seller's contracts and leases included in the Acquired Assets except those that expire per terms;

(b)    not sell, lease, license, or otherwise surrender, relinquish, encumber, or dispose of any of the Acquired Assets (other than sales of inventory in the ordinary course);

(c)    not take any action or omit to take any action that would cause any of the representations and warranties of the Seller to become inaccurate; and

(d)    recognizing that the Seller is in severe financial distress, use its commercially reasonable efforts to preserve its relationships with third parties and keep available the services currently provided to the Seller.

provided, however, that (i) nothing in this Section 6 shall restrict the Seller from taking actions otherwise specifically permitted or contemplated by this Agreement or otherwise required by the Bankruptcy Court or the pendency of the Bankruptcy Filing; and provided, further, that nothing in this Section 6 shall restrict the Seller from entering into or consummating the sale or assignment of any of the Excluded Assets on terms consistent with documentation filed with the Bankruptcy Court.

## SECTION 7
## EMPLOYEES

5933322_14

**7.1    Employees; Benefits**. Except as set forth on Schedule F annexed hereto, the Purchaser shall offer employment to commence as of the Closing Date to substantially all persons currently employed by Seller (the "**Employees**"), on terms similar to those currently offered by the Seller to such Employees.    The Employees who accept and commence employment with the Purchaser are hereinafter collectively referred to as the "**Newco Employees**".    The provisions of this Section 7.1 are for the sole benefit of the parties to this Agreement and nothing herein, expressed or implied, is intended or shall be construed to confer upon or give to any person (including for the avoidance of doubt any Newco Employees), other than the parties hereto and their respective permitted successor and assigns, any legal or equitable or other rights or remedies under any provision of this Agreement.

## SECTION 8
## APPROVAL OF BANKRUPTCY COURT AND COMPETING TRANSACTIONS

**8.1    Submission for Bankruptcy Court Approval**. On or before May 17, 2017, the Seller shall file a motion (the "**Sale Motion**"), notices and proposed orders, as may be appropriate, all in form and substance reasonably satisfactory to Purchaser, seeking (i) approval of this Agreement, the Seller's performance hereunder and the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances (the "**Sale Order**").    The Sale Order shall be entered no later than June 16, 2017, which deadline may be extended one (1) time by the Seller, upon written notice to the Purchaser, for a period of ten (10) days provided that a hearing to consider entry of the Sale Order is scheduled before the Bankruptcy Court before the expiration of such ten (10) day period. Sale Order shall be deemed be to reasonably satisfactory to Purchaser if it contains findings and conclusions by the Bankruptcy Court that, among other things, decree, find and conclude that:  (i) this Agreement is approved pursuant to section 363 of the Bankruptcy Code; (ii) the Acquired Assets are being sold to Purchaser free and clear of all liens, claims, interests, and encumbrances of any type whatsoever, including claims otherwise arising under doctrines of successor liability) pursuant to section 363(f) of the Bankruptcy Code, (iii) the actions taken by the Purchaser in connection with the sale were undertaken in good faith, as such term is defined in section 363(m) of the Bankruptcy Code, and the Purchaser is a good faith purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code; (iv) the Purchaser is not liable for any claims held by any Person against the Seller or for any obligations of the Seller arising under or related to the Acquired Assets except as expressly set forth in this Agreement; and (v) the Seller has complied with the notice requirements of Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable rules of the Bankruptcy Court with respect to the transactions contemplated hereby.

**8.2    Competing Transaction**. The Purchaser acknowledges that, from the date hereof until the entry of the Sale Order, the Seller has a fiduciary duty to, and to cause its representatives and affiliates to consider submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its affiliates, agents, and representatives) in connection with any sale or other disposition, directly or indirectly, in one or more transactions, of the Acquired Assets or any portion thereof, whether such transaction is structured as an asset sale, stock sale, merger, recapitalization or otherwise (each, a "**Competing Transaction**").    In addition, Purchaser acknowledges that from the date hereof until the issuance of the Sale Order by the Bankruptcy Court, the Seller shall have the responsibility and obligation to respond to any inquires or offers to purchase all or any part of the Acquired Assets and perform any and all

8

other acts related thereto which are required under the Bankruptcy Code or other applicable legal requirements, including, without limitation, supplying information relating to the Business and the Acquired Assets to prospective purchasers. The Seller shall provide copies of all written bids to the Purchaser no later than forty-eight (48) hours after such written bids are received by the Seller. Prior to Seller's consideration of any Competing Transaction, such Competing Transaction shall result in a benefit to Seller's bankruptcy estate of at least Two Hundred Thousand ($200,000) Dollars more than the transaction contemplated by this Agreement, after consideration of the Termination Fee (defined herein).

