UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK (Syracuse Division)

| | |
|---|---|
| In re: | |
| | Main Case No. 17-30743-5-MCR |
| AUBURN ARMATURE, INC., *et al.*,[1] | |
| | Chapter 11 |
| Debtors. | Jointly Administered |

### FINAL ORDER APPROVING THE DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SENIOR SECURED, SUPER-PRIORITY INDEBTEDNESS, AND PROVIDING ADEQUATE PROTECTION, ALL PURSUANT TO SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE

Upon the Emergency Motion For Order Authorizing Debtors to Incur Post-Petition Senior Secured, Super-Priority Indebtedness, and Providing Adequate Protection, all Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code (the "Motion") dated May 19, 2017 of Auburn Armature, Inc. ("AAI"), EASA Acquisition I, LLC ("EASA I"), and EASA Acquisition II, LLC ("EASA II"), each as a debtor and a debtor-in-possession (collectively, the "Debtors") filed in the above-captioned case (the "Case"):

(a) seeking the Court's authorization, pursuant to Sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (11 U.S.C. § 101 et seq., as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtors to obtain from KeyBank, National Association ("Key" or the "DIP Lender"), direct borrowings (the "Loans") and for the Debtors and Borrowers and the Non-Debtor Guarantor (defined below), to cross-guaranty the

---

1 The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Auburn Armature, Inc. [2853]; EASA Acquisition I, LLC [7967]; and EASA Acquisition II, LLC [0374].

obligations of each Borrower, pursuant to that certain DEBTOR-IN-POSSESSION CREDIT

AGREEMENT, dated as of May 25, 2017 (the "DIP Loan Agreement"), by and among the

DIP Lender, the Debtors, as borrowers (the "Borrowers" and each a "Borrower"), and

Electrical Supply Acquisition Company, Inc. ("ESA" or the "Non-Debtor Guarantor"): (i) to

fund the ongoing working capital needs of the Debtors, (ii) to permit the Borrowers, on the

Effective Date basis described below, and as may be provided in a Final Order, to refinance

(only to the extent that such sums are not otherwise paid from funds held by the Borrowers

on the (as defined in the DIP Loan Agreement) with the approval of the Bankruptcy Court,

and subject to the terms of the DIP Loan Agreement and the other agreements defined as

"Loan Documents" therein (the "DIP Loan Documents")), those certain obligations owed

pursuant to that certain Amended and Restated Credit and Security Agreement dated as of

March 31, 2014, by and among Key and the Borrowers (as amended, supplemented or

otherwise modified from time to time, the "Pre-Petition Loan Agreement") (which

obligations are stipulated by the Borrowers to be secured by substantially all of the assets of

the Borrowers), (iii) subject to the terms of the DIP Loan Agreement and this Final Order, to

pay fees, costs, expenses, disbursements to professionals retained by the Debtors, or any

official committees subsequently appointed in the Cases pursuant to Section 1102 of the

Bankruptcy Code (hereinafter, collectively, the "Committees"), the costs and expenses of the

members of the Committees, as approved by the Court, and bankruptcy related charges as

allowed by the Court and as permitted by the DIP Loan Documents, and (iv) to pay fees and

expenses, subject to review by the court, (including, without limitation, reasonable attorneys'

2

fees and expenses) owed to Key under the DIP Loan Agreement and the other DIP Loan Documents (as such term is defined below);

(b) requesting, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, that the financing under the DIP Loan Agreement: (i) have priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, except for Carve-Out Expenses up to the Carve-Out Amount as provided for herein and exclusive of any avoidance actions (the "Avoidance Actions") available to the bankruptcy estates of the Debtor Borrowers pursuant to Sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code and the proceeds thereof; (ii) be secured by a first priority security interest in, and lien upon, all existing and hereafter acquired property of the Debtors and the Debtors' estates, of whatever kind or nature, real or personal, whether acquired pre-petition or post-petition, including without limitation and by way of general description only, all of the Debtors' stock, membership interests, real estate interests; all interests under leases, licenses or occupancy agreements covering personal or real property; all motor vehicles; all accounts and accounts receivable; all agreements, contracts, contract rights, copyrights, trademarks and patents and other general intangibles; all deposit accounts, including all blocked accounts, concentration accounts, depository accounts, disbursement accounts, and all other bank accounts and all deposits therein; instruments; documents; chattel paper; all loan proceeds; all other obligations in whatever form owing to the Debtors; all rights in the farm products, merchandise or services which give rise to any of the foregoing; all inventory, including, without limitation, machinery,

equipment, furniture, furnishings, fixtures and other personal property acquired for use primarily in the Debtors' businesses; all causes of action, whether arising in contract, tort or otherwise; all collateral as defined in the Pre-Petition Loan Agreement; and all other claims and property recovered by or on behalf of the Debtors or the estates of the Debtors, exclusive of any Avoidance Actions available to the bankruptcy estates of the Debtor Borrowers pursuant to Sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code and the proceeds thereof (all of the foregoing, collectively, the "Collateral"), as provided for by Sections 364(c) and (d) of the Bankruptcy Code, provided that the DIP Lender's first priority security interest in, and lien upon the Collateral shall be subordinate to only the valid, perfected and unavoidable senior liens (if any) defined as "Permitted Liens" in the DIP Loan Agreement (the "Senior Claims") and the Carve-Out Expenses up to the Carve-Out Amount as provided for herein, and provided further that any and all claims and security interests of the Pre-Petition Lenders in or upon the Collateral shall be expressly subordinate to the liens, claims and interests granted to the DIP Lender under the DIP Loan Documents and this Final Order; and (iii) be secured by a second priority security interest in and lien upon all Collateral otherwise encumbered by Senior Claims, all as provided by Sections 364(c) and (d) of the Bankruptcy Code;

(c) seeking the Court's authorization pursuant to Sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code to provide adequate protection to the Pre-Petition Lenders on account of their claims under the Pre-Petition Loan Agreement, which claims are to be