**8.3** **Bid Protections**. In consideration for the Purchaser having expended considerable time and expense in connection with this Agreement, the negotiation thereof, and the identification and quantification of assets of the Seller, the Seller believes that the Purchaser is entitled to certain bid protections to be approved by the Bankruptcy Court. Seller agrees to promptly seek approval of the bid protections set forth in this Agreement.

**8.4** **Termination Fee**. Subject to approval by the Bankruptcy Court, if Seller enters into a Competing Transaction, then Seller shall, or shall cause the purchaser in a Competing Transaction, as applicable, to pay to the Purchaser a termination fee of Two Hundred Thousand ($200,000) Dollars (the "**Termination Fee**") upon consummation of the Competing Transaction from the proceeds of such Competing Transaction paid at the closing thereof. The Termination Fee payable to the Purchaser under this Agreement shall be entitled to administrative expense priority in the Seller's bankruptcy case pursuant to sections 503(b) and 507(a) of the Bankruptcy Code.

**SECTION 9**
**CONDITIONS PRECEDENT**

**9.1** **Conditions Precedent to the Obligations of the Purchaser**. The obligations of the Purchaser hereunder are subject to the satisfaction on or prior to the Closing of the conditions set forth below (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Purchaser, unless such a waiver is prohibited by law).

(a)    Compliance with Agreement.    The Seller shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by Seller prior to or on the date of the Closing.

(b)    No Order.    No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any governmental authority or arbitrator, including without limitation the Bankruptcy Court, that prohibits, restrains, enjoins, or materially restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and no claim, action, suit, arbitration, inquiry, adverse proceeding or investigation (each, an "**Action**") shall be pending (other than an Action that has been or would be vitiated by the Sale Order) by or before any governmental authority or arbitrator against the Purchaser or the Seller, seeking to restrain, enjoin or materially restrict the transactions contemplated by this Agreement; provided, however,

9

that the provisions of this Section shall not apply if the Purchaser has directly solicited or encouraged any such Action.

(c)    <u>Release</u>. The Sale Order shall provide that the Purchaser is released from any and all claims of any kind or nature whatsoever, through and including the Closing Date, which could be asserted by the Seller, the Seller's bankruptcy estate or any party having standing to take action on behalf of the Seller's bankruptcy estate.

(d)    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Sale Order as described herein.

**9.2    <u>Conditions Precedent to the Obligations of the Seller</u>.** The obligations of the Seller hereunder are subject to the satisfaction on or prior to the Closing of the conditions set forth below (compliance with which or the occurrence of which may be waived in whole or in part in a writing executed by the Seller, unless such a waiver is prohibited by law).

(a)    <u>Representations and Warranties True</u>. The representations and warranties made by the Purchaser in this Agreement shall be true and correct, in each case as of the Closing Date (other than those representations and warranties that address matters as of a particular date), with the same effect as though such representations and warranties had been made or given on and as of such date.

(b)    <u>Compliance with Agreement</u>. The Purchaser shall have performed and complied in all material respects with all of their obligations under this Agreement which are to be performed or complied with by Purchaser prior to or on the date of the Closing Date.

(c)    <u>No Order</u>. No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any governmental authority or arbitrator, including without limitation the Bankruptcy Court, that prohibits, restrains, enjoins, or materially restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and no Action shall be pending (other than an Action that has been or would be vitiated by the Sale Order) by or before any governmental authority or arbitrator against the Purchaser or the Seller, seeking to restrain, enjoin or materially restrict the transactions contemplated by this Agreement.