4

"primed" by the financing provided for herein, until such claims are paid in full pursuant and subject to the terms of this Final Order;

(d) requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Emergency Interim Hearing") be held before this Court on an emergency basis to consider entry of an interim order (the "First Interim Order") authorizing the Debtor Borrowers to obtain the financing contemplated in the DIP Loan Agreement, and further requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to consider entry of a final order (the "Final Order") authorizing the financing contemplated by the DIP Loan Agreement, as set forth in the Motion and the DIP Loan Agreement and the other loan documents related thereto (collectively, with the DIP Loan Agreement, the "DIP Loan Documents");

(e) the Emergency Interim Hearing having been held on May 23, 2017, and a second interim hearing having been held on June 13, 2017;

(f) the First Interim Order having been entered by the Court on May 25, 2017 and a Second Interim Order having been entered by the Court on June 15, 2017 (the "Second Interim Order;" and together with the First Interim Order, the "Interim Orders"); and

(g) it appearing that service of the Interim Orders and notice of the Final Hearing having been given in accordance with the terms of the Interim Orders, and the Final Hearing having been held before this Court on June 23, 2017.

Now, upon all of the pleadings filed with the Court and proceedings held before the Court, and upon the record of the Final Hearing and after due deliberation and consideration

of the respective positions of the parties and upon their consent;

**IT IS HEREBY ORDERED** that:

**1    Disposition**.  The Motion is granted as set forth below on a final basis and this Final Order is effective immediately.  The DIP Loan Agreement matures at 11:59 p.m. on June 30, 2017, unless extended by agreement of the parties or Order of this Court.

**2    Jurisdiction**.  This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157.

**3    Purpose and Necessity of Financing**.  The Debtors require immediate financing, among other things, to finance the ongoing working capital needs of the Debtors.  The Debtors are unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense and are unable to obtain, within the time required by their needs to avoid immediate and irreparable harm, other financing under Sections 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than the DIP Loan Agreement and the other DIP Loan Documents.  A facility in the amount provided by the DIP Loan Agreement and the other DIP Loan Documents is unavailable to the Debtors without the Debtors granting to the DIP Lender, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, (i) priority claims, with respect to all Loans advanced post-petition, and all other obligations under the DIP Loan Agreement and the other DIP Loan Documents (collectively, the "Post-Petition Obligations"), having priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 105, 503(b) and 507(b)

of the Bankruptcy Code (except as otherwise expressly provided herein) and (ii) as security for all such Post-Petition Obligations, a first priority senior security interest in the Collateral that is not otherwise encumbered by Senior Claims and a second priority security interest in and lien upon all Collateral otherwise encumbered by allowed Senior Claims (except as otherwise expressly provided herein).

The Debtors' and Non-Debtor Guarantor's collective execution of the DIP Loan Agreement, and the collective procurement of the Loans to finance the working capital needs of the Debtors is necessary because the Borrowers' business is a mutual and collective enterprise and the consolidation of all loans and other financial accommodations under the DIP Loan Agreement will enhance the aggregate borrowing power of the Borrowers and will facilitate the administration of the Chapter 11 Cases. The DIP Lender's willingness to extend financial accommodations to the Borrowers is done solely in consideration and in furtherance, of the Borrowers' mutual and collective enterprise and the Non-Debtor Guarantor's execution of the Guaranty.

4 **Exigency**. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtors' estates and creditors thereof, so that the business need for the Debtors to be operating under normal business terms may be met. The preservation and maintenance of the going concern value of the Debtors is integral to a successful sale of the Debtors' business pursuant to the provisions of Chapter 11 of the

7

Bankruptcy Code.  Absent entry of this Final Order, the Debtors' estates will be immediately and irreparably harmed.

5  **Good Faith Bargaining**.   The DIP Loan Agreement and the other DIP Loan Documents have been negotiated in good faith and at arms'-length between the Borrowers and the DIP Lender, and any Loans extended and other financial accommodations made to the Debtors by the DIP Lender pursuant to the DIP Loan Agreement shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in Section 364(e) of the Bankruptcy Code. The extension of credit under the DIP Loan Documents, and the fees to be paid thereunder: (a) are fair, reasonable, and the best available under the circumstances, (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (c) are supported by reasonably equivalent value and consideration. The DIP Lender is entitled to the protections and benefits of Section 364(e) of the Bankruptcy Code.

6  **Borrowing and Guaranty Authorization**.   The Debtors are immediately authorized to borrow or obtain Loans pursuant to the DIP Loan Agreement and the other DIP Loan Documents, in accordance with the availability and terms and conditions under the DIP Loan Agreement, and the Debtors are hereby authorized to cross-guaranty any and all obligations of the Borrowers pursuant to the terms of the DIP Loan Agreement and the other DIP Loan Documents.  Such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Available financing and advances under the DIP Loan Agreement will be made only to fund the Borrowers' ordinary working capital and general corporate needs, as set forth in the budget attached hereto as Exhibit "A" (the "Budget"), in accordance

with this Final Order and the DIP Loan Agreement and other amounts required or allowed to be paid pursuant to the DIP Loan Agreement.

7    **Stipulations**. Subject to the investigation rights set forth in paragraph 9 below, in providing for the advancement of post-petition financing under the DIP Loan Agreement, each of the Borrowers, the Non-Debtor Guarantor, and the DIP Lender have stipulated that:

(a) The Pre-Petition Loan Agreement (including any and all guaranties executed in connection therewith) is in all respects a valid and binding agreement and obligation of each of the Borrowers and the Non-Debtor Guarantor;