(d)    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Sale Order as described herein, and such Sale Order shall not be subject to any stay.

**SECTION 10**
**MISCELLANEOUS**

**10.1    <u>Expenses</u>.** Except as provided in Sections 2.2(f) and 8.4 above, each party will be responsible for the payment of its own costs and expenses (including, without limitation, professional fees of its attorneys, accountants and other advisors) in connection with the transactions contemplated herein.

10

**10.2    Notice of Litigation.** During the period from the date of this Agreement to the Closing Date, each party will promptly inform the other party in writing of any litigation commenced or, to the knowledge of such party, threatened against such party in respect of the transactions contemplated by this Agreement or the Business.

**10.3    Assignment.** Purchaser may, without the prior written consent of the Seller, transfer or assign by operation of law or otherwise this Agreement to one or more parents, subsidiaries, or affiliates of the Purchaser.

**10.4    Good Faith.** The Seller and the Purchaser shall cooperate in all reasonable respects and in good faith in seeking (i) entry by the Bankruptcy Court of the Sale Order and (ii) the consummation of the transactions contemplated hereby.

**10.5    Governing Law.** This Agreement shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

**10.6    Jurisdiction and Jury Waiver.** The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or any other agreement entered into by the Parties in connection herewith, or the breach hereof or thereof, and each of the Parties hereby consents to the personal jurisdiction of such court (and of the appropriate appellate courts) in any such action or proceeding and waives any right to trial by jury and any objection, including, but not limited to, any objection to the laying of venue or on the grounds of *forum non conveniens*, which any of them may now or hereafter have to the bringing of such action or proceeding in such jurisdiction. Each Party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding.

**10.7    Amendment and Modification.** No amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by the Purchaser and the Seller party hereto.

**10.8    Notices.** All notices, requests, demands and other communications hereunder shall be made in writing. Notices, requests, demands and other communications shall be deemed to be duly given upon the date of delivery, if delivered by hand; upon the date of sending, if delivered by email; upon the second business day after mailing, if mailed by certified or registered mail with postage prepaid; or upon the first day after dispatch, if sent by nationally-recognized overnight courier as follows:

If to the Seller:

> Auburn Armature, Inc.
> 70 Wright Circle

11

5933322_14

Auburn, NY 13021
Attn: Geoff Murphy
Geoff.Murphy@aainy.com

With a copy to:

Harter Secrest & Emery LLP
1600 Bausch & Lomb Place
Rochester, New York 14604
Attn: William A. Hoy, Esq.
whoy@hselaw.com

If to the Purchaser:

AAI Acquisition LLC
270 Park Avenue
New Hyde Park, New York 11040
Attn: Gerald J. DiCunzolo
Jerry.DiCunzolo@UnitedElectricPower.com

With a copy to:

SilvermanAcampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Attn: Ronald J. Friedman, Esq.
RFriedman@SilvermanAcampora.com

or to such other addresses as any party may provide to the other parties in writing.

**10.9    Entire Agreement.**    This Agreement, together with its schedules and the certificates, agreements, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the Purchaser and the Seller with respect to the subject matter hereof and supersedes all prior understandings, agreements, or representations by or among the Purchaser and the Seller, written or oral, to the extent they relate in any way to the subject matter hereof or the transactions contemplated hereby.

**10.10    Successors.** This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and to their respective successors and permitted assigns.

**10.11    Counterparts and Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.  Signatures in Portable Document Format or other similar electronic format shall constitute original signatures for the purposes of this Agreement.

12

**10.12   Severability**. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions hereof.

**10.13   Drafting Presumption**.   The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.14   Headings**. The headings used in this Agreement are for convenience only and shall not constitute a part of this Agreement.

**10.15   Schedules**.   All of the Schedules attached hereto are incorporated herein and made a part of this Agreement by reference.

**10.16   Third Party Beneficiaries**.   This Agreement is solely for the benefit of the parties hereto and their respective successors and permitted assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim of liability or reimbursement, cause of action, or other right.