(b) the aggregate principal balance of the loans outstanding under the Pre-Petition Loan Agreement as of May 19, 2017 (excluding interest, fees, costs and legal and other expenses) was approximately (i) $4,946,853.33 on the Second Amended and Restated Revolving Note dated as of April 14, 2014, and (ii) $180,907.36 on the Amended and Restated CapEx Note Loan dated as of April 14, 2014 (all of the afore-detailed indebtedness, including accrued and unpaid interest, the fees, costs and legal and other expenses, being collectively referred to as the "Pre-Petition Indebtedness," such term including all "Indebtedness" owing under and as defined in the Pre-Petition Loan Agreement), and the aggregate principal balance of the loans outstanding under the Pre-Petition Loan Agreement as of June 12, 2017 (excluding interest, fees, costs and legal and other expenses) was approximately $3,179,342.96 on the Second Amended and Restated Revolving Note dated as of April 14, 2014, and the aggregate principal balance of the loans outstanding under the Amended and Restated CapEx Note Loan dated as of April 14, 2014 as of June 2, 2017

9

(excluding interest, fees, costs and legal and other expenses) was approximately $177,269.57;

(c)    the aggregate principal balance of the loans outstanding under the Pre-Petition Loan Agreement as of June 22, 2017 (excluding interest, fees, costs and legal and other expenses) was approximately $2,264,214 on the Second Amended and Restated Revolving Note dated as of April 14, 2014, and the Loans under the DIP Loan Agreement totaled $1,004,899 as of June 22, 2017;

(d) the liens and security interests granted by the Borrowers and the Non-Debtor Guarantor and held by the Pre-Petition Lender under the Pre-Petition Loan Agreement, are valid, enforceable, properly perfected and non-avoidable (the "Pre-Petition Liens");

(e) other than as provided in Subparagraph (f) of this Paragraph 7, the Borrowers and the Non-Debtor Guarantor are not aware of any claim, counterclaim, setoff or defense of any kind or nature which would in any way:  (i) affect the validity, enforceability and non-voidability of the Pre-Petition Indebtedness owing to the Pre-Petition Lenders or any of the Pre-Petition Liens (other than with respect to titled motor vehicles and any other potentially unencumbered assets as will be more fully determined through the Committee's lien investigation under Paragraph 9 below) or (ii) reduce or affect the obligations of the Borrowers and the Non-Debtor Guarantor to pay any of such Pre-Petition Indebtedness;

(f) the Borrowers and the Non-Debtor Guarantor are not aware of any claim, counterclaim, setoff or defense of any kind or nature which would in any way: (i) affect the validity, enforceability and non-voidability of the Post-Petition Obligations owing to DIP

Lender and the DIP Loan Agreement and the other DIP Loan Documents or (ii) reduce or affect the obligations of the Borrowers and/or the Non-Debtor Guarantor to pay any of such Post-Petition Obligations;

(g) pursuant to the terms of the DIP Loan Agreement and DIP Loan Documents, the terms of this Final Order and Bankruptcy Code Section 364(d), the Pre-Petition Liens and the Pre-Petition Indebtedness are each made subordinate in all respects to the liens and claims granted to the DIP Lender pursuant to the DIP Loan Agreement, the other DIP Loan Documents and this Final Order;

(h) in entering into the DIP Loan Documents, the Borrowers and the Non-Debtor Guarantor have obtained all authorizations, consents and approvals necessary from, and made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Borrowers and/or the Non-Debtor Guarantor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which each Borrower and/or Non-Debtor Guarantor is a party; and

(i) in entering into the DIP Loan Documents, and as consideration therefor, the Borrowers and the Non-Debtor Guarantor hereby agree that until such time as all Post-Petition Obligations are indefeasibly paid in full in cash, the Borrowers and the Non-Debtor Guarantor shall not in any way prime the liens provided to the DIP Lender under Paragraphs 10 and 12 of this Final Order, by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code.

11

The foregoing stipulations shall be binding on the Borrowers, the Non-Debtor Guarantor, and each of their successors and assigns for all purposes in these Cases, but subparagraphs (a), (b), (c) (d) and (e) shall not bind the Committee, nor any other party in interest until the passing of the Investigation Termination Date (as defined below) with no objection, adversary proceeding or appropriate litigation being initiated in accordance with Paragraph 9 of this Final Order.

   **8   Power to Execute Necessary Documents**. The Debtors are expressly authorized and empowered to enter into and deliver, among other documents: (i) the DIP Loan Agreement and the other attendant DIP Loan Documents in substantially the form presented at the initial hearing to consider the Motion. The Debtors also are authorized, empowered and directed to perform all of their obligations under the DIP Loan Agreement and the other attendant DIP Loan Documents and such other agreements as may be required by the DIP Lender to give effect to the terms of the financing provided for in this Final Order. The Debtors are authorized to perform and do all acts that may be required in connection with the DIP Loan Agreement and the other DIP Loan Documents, including, without limitation, the payment of reasonable fees and the reimbursement of present and future reasonable costs and expenses, which are subject to review by this court, and paid or incurred by the DIP Lender as provided in this Final Order, the DIP Loan Agreement and the other DIP Loan Documents, all of which unpaid fees, commissions, costs and expenses shall be and are included as part of the principal amount of the Post-Petition Obligations, and secured by a first priority lien and security interest in all of the Collateral, as provided for in this Final Order, the DIP Loan

12

Agreement and the other DIP Loan Documents. The DIP Loan Agreement and the other DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors and the Non-Debtor Guarantor enforceable against each of the Debtors and the Non-Debtor Guarantor, and each of their successors and assigns, in accordance with their terms, subject to the terms of this Final Order. The Debtors and the Non-Debtor Guarantor may enter into any non-material amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or Order of this Court provided that, such modifications or amendments do not materially and adversely affect the rights of any creditor, equity holder or party-in-interest. For purposes of this Final Order, non-material amendments or modifications to the DIP Loan Agreement and the DIP Loan Documents shall include, without limitation, clarifications of procedures and reporting requirements, insertions of incomplete information, corrections of any errors, any waivers or consents that the DIP Lender can exercise at its discretion, or any amendments to any budget to the extent authorized in the DIP Loan Agreement or the other DIP Loan Documents and to the extent that such amendments or modifications do not cause an increase in the maximum amount available to be borrowed pursuant to the DIP Loan Agreement and the other DIP Loan Documents.