*(Signature page to follow.)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**PURCHASER:**

**AAI ACQUISITION LLC**

By: _Gerald J. DiCunzolo_

Name: Gerald J. DiCunzolo
Title: President

**SELLER:**

**AUBURN ARMATURE INC.**

By: _Geoff Murphy_

Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION I, LLC**

By: _Geoff Murphy_

Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION II, LLC**

By: _Geoff Murphy_

Name:  Geoff Murphy
Title:  Chief Executive Officer

14

**SCHEDULE A**
**EXCLUDED ASSETS**

Excluded Assets shall include:

- Any and all employment contracts set forth on Schedule F hereto;

- The Excluded Receivables, as defined on Schedule C hereto;

- All executory contracts and unexpired leases related to Seller's Rochester, New York location;

- All executory contracts and unexpired leases added by Purchaser pursuant to Section 1.1 hereof.

15

## SCHEDULE B
## ASSUMED LIABILITIES

Purchaser shall assume the following liabilities of Seller subject to the terms hereof:

- Thirty-Eight (38%) of the liability to IMARK Group, Inc. members, up to a maximum of $650,000.00.

- The Cure Amounts.

16

## SCHEDULE C
## PURCHASE PRICE

The Purchase Price shall be equal to the sum of the following:

- The product determined by multiplying (x) the gross value (total) of the Seller's accounts receivable on the books and records of the Seller as of the Closing Date, <u>minus</u> the Excluded Receivables[1], by (y) 0.8; <u>plus</u>

- Thirty-five percent (35%) of the book value of Seller's inventory; <u>plus</u>

- Sixty percent (60%) of the book value of the Seller's fixed assets, including but not limited to intellectual property, vehicles, equipment, and fixtures; <u>plus</u>

- The total of the assumed liabilities on Schedule B hereto.[2]

The Purchase Price may also be adjusted by reduction of the Holdback Amount in accordance with Sections 2.4 and 2.5 of the Asset Purchase Agreement.

The Estimated Purchase Price shall be equal to the sum of the following:

- The product determined by multiplying (x) the gross value (total) of the Seller's accounts receivable on the books and records of the Seller as of the Closing Date, <u>minus</u> the Excluded Receivables, by (y) 0.8; <u>plus</u>

- Thirty-five percent (35%) of the book value of Seller's inventory; <u>plus</u>

- Sixty percent (60%) of the book value of the Seller's fixed assets, including but not limited to intellectual property, vehicles, equipment, and fixtures; <u>plus</u>

- The total of the assumed liabilities on Schedule B hereto.

The Closing Purchase Price Statement shall set forth Purchaser's calculation of the Purchase Price using the same formula as set forth above in connection with calculating the

---

[1] "<u>Excluded Receivables</u>" shall mean: (i) all accounts receivable of Seller that as of the Closing Date are aged more than 120 days past the due date, except for those accounts receivable that as of the Closing Date are aged more than 120 days past the due date that are specifically designated in writing by the Purchaser as Acquired Assets, plus (ii) the accounts receivable payable by Rando Machine to Seller in the aggregate amount of $73,652.36, to the extent that such accounts receivable payable by Rando Machine to Seller are not included in subsection (i) as excluded receivables.

[2] Seller shall assume and assign to Purchaser only those contracts specifically identified on Schedule E hereto. To the extent that the Seller is required to pay any cure amounts with respect to the assumption and assignment of the executory contracts and unexpired leases identified on Schedule E hereto, Purchaser shall pay such amounts directly to the relevant counterparty, with the exception of any unexpired leases of non-residential real property. Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property. At any time up to and through twenty (20) business days after the Closing Date, Purchaser, in its sole discretion by written notice to Seller, may add additional executory contracts or unexpired leases to the Excluded Assets, and such executory contracts or unexpired leases shall not constitute Acquired Assets and Purchaser shall not acquire any rights or assume any liabilities with respect thereto.

17

5933322_14

Estimated Purchase Price.

If the Closing Purchase Price (as finally determined pursuant to Section 2.3) is less than the Estimated Purchase Price, then the Purchaser shall reduce the Holdback Amount by the Holdback Reduction Amount. If the Closing Purchase Price (as finally determined pursuant to Section 2.3) is greater than or equal to the Estimate Purchase Price, Purchaser shall pay to Seller by wire transfer of immediately available funds to an account(s) designated by Seller an amount equal to the amount, if any, by which the Closing Purchase Price exceeds the Estimated Purchase Price.