**9    Investigation Rights**. Notwithstanding anything herein to the contrary, until sixty (60) days after the appointment of the Committee (the "Investigation Termination Date"), the Committee or any other party-in-interest with requisite standing shall be entitled to investigate the validity, perfection and enforceability of the Pre-Petition Liens and the Pre-

13

Petition Indebtedness of Key. If the Committee or any other party-in-interest with requisite

standing determines that there may be a challenge to the Pre-Petition Liens or Pre-Petition

Indebtedness of Key by the Investigation Termination Date, such Committee or other party-

in-interest shall be permitted to file and prosecute an objection or claim related thereto, and

shall have an additional ten (10) days following the Investigation Termination Date to file

such objection or otherwise initiate an appropriate action or adversary proceeding on behalf

of the Debtors' estates setting forth the basis of any such challenge (the "Challenge Filing").

Prior to making a Challenge Filing, the Committee or other party in interest may file an

expedited motion to determine standing ("Standing Motion"). Key agrees not to object to

any Standing Motion filed by the Committee. If such Challenge Filing is not initiated on or

before ten (10) days following the Investigation Termination Date (or such other later date as

extended by the written consent of the Debtors and the Pre-Petition Lender), the stipulations

contained in subsections (a) through (h) of Paragraph 7 of this Final Order shall be

irrevocably binding on the Committee, interest holders, and all other parties in interest,

without further action by any party or this Court. Unless the Pre-Petition Lenders and the

Debtors each consent in writing to an extension, the Investigation Termination Date may

only be extended for cause therefor shown to the Court and only after notice and a hearing on

any request to extend the Investigation Termination Date being requested before the

expiration of the Investigation Termination Date. To the extent that any such challenge is

commenced, the Pre-Petition Lender may be entitled to include the costs and expenses,

including, but not limited to, reasonable and documented attorneys' fees and disbursements,

as recognized by the Court, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Pre-Petition Indebtedness owed under the Pre-Petition Loan Agreement. Only up to $35,000 of the Carve-Out Amount may be used by the Committee in connection with its investigation.

**10  Lien Status and Priority**.  (a)  For all of the Post-Petition Obligations, DIP Lender is hereby granted pursuant to Sections 361, 362, 363(e), 364(c)(1) and 364(d) of the Bankruptcy Code an allowed claim having priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 105, 503(b) and 507(b) of the Bankruptcy Code and, except for the fees of the U.S. Trustee, Chapter 5 Avoidance Actions and the proceeds thereof, and court fees, if any, all as more fully set forth herein below, subject only to certain unpaid fees, costs, expenses and disbursements incurred after the Petition Date and which are unpaid on the Termination Date (as defined in the DIP Loan Agreement), and which have been, or may be, awarded by the Court pursuant to Sections 330 and 331 of the Bankruptcy Code in an aggregate amount not to exceed the Carve-Out Amount (as that term is defined herein, including fees and expenses that may be awarded and paid on an interim basis or any pre-petition retainer paid to Debtors' counsel in connection with or related to the Cases), all as more fully set forth herein below. Further, the respective liens and security interests granted herein to the DIP Lender in the Collateral or, as the case may be, the priorities accorded to the Post-Petition Obligations as set forth in this  Final Order, shall be subject only to the Senior Claims and the Carve-Out Expenses (which Carve-

15

Out Expenses shall have an administrative priority superior to that granted by this Final

Order) up to the Carve-Out Amount, and shall otherwise have the priority and senior secured

status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code, as applicable. The

"priming" of any liens and claims as provided for in this Final Order shall specifically relate

and be applicable to the liens, claims and interests of the Pre-Petition Lenders in and with

respect to the Collateral. So long as an Event of Default shall not have occurred and be

continuing, the Debtors shall be permitted to pay court-approved administrative expenses of

the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course

of business of the Debtors' or otherwise permitted hereunder, and court-approved

administrative expenses related to compensation and reimbursement of expenses allowed and

payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and

payable, within the parameters of this Final Order and the amounts to be advanced pursuant

to the DIP Loan Agreement, and further provided such amounts are included in the Budget

and/or paid from any pre-petition retainer paid by the Debtors. As used in the preceding

sentence, "court-approved administrative expenses" shall include payments made pursuant to

any court-approved procedure for monthly or other payment of administrative expenses to

which DIP Lender may consent; provided that nothing contained herein shall be read to

exempt those persons hereafter receiving interim compensation payments or reimbursement

of expenses pursuant to any such court-approved procedure for monthly or other payment of

administrative expenses from otherwise applicable provisions of bankruptcy law, including

but not limited to requirements that such compensation or reimbursement be allowed on a

16

final basis and, when applicable, any subsequent order of this Court requiring that such payments be disgorged; provided further that nothing contained herein shall be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the DIP Lender to object to the reasonableness of such amounts. Subject to the up to $35,000 of the Carve-Out Amount that may be used by the Committee in connection with its investigation, the Debtors shall not be permitted hereunder to pay any fees or expenses incurred by any party, including the Debtors or any Committee, in connection with the preparation, initiation, prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender and/or the Pre-Petition Lenders, including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to the Pre-Petition Indebtedness, Post-Petition Obligations or the security interests or liens of the Pre-Petition Lender and/or DIP Lender in respect thereof. No other liens or priority status, other than the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, having a lien or administrative priority superior to or pari passu with that granted by this Final Order to the DIP Lender, shall be granted while any portion of the Post-Petition Obligations or the Commitments under the DIP Loan Agreement remains outstanding, absent the consent of the DIP Lender.