At Closing, the $400,000 Deposit shall be credited towards the Purchase Price as set forth in Section 2.2 of the Asset Purchase Agreement.

The Holdback Amount of $400,000 shall be used to adjust the Purchase Price as follows:

- Pursuant to Section 2.3 of the Asset Purchase Agreement;

- In an amount equal to the Rejected Receivables[3], in accordance with the provisions of Section 2.5 of the Asset Purchase Agreement;

The Holdback Amount shall serve as Purchaser's exclusive remedy with respect to any Reduction Amounts (as defined in Section 2.4 of the Asset Purchase Agreement).

The Holdback Amount shall be paid to Seller in accordance with Section 2.5(c).

---

[3] "Rejected Receivables" shall mean those accounts receivable of Seller that are purchased at Closing by Purchaser pursuant to this Agreement, that are not collected by Purchaser as of the date that is 120 days following the Closing Date and that Purchaser elects in writing to assign to Seller in accordance with Section 2.5 of this Agreement. For the avoidance of doubt, the value of the Rejected Receivables shall be zero dollars ($0) for purposes of calculating the Estimated Purchase Price and Closing Purchase Price.

18

**SCHEDULE D**
**THIRD PARTY CONSENTS**

None

19

5933322_I4

## SCHEDULE E
## CONTRACTS ASSUMED AND ASSIGNED

Except to the extent included in the Excluded Assets, all non-residential commercial leases to which Seller is a party.  Seller is solely responsible for any and all cure amounts arising from unexpired leases of non-residential real property.

20

5933322_14

**SCHEDULE F**
**EXCLUDED EMPLOYEES**

The Purchaser shall not offer employment to the following employees of the Seller:

- All employees of the Seller's Rochester location.

21

## SALES AND COMMISSIONS AGREEMENT

This Sales and Commissions Agreement (this "**Agreement**") is made and entered into on May 15, 2017, by and between United Electric Power Inc. and its wholly-owned or controlled affiliates (collectively "**UEP**") and Auburn Armature Inc. (the "**AAI**").

**WHEREAS**, AAI has agreed, pending approval by the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**") to the sale (the "**Sale**") of substantially all of AAI's assets (the "**Assets**") to AAI Acquisition LLC, an affiliate of UEP ("**Acquisition**"); and

**WHEREAS**, due to its financial difficulties and its pending chapter 11 case, AAI anticipates having difficulty obtaining certain new inventory from its vendors which inventory UEP is able to purchase from such vendors (the "**New Inventory**"); and

**WHEREAS**, in order to maintain the continuity of AAI's business prior to the closing of the Sale, UEP has agreed to purchase and/or deliver the New Inventory on behalf of AAI and compensate AAI on a commission basis; and

**NOW WHEREAS**, AAI and UEP agree as follows:

1.      If AAI receives an order for New Inventory which AAI determines, in its sole discretion, to have fulfilled by UEP pursuant to the terms of this Agreement (each an "**Order**"), the following procedure shall be followed:

    (a)  first, an AAI employee will provide all product information pertaining to the Order, in writing, to a UEP employee;

    (b)  second, UEP will determine whether the Order is acceptable to Acquisition and can be fulfilled;

    (c)  third, an AAI and a UEP employee will together contact the customer, verify the Order, and advise the customer that UEP will fill the Order on behalf of AAI; and

    (d)  fifth, UEP will fill the Order on behalf of AAI; provided, however, that UEP shall not extend any credit to any customer that has an outstanding receivable owing

5937567_3

to AAI that is outstanding beyond the agreed upon credit terms extended by AAI unless and until such customer pays such receivable owing to AAI in full.

2.      For Orders of New Inventory fulfilled by UEP pursuant to this Agreement, UEP shall pay AAI a commission equal to either (as applicable, a "Sales Commission"): (i) five (5%) percent of Gross Margin for drop ship Orders; or (ii) seven (7%) of Gross Margin for Orders shipped on AAI vehicles. The Sales Commission shall be paid by UEP to AAI on the date of receipt of payment by UEP with respect to the applicable Order.