(b) As used in this Final Order and the DIP Loan Agreement, Carve-Out Expenses shall mean: unpaid fees and expenses incurred on and after the Petition Date by professionals retained in these Cases pursuant to Sections 327 or 1103 of the Bankruptcy Code, by the Debtors, or by the Committee pursuant to Section 1102 of the Bankruptcy Code

17

(the "Bankruptcy Professionals"), and any statutorily mandated costs and fees of the Clerk of

the Court and the U.S. Trustee with respect to the Cases (collectively, the "Professional

Fees") up to a maximum aggregate amount not to exceed $723,000 (such dollar amount

being referred to herein as the "Carve-Out Amount" without regard to any pre-petition

retainers paid to Debtors' counsel in connection with the Cases); provided that the Carve-Out

Expenses shall not include (i) any other claims that are or may be senior to or pari passu with

any of the Carve-Out Expenses or any Professional Fees and expenses of a Chapter 7 trustee,

except, however in an amount not to exceed $25,000.00, or (ii) any fees and/or expenses of

the Bankruptcy Professionals incurred in connection with the commencement or continuation

of any suit, motion, action or other proceeding challenging the extent, validity, perfection,

enforceability or priority of the Post-Petition Obligations or the security interests or liens of

the DIP Lender in respect thereof.

(c) Notwithstanding anything herein to the contrary, the Pre-Petition Lender agrees to

carve-out from its Collateral the amount of $200,000.00 for the benefit of the Debtors'

estates, *provided*, *however*, that up to $50,000.00 of such $200,000.00 shall be repaid to the

Pre-Petition Lender out of the Holdback Amount and/or the proceeds of collection of the

Rejected Receivables (as such terms are defined in that certain Asset Purchase Agreement

dated May 15, 2017, by and among the Debtors (as sellers) and AAI Acquisition LLC (as

buyer), as the same may be amended, amended or restated or modified from time to time, a

copy of which is attached as Exhibit A to Docket No. 9, filed with this Court on May 19,

2017 and incorporated herein by reference) to the extent actually received in accordance with

18

the following formula: (i) 75% of each Holdback Amount and/or Rejected Receivables payment shall be paid to the Pre-Petition Lender (Key), and (ii) the remaining 25% of each Holdback Amount and/or Rejected Receivables payment shall be paid to the Debtors' estates.

**11** **Limitation Upon Additional Surcharges**.   Neither the Collateral, the Pre-Petition Collateral, the Pre-Petition Lender, nor the DIP Lender shall be subject to surcharge, pursuant to Section 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest, without the prior written consent of the DIP Lender and Pre-Petition Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or Pre-Petition Lender in this proceeding, including but not limited to acceptance of the Budget or funding of the Borrowers' ongoing operations by the DIP Lender.   In no event shall the DIP Lender or Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Pre-Petition Collateral.

The DIP Lender is entitled to all of the rights and benefits of section 552(b)(1) of the Bankruptcy Code and the "equities of the cases" exception therein shall not apply.

**12** **Lien to Secure Post-Petition Obligations**.  (a)  As security for all of the Post-Petition Obligations, the DIP Lender is hereby granted (effective immediately and without the necessity of the execution or filing by the Borrowers and/or the Non-Debtor Guarantor of a security agreement, financing statements, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, landlord lien waivers, bailee waivers, licensee consents or otherwise), pursuant to

19

Sections 364(c) and (d) of the Bankruptcy Code, a first priority security interest in and lien upon all of the Collateral, senior in all respects to any and all present liens having been properly noticed and future liens or claims, if any, that encumber the Collateral (including, without limitation: (i) any and all liens and security interests held by the Pre-Petition Lenders pursuant to the Pre-Petition Loan Agreement, (ii) liens and security interests, if any, of pre-petition and post-petition landlords, possessory lienholders, and/or bailees, and (iii) liens and security interests, if any, granted in favor of any governmental authority for any liability under federal or state environmental laws or regulations or for damages arising from or costs incurred by such governmental authority in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment or otherwise) except as provided in subparagraph (b) hereof, and subject only to the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, and a second priority security interest in and lien upon all Collateral otherwise encumbered by allowed Senior Claims. The security interests and liens in the Collateral granted to the Agent and the DIP Lender hereunder include, but are not limited to: (i) those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code and all Collateral in which the Pre-Petition Lenders have a security interest pursuant to the Pre-Petition Loan Agreement (which security interests are and shall be "primed" by the liens granted the Agent and the DIP Lenders pursuant to this Final Order), (ii) those items and types of Collateral not governed by Article 9 of the Uniform Commercial Code, including without limitation, licenses issued by any federal or state regulatory authority and any

20

leasehold or other real property interests; and (iii) the products and proceeds of any of the foregoing. Notwithstanding anything to the contrary herein, the Collateral shall not include any Avoidance Actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof. Said liens and security interests discussed herein shall not be (i) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estate under Section 551 of the Bankruptcy Code, or (ii) subordinated to or made pari passu with any other lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise. The security interest arising hereunder shall be and hereby is a fully perfected security interest, such that no additional steps need be taken by the Agent to perfect said interest. Pursuant to Sections 363(b)(1) and 364(c)(2) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties in order for the Debtors to pledge, grant, sell, transfer or otherwise transfer any such leasehold interest or the proceeds thereof or other Collateral are and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and are and shall have no force and effect with respect to the transactions granting the DIP Lender a priority security interest in such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtors in favor of the DIP Lender in accordance with the terms of the DIP Loan Agreement.

(b) Notwithstanding anything herein to the contrary, the liens and security interests granted to DIP Lender in any Collateral pursuant to this Paragraph 12 or otherwise hereunder shall be superior in all events and in all respects to the claims and liens of the Pre-Petition

21

Lenders upon such Collateral, and the DIP Loan Agreement and the DIP Loan Documents shall govern the respective rights of the DIP Lender vis-à-vis the Pre-Petition Lenders with respect to said Collateral to the extent such DIP Loan Agreement and DIP Loan Documents do not conflict with this Final Order.