3.      This Agreement shall be binding until the earlier of (i) the closing on the Sale; (ii) the entry of an order by the Bankruptcy Court authorizing the sale of any of the Assets to any party other than Acquisition or its designee; (iii) upon five (5) days written notice given by UEP to AAI, or (iv) upon five (5) days written notice given by AAI to UEP. Notwithstanding anything to the contrary in this Agreement, all obligations of UEP to timely pay AAI the Sales Commissions set forth in Section 2 of this Agreement shall survive termination of the Agreement until fulfilled.

4.      During the term of this Agreement, UEP shall not, directly or indirectly, without AAI's prior written consent: (a) contact or solicit or permit or cause others to contact or solicit any customer of AAI introduced by AAI to UEP and with whom UEP does not have a prior commercial relationship (an "**AAI Customer**"), or (b) circumvent or undermine AAI's relationship with any AAI Customer or enter into any agreement, whether in writing or orally, or attempt to enter into any agreement, with any AAI Customer for UEP's own benefit or for the benefit of any third party or the purpose or consequence of which is to circumvent or undermine AAI's relationship with such AAI Customer.

5.      This Agreement, which constitutes the entire agreement between UEP and Acquisition with respect to this subject matter, may not be changed, rescinded or modified except in an agreement in writing signed by both parties hereto. This Agreement shall be

5937567_3

governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision.

6.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.  Signatures in Portable Document Format or other similar electronic format shall constitute original signatures for the purposes of this Agreement.

7.      All notices, requests, demands and other communications hereunder shall be made in accordance with the requirements set forth in Section 10.8 of the purchase agreement relating to the Sale.

**[ONE SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**United Electric Power**
on behalf of itself and its affiliates

By: _____
Name: Gerald J. DiCunzolo
Title: President

**AUBURN ARMATURE INC.**

By: _____
Name:  Geoff Murphy
Title:  Chief Executive Officer

5937567_3

## FIRST AMENDMENT TO
## ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "First Amendment") is made as of May 17, 2017, by and among AAI ACQUISITION LLC, a New York limited liability company (the "Purchaser"), on the one hand, and AUBURN ARMATURE INC., a New York corporation ("AAI"), EASA Acquisition I, LLC, a Delaware limited liability company ("EASA I"), and EASA Acquisition II, LLC, a Delaware limited liability company ("EASA II" and collectively with AAI and EASA I, the "Seller").

### RECITALS

WHEREAS, the Purchaser and Seller are parties to that certain Asset Purchase Agreement dated as of May 15, 2017 (the "Agreement"); and

WHEREAS, the Purchase and Seller desire to amend the Agreement in the manner specified herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the foregoing recitals, which are incorporated herein; and intending to be legally bound hereby, the parties agree as follows:

1.  Defined Terms. Each capitalized term used in this First Amendment shall have the same meaning ascribed to such term in the Agreement, unless otherwise defined in this First Amendment.

2.  Amendment to the Agreement. The second sentence of Section 3.1 of the Agreement is hereby amended and restated in its entirety as follows:

> "Prior to the Seller's Bankruptcy Filing, this Agreement may be terminated by either Purchaser or Seller (i) by mutual agreement or (ii) in the event the Bankruptcy Filing shall not have occurred by 5:00 pm eastern time on May 19, 2017."

3.  Conflict. If any conflict exists between the terms or provisions of the Agreement and the terms or provisions of this First Amendment, the terms and provisions of this First Amendment shall govern and control.

4.  Effect of Amendment. The terms and provisions of this First Amendment shall modify and supersede all inconsistent terms and provisions of the Agreement. As amended by this First Amendment, the Agreement shall remain in full force and effect and is ratified by the parties hereto. This First Amendment contains the entire agreement of the parties with respect to the matters set forth herein and all preliminary negotiations with respect thereto are merged into and superseded by this First Amendment. All references to the Agreement shall be deemed references to the Agreement as supplemented and modified hereby.