(c) For purposes of clarity, nothing set forth in any order entered by this Court with respect to the First Day Pleadings (as hereinafter defined) shall be deemed to affect the super-priority administrative priority and senior secured status granted in favor of Pre-Petition Lender pursuant to this Final Order, and any claims which may arise from or on account of any orders entered with respect to the First Day Pleadings are and shall be subordinate to the claims and interests the DIP Lender. "First Day Pleadings" shall mean:

(1)    Motion of the Debtors for an Order Pursuant to Sections 105 and 363(b) of the Bankruptcy Code Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits and Authorizing and Directing Financial Institutions to Honor and Process Checks and Wire Transfers Related to Such Obligation;

(2)    Motion of the Debtors Pursuant to Sections 105(a) and 541 of the Bankruptcy Code for Authority to Pay Prepetition Sales and Use Taxes; and

(3)    Motion of the Debtors Pursuant to Sections 105(a), 363(c), and 364(a) of the Bankruptcy Code for Authorization to (I) Continue to Operate the cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Waive Requirements of Section 345(b) of the Bankruptcy Code.

**13 Additional Perfection Measures**. The liens and priority granted to the DIP Lender pursuant to this Final Order and the DIP Loan Agreement shall be perfected by operation of law upon execution of this Final Order by the Court. The DIP Lender shall not be required to enter into or to obtain landlord waivers, possessory lien waivers, mortgagee

22

waivers, bailee waivers or warehouseman waivers or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction, or obtain consents from any licensor or similar party-in-interest, or take any other action in order to validate and to perfect the security interest and lien granted to the DIP Lender pursuant to this Final Order. If the DIP Lender, in its sole discretion, chooses to obtain consents from any licensor or similar party-in-interest, to file such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Final Order, and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder. In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the DIP Lender may, in its sole discretion, choose to file a certified copy of this Final Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the DIP Lender shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Final Order.

**14  Access to Collateral -- No Landlord's Liens**. Each landlord waiver, mortgagee waiver and bailee letter executed in connection with the Pre-Petition Loan Agreement shall continue to govern the rights of the respective parties thereto, and such waivers and letters shall also be equally applicable to, and shall govern the rights of such parties vis-a-via the

23

DIP Lender in connection with, the DIP Loan Agreement. Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent and the DIP Lenders contained in this Final Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Agreement, upon written notice to the landlord of any leased premises that a default has occurred and is continuing under the DIP Loan Documents, the DIP Lender may, subject to any separate agreement by and between such landlord and the DIP Lender, enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtor Borrowers' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the DIP Lender shall only pay rent and additional rent obligations of the Debtors that first arise after the DIP Lender's written notice referenced above and that are payable during the period of such occupancy by the DIP Lender, calculated on a per diem basis. Nothing herein shall require the DIP Lender to assume any lease as a condition to the rights afforded to the DIP Lender in this paragraph. Furthermore, any title, landlord's lien, right of distraint or levy, security interest or other interest that any landlord or mortgagee may have in any Collateral of the Debtors located on such leased premises, to the extent the same is not void under Section 545 of the Bankruptcy Code, is hereby expressly subordinated to the lien of the DIP Lender in such Collateral.

**15  No Responsible Person**. In making the decision to make Loans and to extend other financial accommodations to the Debtors under the DIP Loan Agreement or to collect

the indebtedness and obligations of the Debtors, the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a responsible person or owner or operator with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or any similar Federal or State statute).

**16  Enabling Clause**.  The Debtors are authorized to perform all acts, to make, execute and deliver all instruments and documents, and to pay fees which may be required or necessary for their performance under the DIP Loan Agreement and the other DIP Loan Documents, including, without limitation, the execution and delivery of the DIP Loan Agreement and the other DIP Loan Documents.

**17  Automatic Stay Modified**.  Subject only to the provisions of the DIP Loan Agreement, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary so as to permit the DIP Lender:

(a)  whether or not an Event of Default has occurred, to require all cash, checks or other collections or proceeds from Collateral received by the Borrowers to be deposited in accordance with the DIP Loan Agreement, and to apply amounts deposited in any such account and other amounts paid to or received by the DIP Lender under the DIP Loan Agreement and the other DIP Loan Documents as respectively provided in the DIP Loan Agreement;

(b)  upon the occurrence of an Event of Default and subject to five (5) business days' written notice to the Debtors, the United States Trustee and any Committee, to exercise all

rights and remedies provided for in the DIP Loan Agreement and the other DIP Loan Documents, pursuant and subject to the provisions of the DIP Loan Agreement without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay shall be deemed terminated as provided herein without the necessity of any further action by the Court, the Debtors, the Committee, the DIP Lender or any of them, in the event that the Debtors or the Committee have not obtained an Order from this Court to the contrary within five (5) business days after receiving written notice from the DIP Lender pursuant to this Paragraph 17(b). The Debtors and/or the Committee shall have the burden of proof at any hearing on any request by the Debtors and/or the Committees to re-impose or continue the automatic stay as provided for herein;

(c) notwithstanding the provisions of subparagraph (b) of this Paragraph 17, following the occurrence of an Event of Default the DIP Lender shall not take possession of or foreclose upon the Collateral until the earlier of the Final Hearing or entry of a subsequent Order of the Court; and

(d) this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Paragraph 17 and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

18 **Successors and Assigns**. The DIP Loan Agreement and the other DIP Loan Documents and the provisions of this Final Order shall be binding upon, the DIP Lender, the Pre-Petition Lender, the Debtors and their respective successors and assigns and the same

26

shall inure to the benefit of the DIP Lender, the Pre-Petition Lender, the Debtors and their respective successors and assigns.

19 **Cash Management Systems**. Unless and until new procedures are established as may be required pursuant to the DIP Loan Agreement and the other DIP Loan Documents, the Debtors are authorized and directed to maintain their pre-petition cash management system as in effect on the date of this Final Order, and as described in the DIP Loan Agreement and the other DIP Loan Documents, subject to the Borrowers establishing certain new disbursement accounts as may be more fully set forth in the DIP Loan Agreement and the other DIP Loan Documents. The cash management system set forth in the DIP Loan Agreement, including all accounts established in relation thereto, shall be used for the purposes, and on the terms and conditions set forth in the DIP Loan Agreement and the other DIP Loan Documents without the necessity of any further action by the DIP Lender or the Debtors. As part of the foregoing cash management system, the DIP Lender shall be authorized to apply any and all proceeds and collections received with respect thereto in accordance with Paragraph 17 of this Final Order. The Debtors are authorized to enter into any additional appropriate agreements providing for on-going lockboxes, blocked accounts or similar arrangements in favor of the DIP Lender for purposes of facilitating cash collections in accordance with the financing provided for by this Final Order and as required by the terms of the DIP Loan Agreement.