5.      Binding Effect.  This First Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted under the Agreement.

6.      Counterparts; Delivery by Facsimile and Email.  This First Amendment may be executed in multiple counterparts (including by means of facsimile or electronic transmission in portable document format ("pdf")), each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

7.      Governing Law; Consent to Jurisdiction.  This First Amendment shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

[Signature page follows.]

5970871_1

IN WITNESS WHEREOF, each of the parties hereto has caused this First Amendment to be executed on its behalf as of the date first written above.

**PURCHASER:**

**AAI ACQUISITION LLC**

By: _Gerald J. DiCunzolo_

Name: Gerald J. DiCunzolo
Title: President

**SELLER:**

**AUBURN ARMATURE INC.**

By: _Geoff Murphy_
Name: Geoff Murphy
Title: Chief Executive Officer

**EASA ACQUISITION I, LLC**

By: _Geoff Murphy_
Name: Geoff Murphy
Title: Chief Executive Officer

**EASA ACQUISITION II, LLC**

By: _Geoff Murphy_
Name: Geoff Murphy
Title: Chief Executive Officer

## SECOND AMENDMENT TO
## ASSET PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "Second Amendment") is made as of June 22, 2017, by and among AAI ACQUISITION LLC, a New York limited liability company (the "Purchaser"), on the one hand, and AUBURN ARMATURE INC., a New York corporation ("AAI"), EASA Acquisition I, LLC, a Delaware limited liability company ("EASA I"), and EASA Acquisition II, LLC, a Delaware limited liability company ("EASA II" and collectively with AAI and EASA I, the "Seller").

### RECITALS

**WHEREAS**, the Purchaser and Seller are parties to that certain Asset Purchase Agreement dated as of May 15, 2017 (the "Agreement"); and

**WHEREAS**, the Purchaser and Seller entered into a First Amendment to the Agreement dated as of May 15, 2017; and

**WHEREAS,** the Purchase and Seller desire to amend the Agreement in the manner specified herein.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, the foregoing recitals, which are incorporated herein; and intending to be legally bound hereby, the parties agree as follows:

1.    Defined Terms.  Each capitalized term used in this Second Amendment shall have the same meaning ascribed to such term in the Agreement, unless otherwise defined in this Second Amendment.

2.    Amendment to the Agreement.  The Schedule B of the Agreement is hereby amended and restated in its entirety as follows:

> "Purchaser shall assume the following liabilities of Seller subject to the terms hereof: None."

3.    Conflict.  If any conflict exists between the terms or provisions of the Agreement and the terms or provisions of this Second Amendment, the terms and provisions of this Second Amendment shall govern and control.

4.    Effect of Amendment.  The terms and provisions of this Second Amendment shall modify and supersede all inconsistent terms and provisions of the Agreement.  As amended by this Second Amendment, the Agreement shall remain in full force and effect and is ratified by the parties hereto.  This Second Amendment contains the entire agreement of the parties with respect to the matters set forth herein and all preliminary negotiations with respect thereto are merged into and superseded by this Second Amendment.  All references to the Agreement shall be deemed references to the Agreement as supplemented and modified hereby.

5.      Binding Effect.  This Second Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted under the Agreement.

6.      Counterparts; Delivery by Facsimile and Email.  This Second Amendment may be executed in multiple counterparts (including by means of facsimile or electronic transmission in portable document format ("pdf")), each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

7.      Governing Law; Consent to Jurisdiction.  This Second Amendment shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

[Signature page follows.]

BPOWERS/2079648.1/063420

IN WITNESS WHEREOF, each of the parties hereto has caused this Second Amendment to be executed on its behalf as of the date first written above.

**PURCHASER:**

**AAI ACQUISITION LLC**

By:_____
Name: Gerald J. DiCunzolo
Title: President

**SELLER:**

**AUBURN ARMATURE INC.**

By:_____
Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION I, LLC**

By:_____
Name:  Geoff Murphy
Title:  Chief Executive Officer

**EASA ACQUISITION II, LLC**

By:_____
Name:  Geoff Murphy
Title:  Chief Executive Officer