20 **Binding Nature of Agreement**. Each of the DIP Loan Documents to which the Debtors and/or the Non-Debtor Guarantor are and will become a party shall constitute legal,

27

valid and binding obligations of the Debtors and/or the Non-Debtor Guarantor, enforceable

in accordance with their respective terms.  The DIP Loan Documents have been duly

executed and delivered to the DIP Lender by the Debtors and the Non-Debtor Guarantor.

The rights, remedies, powers, privileges, liens and priorities of the DIP Lender provided for

in this Final Order and in any other DIP Loan Document shall not be modified, altered or

impaired in any manner by any subsequent order (including a confirmation order) or by any

plan of reorganization or liquidation in these Cases or in any subsequent case under the

Bankruptcy Code unless the Post-Petition Obligations have first been paid in full and

completely satisfied. The Debtors are authorized and directed on a final basis to pay to the

Pre-Petition Lender for application to the Pre-Petition Indebtedness all collections on

accounts and sales of inventory, including current interest on the Pre-Petition Indebtedness as

adequate protection payments to the Pre-Petition Lender, all as set forth in the DIP Loan

Agreement. All such applications to the Pre-Petition Indebtedness shall be final, subject only

to the right of parties in interest with requisite standing to seek a determination under

paragraph 9 above that such applications to the Pre-Petition Indebtedness resulted in the

payment of any unsecured claim of the Pre-Petition Lender. The Debtors waive their rights to

return any of the Collateral pursuant to Section 546(h) of the Bankruptcy Code.

**21  Pre-Petition Loan Agreement Commitments Terminated**.  The Pre-Petition

Lender's commitment to make advances under the Pre-Petition Loan Agreement is hereby

terminated on a final basis; provided, however, that all other terms and conditions and other

claims thereunder, and the liens and security interests provided for therein and in the Loan

Documents as defined in the Pre-Petition Loan Agreement, and except as otherwise noted

herein, shall remain in full force and effect, except to the extent that the security interests,

liens and claims under the DIP Loan Agreement "prime" such pre-petition claims and

interests as provided for herein and in the DIP Loan Agreement and the DIP Loan

Documents.

**22 Replacement Liens and Adequate Protection.** (a) Until all Pre-Petition

Indebtedness has been paid and the Investigation Termination Date has passed with no action

taken or challenge made to the Pre-Petition Liens or the Pre-Petition Indebtedness in

accordance with Paragraph 9 of this Final Order, and in an effort to provide adequate

protection for the diminution in value of the Pre-Petition Lender's Collateral, pursuant to

Section 361, 362, 363 and 364 of the Bankruptcy Code, of the interests of the Pre-Petition

Lender under the Pre-Petition Loan Agreement, the Pre-Petition Lender is hereby granted, a

valid, perfected and enforceable security interest in and replacement liens upon all of the

assets of the Debtors created after the Petition Date, including, without limitation, the

Collateral, and all of the Debtor's accounts, contract rights, inventory, general intangibles

and such other collateral in which the Pre-Petition Lender had an interest prior to the Petition

Date and all improvements thereof, all books and records with respect thereto and all

products and proceeds of the foregoing (collectively, the "Pre-Petition Collateral"), provided

that any and all such replacement liens granted to the Pre-Petition Lender by operation of this

Paragraph 22 shall be subordinate in all respects to the liens, claims and security interests

granted to the DIP Lender under the terms of the DIP Loan Documents and this Final Order,

and shall not include Chapter 5 Avoidance Actions and the proceeds thereof. The security interests and liens granted to the Pre-Petition Lender in this Paragraph 22 shall be effective immediately and without the necessity of the execution or filing by the Debtors of a security agreement, financing statements, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, landlord lien waivers, licensee consents or otherwise.

(b) subject to the provisions of the DIP Loan Agreement, the DIP Loan Documents, and this Final Order, until all Pre-Petition Indebtedness has been paid and the Investigation Termination Date has passed with no action taken or challenge made to the Pre-Petition Liens or the Pre-Petition Indebtedness in accordance with Paragraph 9 of this Final Order, and in an effort to provide adequate protection, pursuant to Section 361, 362, 363 and 364 of the Bankruptcy Code of the interests of the Pre-Petition Lender under the Pre-Petition Loan Agreement, unless and until the occurrence of an Event of Default pursuant to and as defined in the DIP Loan Agreement, the Debtors are authorized and directed to pay to the Pre-Petition Lender for application to the Pre-Petition Indebtedness all collections on accounts and sales of inventory, including current interest on the Pre-Petition Indebtedness as adequate protection payments to the Pre-Petition Lender, all as set forth in the DIP Loan Agreement. All such payments are adequate protection payments and are to be afforded the full and complete protection given to such payments under the Bankruptcy Code. In the Second Interim Order, the Court ordered that such payments of, and applications to, the Pre-Petition Indebtedness of all collections on accounts and sales of inventory, including current interest

30

on the Pre-Petition Indebtedness, through June 23, 2017 were approved on a final basis, subject to the Committee's challenge rights with respect to the validity, priority, and extent of Key's Pre-Petition Liens as set forth in Paragraph 9 above.

(c) These payments are to be made to the Pre-Petition Lender because, among other things, the Debtors will continue to use the pre-petition collateral that secures the claims and obligations owing under the Pre-Petition Credit Agreement. Such payments are being made for the purpose of, among other things, protecting the Pre-Petition Lender's claims and obligations, and collateral interest from such use and the potential depreciation and deterioration of the collateral as a result thereof. In addition, the Debtors shall timely make regular payments of principal and interest on the 1st day of each month under the Amended and Restated CapEx Note Loan dated as of April 14, 2014 (as the same has been amended, amended and restated or modified from time to time).

(d) in order to provide adequate protection for all of the Pre-Petition Indebtedness owed to the Pre-Petition Lender, the Pre-Petition Lender is hereby granted pursuant to Sections 361, 362, 363(e), 364(c)(1) and 364(d) of the Bankruptcy Code an allowed claim having priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 105, 503(b) and 507(b) of the Bankruptcy Code, and except for the fees of the U.S. Trustee and court fees, all as more fully set forth herein below, subject only to (i) certain unpaid fees, costs, expenses and disbursements incurred after the Petition Date and which are unpaid on the Termination Date (as defined in the DIP Loan Agreement), and which have been, or may be, awarded by the Court pursuant to Sections 330 and 331 of the

31

Bankruptcy Code in an aggregate amount not to exceed the Carve-Out Amount (as that term is defined herein), all as more fully set forth herein, and (ii) the allowed administrative claim granted to the DIP Lender pursuant to paragraph 10(a) above. The super-priority administrative claim granted to the Pre-Petition Lender under this Final Order shall not include Chapter 5 Avoidance Actions or the proceeds thereof.

(e) The Pre-Petition Lender is granted the above referenced adequate protection post-petition claims for any diminution in the value of its respective interests in the Collateral from the Petition Date resulting from (i) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Collateral by the Debtors, and (ii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

(f) Notwithstanding any provision of the Interim Orders, this Final Order, or the Pre-Petition Loan Documents to the contrary, the Pre-Petition Lender reserves, and this Final Order is without prejudice to, its rights to, among other things, seek additional adequate protection.

**23  Fees for DIP Loan Agreement**.  The commitment fees paid to the DIP Lender pursuant to the Interim Orders, DIP Loan Agreement and the other DIP Loan Documents were reasonable, fully-earned when due, and non-refundable when paid.

**24  Subsequent Reversal or Modification**.  This Final Order is entered pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code.  The DIP Lender is entitled to all protection afforded by Sections 364(e) and 363(m) of the Bankruptcy Code.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such

reversal, stay, modification or vacation shall not affect: (y) the validity of any obligation, indebtedness or liability incurred post-petition hereunder by any of the Debtors to the DIP Lender prior to the date of receipt of written notice to the DIP Lender of the effective date of such reversal, stay, modification or vacation; or (z) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement or the other DIP Loan Documents.  Notwithstanding any such reversal, stay, modification or vacation, any indebtedness, obligation or liability incurred post-petition hereunder by any of the Debtors to the DIP Lender prior to written notice to the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this  Final Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the DIP Loan Agreement and the other DIP Loan Documents with respect to all such indebtedness, obligation or liability.

**25  No Waiver**.  This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that DIP Lender may have to bring or be heard on any matter brought before this Court.

**26  No Dismissal; No Sale**.  The Debtors shall not request any order dismissing or converting any of these Cases under Section 1112 unless each and every Obligation of the Borrowers to the DIP Lender shall have been paid indefeasibly in full in cash and completely satisfied prior to the entry thereof.  No order providing for the sale of any of the Debtors or the sale of all or substantially all of any of the Debtor's assets under Section 363 or otherwise

33

shall be entered unless either: (i) all Post-Petition Obligations will be paid indefeasibly in full in cash and completely satisfied as part of such transaction within one business day of the sale closing; or (ii) the DIP Lender expressly consents otherwise.

**27  Supremacy of Terms.**  To the extent of any conflict between or among the express terms or provisions of any of the Pre-Petition Loan Documents, DIP Loan Documents, the Motion, or any other agreements and the express written terms and provisions of this Final Order, the terms and provisions of this Final Order shall govern. Notwithstanding any contrary provision within any document or agreement, except as expressly provided in this Final Order, the DIP Loan Agreement or the other DIP Loan Document, or as consented to by the DIP Lender in writing, (i) no other liens or priority status, other than the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, having a lien or administrative priority superior to or pari passu with that granted by this Final Order to the Agent and the DIP Lender, shall be granted while any portion of the Post-Petition Obligations or the Commitments under the DIP Loan Agreement remains outstanding, and (ii) the DIP Lender shall have no obligation to make loans available to or for the benefit of the Debtors, to fund the Debtor's operations, or to pay expenses incurred by the Debtors prior or subsequent to the entry of this Final Order.  The Committee shall simultaneously receive any financial reporting and/or sale process updates sent by the Debtors to Key.

**28  Proofs of Claim.**  The Pre-Petition Lender (Key) and the DIP Lender shall not be required to file proofs of claim in the Cases or in any successor cases, but shall fully

34

cooperate in providing documents as requested as part of any investigation conducted under the terms of paragraph 9 of this Final Order .

29 **Adequate Notice**.  The notice given by the Debtors of the Final Hearing was given in accordance with Bankruptcy Rule 4001(c)(2) and the terms of the Interim Orders.

SO ORDERED, this 26th day of June, 2017.

_____
Hon. Margaret Cangilos-Ruiz
United States Bankruptcy Court Judge

[CONSENT SIGNATURES ON NEXT PAGE]

Consented to and Approved
as to Form and Substance:

Counsel for the Debtors and
Debtors-in-Possession:


/s/_____
Jeffrey Dove, Esq.
Menter, Rudin & Trivelpiece, P.C.

Counsel for Non-Debtor Borrowers:

/s/_____
William A. Hoy, IV, Esq.
Harter, Secrest & Emery, LLP

Counsel for Key Bank, National Association:

/s/_____
Scott N. Opincar, Esq.
McDonald Hopkins, LLC


Counsel for the Official Committee of Unsecured Creditors:

/s/_____
Eric Chafetz, Esq.
Lowenstein Sandler LLP


The Office of the United States Trustee:

/s/_____
Guy A. Van Baalen, Esq.
Assistant U.S. Trustee